## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DOE CORPORATION 1**<br><br>**DOE CORPORATION 2**<br><br>**DOE CORPORATION 3**<br><br>**DOE CORPORATION 4**<br>c/o Skadden, Arps, Slate, Meagher & Flom LLP<br>1440 New York Ave. NW<br>Washington, DC 20005<br><br>    *Plaintiffs*,<br><br>      v.<br><br>**INTER-AMERICAN DEVELOPMENT BANK**<br>1300 New York Ave. NW<br>Washington, DC 20577<br><br>    *Defendant*. | Civil Action No. _____ |

## COMPLAINT

1.      This is an action arising under the federal statute governing suits against the Inter-American Development Bank (the "IDB"), 22 U.S.C. § 283f.  Plaintiffs Doe Corporation 1, Doe Corporation 2, Doe Corporation 3, and Doe Corporation 4 (collectively, "Doe Corporations") seek relief against the IDB as a result of the IDB's unlawful and illegitimate exercise of enforcement authority against Doe Corporations.

## INTRODUCTION

2.      This action challenges the IDB's assumption of police power untethered to any source of authority.  In violation of both its governing charter and its contracts with Doe Corporations, the IDB has initiated formal internal enforcement proceedings (referred to as

"sanctions proceedings") against Doe Corporations based on alleged conduct that occurred more than a year before the parties executed a single agreement or the IDB disbursed a single dollar to Doe Corporations. The IDB's power grab immediately subjects Doe Corporations to unauthorized sanctions proceedings without any opportunity for external review. And, given that the enforcement process is heavily biased toward the IDB, the pending proceedings likely will culminate in the imposition of a range of highly punitive sanctions against Doe Corporations that will hamstring their ability to undertake development projects throughout the world, imperil their significant investment in the underlying commercial project, and cause indelible reputational harm, among other far-reaching consequences.

3.     Doe Corporation 1, Doe Corporation 2, and Doe Corporation 3 entered into a series of financing agreements with the IDB in 2018 to facilitate a commercial project (the "Commercial Project") with which the IDB was not otherwise involved. Those agreements, in tandem with the IDB's charter, clearly demarcate the IDB's authority over Doe Corporations. The IDB may initiate sanctions proceedings against Doe Corporations based only on specific, enumerated categories of conduct—and only if that conduct post-dates the parties' execution of the financing agreements that form the basis of the parties' relationship.

4.     Despite these clear limitations on its authority, the IDB has initiated sanctions proceedings against Doe Corporations based exclusively on alleged activities that occurred over a year before the commencement of any contractual relationship between Doe Corporations and the IDB. The IDB's commencement of sanctions proceedings in these circumstances is not rooted in any source of authority. It also violates the terms of the contractual agreements between the IDB and Doe Corporations, none of which purports to confer such all-encompassing power on the IDB.

5.      If allowed to continue, the sanctions proceedings against Doe Corporations will cause irreparable harm.  Doe Corporations are now on the clock, forced to defend themselves in unauthorized, one-sided proceedings almost certain to result in the imposition of draconian sanctions, with no possibility of outside review.  Doe Corporations have been and will continue to be subject to severe and irreversible reputational harm through the imminent disclosure of the IDB's investigation, unsubstantiated allegations, and findings, even though the proceedings have been illegitimate from the start.  Such disclosures also will jeopardize Doe Corporations' long-term investment in the Commercial Project.

6.      The IDB's initiation of sanctions proceedings against Doe Corporations reflects a particularly egregious about-face.  Doe Corporations proactively raised the spurious allegations of misconduct that had surfaced and now form the predicate for the IDB's enforcement activity.  Doe Corporations then cooperated with an IDB affiliate's ensuing investigation of the allegations, voluntarily providing detailed information.  The IDB and other lenders continued to provide the agreed-on loan disbursements to Doe Corporations uninterrupted, even after the allegations surfaced.  Those disbursements continued following the completion of the inquiry, until the IDB abruptly reversed course and manufactured a case fit for sanctions.

7.      Doe Corporations bring this action to vindicate the terms of their contractual relationship with the IDB, confirm fundamental limitations on the IDB's power, and enjoin the IDB from unlawfully continuing sanctions proceedings and imposing onerous penalties.

**PARTIES**

8.      Plaintiff Doe Corporation 1 is a corporation that is incorporated and has its principal place of business outside of the United States.

9.      Plaintiff Doe Corporation 2 is a subsidiary of Doe Corporation 1 that is incorporated and has its principal place of business outside of the United States.

10.     Plaintiff Doe Corporation 3 is a subsidiary of Doe Corporation 1 that is incorporated and has its principal place of business outside of the United States.

11.     Plaintiff Doe Corporation 4 is a subsidiary of Doe Corporation 1 that is incorporated and has its principal place of business in the United States.

12.     Defendant Inter-American Development Bank is an international financial institution established pursuant to the Agreement Establishing the Inter-American Development Bank, *opened for signature* Apr. 8, 1959, 10 U.S.T. 3068 (the "Charter").  The IDB is domiciled in the District of Columbia.

## JURISDICTION AND VENUE

13.     This Court has subject-matter jurisdiction over this action pursuant to 22 U.S.C. § 283f and 28 U.S.C. §§ 1331 and 1332.

14.     Pursuant to 22 U.S.C. § 288a(b) and 28 U.S.C. § 1605(a)(1), the IDB has waived any immunity under the International Organizations Immunities Act (the "IOIA"), 22 U.S.C. §§ 288-288f, that it otherwise might have claimed as a defense to the claims asserted in this Complaint.

15.     This Court has personal jurisdiction over the IDB under 22 U.S.C. § 283f.

16.     Venue properly lies in this Court under 22 U.S.C. § 283f.

## FACTS

### I.    The Commercial Project and the Financing Agreements

17.    Doe Corporation 3, a subsidiary of Doe Corporation 1, executed an agreement to complete the Commercial Project (the "Commercial Project Agreement").  The IDB was not involved with the Commercial Project at this point.

18.    In 2018—more than a year after the Commercial Project Agreement was executed—Doe Corporation 1, Doe Corporation 2, and Doe Corporation 3 entered into agreements to obtain financing from the IDB and other parties to fund the Commercial Project.

19.    First, Doe Corporation 3 entered into the Common Terms Agreement with the IDB (expressly through its agent, the Inter-American Investment Corporation ("IDB Invest")), IDB Invest (in its own and other capacities), and other lenders (collectively, the "Senior Lenders"). Ex. A to Compl. and Mot. to Proceed Under Pseudonym ("Combined Ex. A"), Common Terms Agreement ("CTA").[1]

20.    Second, Doe Corporation 3 entered into the IDB Group Senior Loan Agreement (the "Senior Loan Agreement") with the IDB (again expressly through its agent, IDB Invest) and IDB Invest.  Combined Ex. B, Senior Loan Agreement.

---

[1]    Combined Exhibit A consists of the main Common Terms Agreement and Annex 1 thereto.

Consistent with Doe Corporations' request for relief in their contemporaneously filed Motion to Proceed Under Pseudonym, Doe Corporations have filed Exhibits A through H to this Complaint as slipsheets.  Doe Corporations are filing full and unredacted versions of those Exhibits under seal as attachments to their Motion to Proceed Under Pseudonym. Consequently, this Complaint (and other contemporaneously filed documents) refers to these documents as "Combined Exhibits" to both the Complaint and Motion to Proceed Under Pseudonym.  Exhibits I and J to this Complaint are not being filed under seal, and are thus referred to as "Exhibits."

21.     The Common Terms Agreement and the Senior Loan Agreement (collectively, the "Loan Agreements") reflect the agreement between the Senior Lenders (including the IDB) to lend, and Doe Corporation 3 to borrow, "subject to the terms and conditions set forth" within those documents. Combined Ex. A, CTA, at 2; Combined Ex. B, Senior Loan Agreement, at 1. Neither the IDB nor IDB Invest had any prior involvement with any aspect of the Commercial Project.

22.     Doe Corporation 1, Doe Corporation 2, and Doe Corporation 3 entered into several additional agreements with the IDB and other entities relevant to this transaction. Relevant here, all entered into an Equity Contribution and Subordination Agreement with the Senior Lenders and other entities. *See* Combined Ex. C, Equity Contribution and Subordination Agreement ("ECSA"). The parties' entry into the Equity Contribution and Subordination Agreement was a condition precedent to the first disbursement of each senior loan to Doe Corporation 3. *See id.*, at 3 (stating also that Doe Corporation 1, Doe Corporation 2, and Doe Corporation 3 entered into the agreement "[i]n consideration of each Senior Lender entering into the Common Terms Agreement and each Senior Loan Agreement").[2]

---

[2]     Combined Exhibit C consists of the main Equity and Subordination Agreement, but omits appendices.

None of these other agreements conflicts with or differs in material respects from the Common Terms Agreement or the Senior Loan Agreement. Indeed, the entire corpus of agreements between Doe Corporations and the IDB are to be treated as a unified whole. *See, e.g.*, Combined Ex. A, CTA § 7.12 (incorporating other agreements into an integration clause); Combined Ex. C, ECSA § 1.1–1.2 (incorporating definitions and interpretation principles from CTA); 6 (including Doe Corporations 1, 2, and 3 within the definition of "Loan Party"). Accordingly, although Doe Corporation 1 and Doe Corporation 2 did not separately execute the Common Terms Agreement or the Senior Loan Agreement, both Agreements effectively have been incorporated into the other agreements to which Doe Corporation 1 and Doe Corporation 2 are parties for all purposes relevant to this action. *See generally* Combined Ex. A, CTA § 6.1 (articulating various events of default based on conduct by "Loan Parties," including Doe Corporation 1 and Doe Corporation 2).

23.     Doe Corporation 3 received installments of the IDB loan in 2019 and 2020.  Doe Corporation 3 has timely made all payments on the loan to date, and Doe Corporations have otherwise adequately performed all of the contractual obligations owed to the IDB and the other counterparties.

## II.     The IDB's Investigation and Commencement of Sanctions Proceedings

24.     In 2020, the Office of Institutional Integrity (the "OII"), a division of the IDB, began to investigate events concerning the execution of the Commercial Project Agreement.  The OII's investigation centered exclusively on conduct that pre-dates, by more than a year, the beginning of the contractual relationship between Doe Corporations and the IDB and the disbursement of any funds.

25.     Prior to the OII's commencement of the investigation—and before receiving the first loan disbursement—Doe Corporations proactively informed IDB Invest of allegations that had surfaced regarding the award of the Commercial Project Agreement.  Doe Corporations steadfastly denied the allegations and provided information to demonstrate that the allegations were unfounded.

26.     IDB Invest, which had already conducted extensive due diligence related to the Commercial Project, inquired further about the allegations.  Doe Corporations cooperated with these due diligence efforts by, among other things, providing detailed information and documentation to refute the allegations.  Doe Corporations also provided information in response to questions from senior IDB Invest personnel and requests from the Senior Lenders' outside legal counsel.  IDB Group[3] policy permitted IDB Invest to disclose the information provided by Doe

---

[3]     The IDB Group is comprised of IDB, IDB Invest, and the Multilateral Investment Fund, also known as "IDB Lab").

Corporations to the OII.  IDB Invest ultimately ceased its inquiries regarding the allegations and continued its support of the Commercial Project.

27.    Doe Corporation 3 received the first disbursement of loan funds from the IDB (and IDB Invest) shortly after disclosing the allegations.  Doe Corporation 3 continued to receive additional loan disbursements both during and after the subsequent diligence process, consistent with the parties' agreements.

28.    Nevertheless, in early 2020—well after Doe Corporations' disclosure of the allegations and accompanying provision of information in response to IDB Invest's inquiries—the OII notified Doe Corporations that it was initiating an investigation into the award of the Commercial Project Agreement.  OII issued a series of requests for documents and information.  Once again, Doe Corporations fully cooperated with that investigation to try to resolve the matter without the need to resort to adversarial proceedings within the IDB or in a U.S. court.  At the same time, Doe Corporations made clear both that the allegations are without merit and that the IDB lacks the authority to initiate sanctions proceedings against Doe Corporations for alleged conduct that pre-dates the parties' contractual relationship and does not relate to any funds that the IDB disbursed under the Loan Agreements.  Doe Corporations provided the OII with a voluminous record in support of this contention, including a report in which government auditors concluded, following an extensive audit, that the Commercial Project Agreement had been properly awarded.

29.    Unfortunately, the parties' negotiations to resolve the matter were unsuccessful, and, on September 24, 2024, the OII issued written notice that it was terminating the negotiated resolution process.

30.    On April 28, 2025, the IDB's Office of the Sanctions Officer issued a separate Notice of Administrative Action to each of Doe Corporation 1, Doe Corporation 2, Doe

Corporation 3, and Doe Corporation 4 (the "Notices"), pursuant to the IDB's Sanctions Procedures.  Combined Exs. D–G, Notices.  The Notices clarify that the charges, and the IDB's sanctions proceedings, are "linked" to the Common Terms Agreement, the Senior Loan Agreement, and the Equity Contribution and Subordination Agreement.  *See,* Combined Ex. D, Notice to Doe Corporation 1, at 1.  Alongside the Notices, the IDB provided Doe Corporations with the OII's Statement of Charges and Evidence (the "Statement of Charges"), which the OII had presented to the Sanctions Officer.  Combined Ex. H, Statement of Charges.

31.     The Statement of Charges asserts that a "preponderance of the evidence" shows that Doe Corporation 1 and Doe Corporation 2 engaged in so-called "Prohibited Practices," a category of conduct defined in the Sanctions Procedures.  *See* ¶¶ 40–41 *infra*.  The Statement of Charges further claims that Doe Corporation 3 and Doe Corporation 4 may be sanctioned to the same extent as Doe Corporation 1 and Doe Corporation 2 as a result of the supposed commission of those Prohibited Practices.

32.     All of the conduct that forms the basis of the charges against Doe Corporations pre-dates the execution of the Loan Agreements and the Equity Contribution and Subordination Agreement by a year or more.  None of the alleged misconduct relates to the use of any funds that the IDB provided to Doe Corporations.

33.     Service of the Notices triggered the IDB's formal sanctions proceedings against Doe Corporations.  The Notices request Doe Corporations' response to the Sanctions Officer's assertions by June 27, 2025.  The Notices make clear that Doe Corporations' failure to respond to the allegations will be considered an admission of the allegations and a waiver of any future right to appeal the Sanctions Officer's final determination to the IDB's Sanctions Committee.  *See, e.g.*, Combined Ex. D, Notice to Doe Corporation 1, at 1, 5.

34. Doe Corporations have incurred, and will continue to incur, expenses, including, but not limited to, attorneys' fees, in responding to the Notices and otherwise participating in the sanctions proceedings pending resolution of this action and Doe Corporations' request for preliminary injunctive relief. Those expenses exceed $75,000.

## III. Scope of the IDB's Enforcement Authority

35. The IDB is an international organization that was created by a multinational agreement (the Charter). *See* Ex. I, Charter. The IDB derives its authority from the Charter.

### A. The Charter

36. The Charter identifies the IDB's "purpose" as "contribut[ing] to the acceleration of the process of economic and social development of the regional development member countries, individually and collectively." Ex. I, Charter, Art. I, § 1. The Charter grants specific "functions" to the IDB "[t]o implement its purpose." *Id.*, Art. I, § 2(a). As is relevant here, the Charter states that the IDB "shall" "promote the investment of public and private capital for development purposes," "utilize its own capital . . . for financing the development of the member countries," and "encourage private investment in projects, enterprises, and activities contributing to economic development and . . . supplement private investment when private capital is not available on reasonable terms and conditions." *Id.*, Art. I, §§ 2(a)(i)–(iii).

37. The Charter grants the IDB carefully circumscribed enforcement authority. It provides that the IDB "shall take the necessary measures to ensure that the proceeds of any loan made, guaranteed, or participated in by the Bank are used only for the purposes for which the loan was granted, with due attention to considerations of economy and efficiency." *Id.*, Art. III, § 9(b).

38. The IDB's enforcement authority thus is limited to events following the execution of financing agreements with a loan recipient and the disbursement of funds. After all, the IDB

must enter an agreement with the recipient outlining the "purposes for which the loan was granted" before it can invoke its power to ensure that the loaned funds are used in a manner consistent with those purposes. *Id.* And the IDB must actually transfer funds to a recipient before it can exercise its authority to trace the "proceeds" of the "loan." *Id.*

    **B.**    **Sanctions Procedures**

    39.    To implement the enforcement authority granted by the Charter, the IDB, along with the other members of the IDB Group, has adopted Sanctions Procedures. The Sanctions Procedures apply to the IDB Group's contractual counterparties. They "are to be followed in connection with allegations of fraud and corruption in Projects of the [IDB and IDB Invest]." Ex. J, 2015 Sanctions Procedures § 1.1.[4]

    40.    "Parties subject to [the Sanctions] Procedures are prohibited from engaging in [Prohibited Practices]." *Id.* § 2.2. The Sanctions Procedures define five categories of Prohibited Practices. *Id.* § 2.2(a) ("A '*Corrupt Practice*' is the offering, giving, receiving, or soliciting, directly or indirectly, anything of value to influence improperly the actions of another party."); *id.* § 2.2(b) ("A '*Fraudulent Practice*' is any act or omission, including a misrepresentation, that knowingly or recklessly misleads, or attempts to mislead, a party to obtain a financial or other benefit or to avoid an obligation."); *id.* § 2.2(c) ("A '*Coercive Practice*' is impairing or harming, or threatening to impair or harm, directly or indirectly, any party or the property of the party to influence improperly the actions of a party."); *id.* § 2.2(d) ("A '*Collusive Practice*' is an arrangement between two or more parties designed to achieve an improper purpose, including

---

[4]    The Complaint refers to the 2015 Sanctions Procedures, which were in place at the time that the parties executed the Loan Agreements and, accordingly, control here. In any event, the relevant provisions of the current Sanctions Procedures are virtually identical in all respects material to this action.

influencing improperly the actions of another party."); *id.* § 2.2(e) ("An '*Obstructive Practice*' is (a) deliberately destroying, falsifying, altering or concealing evidence material to the investigation or making false statements to investigators in order to materially impede a Bank Group investigation into allegations of a corrupt, fraudulent, coercive or collusive practice; and/or threatening, harassing or intimidating any party to prevent it from disclosing its knowledge of matters relevant to the investigation or from pursuing the investigation; or (b) acts intended to materially impede the exercise of the Bank Group's inspection and audit rights.").

41.    The Sanctions Procedures permit the IDB to initiate sanctions proceedings only after the OII concludes "that a preponderance of the evidence supports a finding of a Prohibited Practice." *Id.* § 3.3.  Likewise, the IDB may ultimately impose sanctions only "[u]pon a finding that the Respondent engaged in a Prohibited Practice." *Id.* § 8.1.

42.    Three aspects of the Sanctions Procedures confirm that the IDB's authority to initiate sanctions proceedings and impose sanctions must be based on conduct following the execution of the relevant financing agreements.  First, the Sanctions Procedures come into force only after the relevant loan agreement is executed. *See id.* § 1.2.  Second, the Sanctions Procedures themselves operate only prospectively.  They permit the initiation of sanctions proceedings and the imposition of sanctions only on persons "*engaging* in [Prohibited Practices]." *Id.* § 2.2 (emphasis added).  Third, the Sanctions Procedures define the relevant Prohibited Practices in a forward-looking manner, using the present tense. *Id.*

C.    **Financing Agreements**

43.    The financing agreements executed by Doe Corporations do not augment the enforcement authority that the Charter and Sanctions Procedures grant the IDB.  Nothing in the Loan Agreements, or in the Equity Contribution and Subordination Agreement, authorizes the IDB

12

to initiate sanctions proceedings against Doe Corporations based on conduct pre-dating the execution of the agreements. To the contrary, these agreements reinforce that the IDB's authority to initiate sanctions proceedings is prospective only.

44.     The Common Terms Agreement enumerates fifteen "Events of Default" for which the IDB may seek redress. Combined Ex. A, CTA § 6.1. It separately defines "Policy Events of Default." *Id.* Annex 1-28. These categories encompass "events of default" based on the conduct of other Loan Parties as defined by the relevant contractual agreements (including, for example, the parties to the Equity Contribution and Subordination Agreement). None of those Events of Default or Policy Events of Default involves the commission of Prohibited Practices—or, indeed, any conduct—before the execution of the Common Terms Agreement.

45.     Similarly, the Senior Loan Agreement states that Doe Corporation 3 "shall not engage in (or authorize or permit any Affiliate or any other Person acting on its behalf to engage in) any Prohibited Practice with respect to the Project." Combined Ex. B, Senior Loan Agreement § 3.3.3. This language is solely prospective, barring Doe Corporations from committing Prohibited Practices ***after*** the execution of the Senior Loan Agreement. *Id.* The same language is present as applied to Doe Corporation 1 and Doe Corporation 2 in the Equity Contribution and Subordination Agreement. Combined Ex. C, ECSA § 4.1. As with the Sanctions Procedures, both agreements define Prohibited Practices in an exclusively forward-looking manner. *See* Combined Ex. B, Senior Loan Agreement, Annex 1; Combined Ex. C, ECSA, at 8 (incorporating definition from Senior Loan Agreement).

46.     The Common Terms Agreement enumerates five remedies for Events of Default and Policy Events of Default. *Id.* § 6.2.3. The Agreement does not expressly mention sanctions proceedings or any other type of administrative enforcement action. At most, the Agreement refers

to the Sanctions Procedures only indirectly, in the catch-all remedies clause, which permits the IDB to "exercise any other remedies that may be available to it under any Financing Document or *Applicable Law*." *Id.* §§ 6.2.3(a)(v), 6.2.3(b)(iii) (emphasis added). To the extent that the Sanctions Procedures are incorporated into the Agreement, then, they are incorporated without modification through the term "Applicable Law." Thus, the Common Terms Agreement reinforces that sanctions proceedings may be initiated against Doe Corporations based solely on Prohibited Practices committed after the execution of the Agreement, consistent with the plain text of the Sanctions Procedures.

47.     Likewise, the Senior Loan Agreement provides that "it shall be a Policy Event of Default if any Loan Party . . . engages in a Prohibited Practice in connection with the Project." *Id.* § 3.4.1(b). It also "incorporate[s]" the remedies provisions from the Common Terms Agreement. *Id.* § 3.4.1(a). Like the Common Terms Agreement, then, the Senior Loan Agreement limits the IDB's authority to impose sanctions to Doe Corporations' commission of Prohibited Practices following the execution of the Agreement.

## IV.    The IDB's Breach of the Loan Agreements

48.     By initiating sanctions proceedings against Doe Corporations based exclusively on conduct pre-dating the execution of the Loan Agreements, the IDB has breached the Loan Agreements in at least two fundamental ways.

49.     First, the IDB has breached the provisions in the Loan Agreements that enumerate the Events of Default and Policy Events of Default for which the IDB may seek relief. The Common Terms Agreement includes a comprehensive list of fifteen Events of Default and exhaustively describes Policy Events of Default. Combined Ex. A, CTA § 6.1, Annex 1-28. The Senior Loan Agreement incorporates those lists (adding a single event that relates solely to the

14

prospective commission of Prohibited Practices).   Combined Ex. B, Senior Loan Agreement § 3.4.1; *see also* ¶ 47, *supra*.  These provisions of the Loan Agreements identify the entire universe of acts by Doe Corporations for which the IDB may seek relief.  The commission of Prohibited Practices before execution of the Loan Agreements is not within that universe.  Accordingly, the IDB's commencement of the present sanctions proceeding against Doe Corporations, which is exclusively based on alleged Prohibited Practices pre-dating entry into the Loan Agreements, breached the Loan Agreements.

50.    Second, the IDB has breached the provisions in the Loan Agreements that enumerate the remedies available to the IDB based on an Event of Default or Policy Event of Default.  The Loan Agreements include an exhaustive list of five potential remedies in such circumstances.  Combined Ex. A, CTA § 6.2.3; *accord* Combined Ex. B, Senior Loan Agreement § 3.4.1(a) (incorporating CTA § 6.2.3).  They do not explicitly authorize the commencement of sanctions proceedings in response to the alleged commission of an Event of Default or Policy Event of Default.  At most, the Loan Agreements incorporate the Sanctions Procedures, if at all, only insofar as they permit the IDB to "exercise any other remedies that may be available to it under . . . Applicable Law."  Combined Ex. A, CTA § 6.2.3; *accord* Combined Ex. B, Senior Loan Agreement § 3.4.1(a) (incorporating CTA § 6.2.3).  But the Sanctions Procedures authorize the IDB to commence sanctions proceedings based solely on Prohibited Practices committed after execution of the relevant financing agreements.  By nevertheless initiating sanctions proceedings as a result of conduct pre-dating the execution of the Loan Agreements, the IDB has breached the remedies provisions in the Loan Agreements.

**THE IDB'S WAIVER OF IMMUNITY**

51.     The IDB is a designated "international organization[]" under the IOIA and, accordingly, is afforded the "same" limited immunity from suit "as is enjoyed by foreign governments."  22 U.S.C. § 288a(b).

52.     As is relevant here, an international organization "shall not be immune . . . in any case . . . in which [it] has waived its immunity either explicitly or by implication."  28 U.S.C. § 1605(a)(1).

53.     The IDB has waived any immunity from the claims asserted in this Complaint through provisions in the financing agreements and through its Charter.

**I.      The Financing Agreements**

54.     Two provisions in the financing agreements establish the IDB's waiver of immunity from the claims asserted in this Complaint.

55.     First, the Loan Agreements each state that "[t]his Agreement and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement and the transactions contemplated hereby, including the validity, interpretation, construction, breach, enforcement or termination hereof, shall be governed by, and construed in accordance with, the law of the State of New York of the U.S.A."  Combined Ex. A, CTA § 7.10.1; Combined Ex. B, Senior Loan Agreement § 4.2.1.  A similar provision is contained in the Equity Contribution and Subordination Agreement.  *See* ¶ 22 n.2 *supra* and Combined Ex. C, ECSA §§ 6.10(a).  The IDB's acquiescence to the application of U.S. law to these agreements—including "any claims, controvers[ies], dispute[s] or cause[s] of action" arising out of those agreements—waives immunity from the claims asserted in this Complaint, which arise out of the agreements.

16

56.    Second, the Loan Agreements each state that the "Senior Lenders shall be entitled under Applicable Law, including the [IOIA], to immunity from *trial by jury* in any proceeding arising out of or relating to this Agreement."  Combined Ex. A, CTA § 7.10.11 (emphasis added); Combined Ex. B, Senior Loan Agreement § 4.2.2 (incorporating Common Terms Agreement § 7.10.11).   A similar provision is contained in the Equity Contribution and Subordination Agreement.  Combined Ex. C, ECSA § 6.10(j).  By specifying that it is immune *only* from jury trials, the IDB has waived immunity as to claims "arising out of or relating to" the agreements for which Doe Corporations seek any other form of judicial relief.  That waiver encompasses this action, in which Doe Corporations do not seek a trial by jury.

## II.    The Charter

57.    The IDB also has waived any immunity from the claims asserted in this Complaint through its Charter.

58.    The Charter includes a waiver of the IDB's immunity.  Ex. I, Charter, Art. XI, § 3 ("Actions may be brought against the Bank only in a court of competent jurisdiction in the territories of a member in which the Bank has an office, has appointed an agent for the purposes of accepting service or notice of process, or has issued or guaranteed securities.").

59.    The Charter waives the IDB's immunity as to the claims in this Complaint because adjudication of these claims will provide corresponding benefits to the IDB sufficient to justify a waiver of its immunity.  Through this action, Doe Corporations seek to clarify whether the IDB's enforcement authority extends to conduct that pre-dates and bears no relation to the execution of the financing agreements that form the basis of the parties' relationship or the disbursement of any funds pursuant to those agreements.

60.     Waiver of immunity from the claims in this Complaint will further the IDB's long-term objectives and organizational purposes of, among other things, "contribut[ing] to the acceleration of the process of economic and social development of the regional development member countries" by "promot[ing] the investment of public and private capital for development purposes" and encouraging and supplementing "private investment" in such projects and activities. *Id.*, Art. I, §§ 1, 2(a).  Without delineation of the IDB's enforcement authority, commercial entities (such as Doe Corporations) could hesitate to pursue, sponsor, or guarantee funding from the IDB Group, or to pursue IDB Group–affiliated or sponsored development projects, for fear of exposing themselves to intrusive enforcement activity and highly punitive sanctions for conduct that pre-dates any contractual relationship with the IDB and does not relate to any funds received from the IDB.  This risk is magnified by the IDB's ability to broadly assert the authority to sanction entities up and down the corporate chain, as it seeks to do in this case.  *See* Ex. J, 2015 Sanctions Procedures § 8.3.  The resulting chill in development and investment would seriously undermine the IDB's core mission.  Resolving the claims in this action thus would enhance the marketability of the IDB's financial products and the credibility of its activities in the lending markets.

61.     The significant benefits that the IDB will gain from a waiver of immunity here are not substantially outweighed by any burdens that the IDB would face in litigating this type of action.  Indeed, Doe Corporations' claims raise a categorical legal question: whether the IDB has the authority to initiate sanctions proceedings (and subsequently impose sanctions) based exclusively on conduct pre-dating the execution of the relevant financing agreements in the absence of contractual language expressly granting the IDB such authority.  Adjudication of Doe Corporations' claims thus would settle a generally applicable legal issue.  It would not open the

courthouse doors to a steady flow of lawsuits against the IDB or otherwise impermissibly intrude on the IDB's internal affairs.

## IRREPARABLE HARM

62.    Doe Corporations face irreparable harm if the IDB's unauthorized sanctions proceedings continue.

63.    Doe Corporations are now, and will continue to be, forced to participate in the IDB's sanctions proceedings even though the IDB lacks any authority to conduct those proceedings or to impose sanctions on Doe Corporations.  Without intervention by this Court, Doe Corporations will have no ability to obtain neutral review of the IDB's illegitimate assumption of power—which, given the IDB's overwhelming structural advantages in the enforcement proceedings, is almost certain to lead to adverse findings and draconian penalties against Doe Corporations.  These sanctions include the significant penalty of debarment, a determination that respondents are "ineligible, either permanently or for a stated period of time, to be awarded and/or participate in additional contracts for [IDB] projects."  Ex. J, 2015 Sanctions Procedures § 8.2.2.  Following such a determination by the IDB, other multilateral development banks likely would recognize and reciprocate the IDB's sanctions, leading to cross-debarment across approximately two dozen international financial institutions.

64.    Doe Corporations also will incur irreparable reputational harm when the IDB discloses the existence of those proceedings, the allegations of misconduct, and the ultimate disposition.  Doe Corporations' core commercial constituents—including government officials, financial institutions, and current and potential customers—will question Doe Corporations' ethics and fitness for business as a result of the IDB's disclosures.

65.     These harms already have begun to materialize.  Earlier this year, for example, a government agency in a country in which Doe Corporations conduct significant business invited a subsidiary of Doe Corporation 1 to participate in a prominent regional event that the agency hosts in partnership with the IDB.  This was a significant opportunity for the subsidiary (and its affiliates, including Doe Corporations) to garner attention and attract new business.  However, the government agency subsequently barred the subsidiary from participating in the event after the IDB told the agency that it had "integrity concerns" with Doe Corporations, in breach of the IDB's own requirements to keep its investigations confidential.

66.     The IDB's actions thus have already jeopardized Doe Corporations' business standing in a key market at a critical time in Doe Corporations' ongoing negotiations for further investment in that market.  Absent the requested remedy, the IDB's dissemination of information concerning the allegations against Doe Corporations will thwart Doe Corporations' ability to maintain existing business relationships and create new ones in a way that cannot be remediated through monetary damages after the fact.

67.     Continuation of the pending sanctions proceedings also will imperil the Commercial Project itself, with the potential for depriving Doe Corporations of the rewards of their significant investment, upending years of construction, and jeopardizing the future of a vital public development project.

68.     Disclosure of the IDB's investigation and sanctions proceedings also will threaten Doe Corporations' ability to secure funding and regulatory approvals needed for their core business activities.  Without this Court's intervention, Doe Corporations' ability to complete complex development projects—which are essential to their business and survival—will be severely compromised.

69.    Monetary damages cannot fully compensate Doe Corporations for these and other harms that would occur if the IDB's enforcement proceedings are permitted to continue.

70.    The equitable relief requested by Doe Corporations is warranted when balancing the hardships faced by Doe Corporations and the IDB.  The public interest would not be disserved by entry of the preliminary and permanent injunctions requested by Doe Corporations.

## CAUSES OF ACTION

### I.    Count One:  Breach of Contract

71.    All preceding paragraphs are repeated, re-alleged, and incorporated as if fully set forth in this paragraph.

72.    In 2018, Doe Corporation 3 and the IDB (expressly through its agent, IDB Invest) entered into the Loan Agreements.  The Loan Agreements are valid written contracts.

73.    Doe Corporation 1 and Doe Corporation 2 assumed obligations through the execution of the Equity Contribution and Subordination Agreement with the IDB, which effectively incorporated the Loan Agreements.   The Equity Contribution and Subordination Agreement is a valid written contract.

74.    Doe Corporations have adequately performed under these Agreements.

75.    Nothing in these Agreements grants the IDB the authority to initiate enforcement proceedings against, or impose sanctions on, Doe Corporations for alleged conduct that occurred before the parties' contractual relationship.

76.    The Common Terms Agreement enumerates fifteen Events of Default and additional Policy Events of Default.  Combined Ex. A, CTA § 6.1, Annex 1-28.  The Senior Loan Agreement incorporates those lists and definitions, adding one Policy Event of Default.  Combined Ex. B, Senior Loan Agreement § 3.4.1.  These provisions of the Loan Agreements are exhaustive

and identify all of the acts by Doe Corporations for which the IDB may seek redress. The commission of Prohibited Practices before the execution of the Loan Agreements is not among those acts.

77.    By instituting sanctions proceedings against Doe Corporations for allegedly engaging in Prohibited Practices before the execution of the Loan Agreements, the IDB has breached the Events of Default and Policy Events of Default provisions of the Loan Agreements.

78.    Additionally, the Loan Agreements include an exhaustive list of five potential remedies for committing Events of Default or Policy Events of Default. Combined Ex. A, CTA § 6.2.3; *accord* Combined Ex. B, Senior Loan Agreement § 3.4.1(a) (incorporating CTA § 6.2.3). The remedies do not expressly mention sanctions proceedings. At most, the Loan Agreements incorporate the Sanctions Procedures, if at all, only insofar as they permit the IDB to "exercise any other remedies that may be available to it under . . . Applicable Law." Combined Ex. A, CTA § 6.2.3; *accord* Combined Ex. B, Senior Loan Agreement § 3.4.1(a) (incorporating CTA § 6.2.3). The Sanctions Procedures, in turn, authorize the IDB to initiate sanctions proceedings based solely on Prohibited Practices committed after execution of the relevant financing agreements.

79.    By initiating sanctions proceedings against Doe Corporations based on alleged actions that exclusively pre-date the execution of the Loan Agreements, the IDB has breached the remedies provisions in the Loan Agreements.

80.    The IDB's breach of the Loan Agreements is material.

81.    The IDB's breach has caused Doe Corporations immediate financial harm. Doe Corporations have expended and will be forced to continue to expend resources to defend themselves in the sanctions proceedings. Those expenses exceed $75,000.

82.     The IDB's breach also has caused Doe Corporations harm that cannot be remedied solely through monetary damages.  In particular, Doe Corporations have been forced to defend themselves in illegitimate sanctions proceedings and will incur irreparable reputational and other harm upon disclosure of those, the underlying allegations, and the ultimate disposition.

83.     The equitable relief requested by Doe Corporations is warranted when balancing the hardships faced by Doe Corporations and the IDB.  The public interest would not be disserved by entry of the preliminary and permanent injunctions requested by Doe Corporations.

## II.     Count Two:  Breach of the Implied Covenant of Good Faith and Fair Dealing

84.     All preceding paragraphs are repeated, re-alleged, and incorporated as if fully set forth in this paragraph.

85.     In 2018, Doe Corporation 3 and the IDB (expressly through its agent, IDB Invest) entered into the Loan Agreements.  The Loan Agreements are valid written contracts.

86.     Doe Corporation 1 and Doe Corporation 2 assumed obligations through the execution of the Equity Contribution and Subordination Agreement with the IDB, which effectively incorporated the Loan Agreements.  The Equity Contribution and Subordination Agreement is a valid written contract.

87.     Under New York law, which governs the Loan Agreements and the Equity Contribution and Subordination Agreement, the IDB owes Doe Corporations an implied duty of good faith and fair dealing.  This duty includes the obligation not to destroy or injure Doe Corporations' rights to receive the fruits of those Agreements.

88.     Nothing in these agreements grants the IDB the authority to initiate enforcement proceedings against, or impose sanctions on, Doe Corporations for actions that occurred before the commencement of the parties' contractual relationship.

89.    The Common Terms Agreement enumerates fifteen Events of Default and additional Policy Events of Default.  Combined Ex. A, CTA § 6.1, Annex 1-28.  The Senior Loan Agreement incorporates those lists and definitions, adding one Policy Event of Default.  Combined Ex. B, Senior Loan Agreement § 3.4.1.  These provisions of the Loan Agreements are exhaustive and identify all the acts by Doe Corporations for which the IDB may seek redress.  The commission of Prohibited Practices before the execution of the Loan Agreements is not among those acts.

90.    Additionally, the Loan Agreements include an exhaustive list of five potential remedies for committing Events of Default or Policy Events of Default.  Combined Ex. A, CTA § 6.2.3; *accord* Combined Ex. B, Senior Loan Agreement § 3.4.1(a) (incorporating CTA § 6.2.3).  The remedies do not expressly mention enforcement proceedings.  At most, the Loan Agreements incorporate the Sanctions Procedures, if at all, only insofar as they permit the IDB to "exercise any other remedies that may be available to it under . . . Applicable Law."  Combined Ex. A, CTA § 6.2.3; *accord* Combined Ex. B, Senior Loan Agreement § 3.4.1(a) (incorporating CTA § 6.2.3).  The Sanctions Procedures, in turn, authorize the IDB to initiate sanctions proceedings based solely on Prohibited Practices committed after execution of the relevant financing agreements.

91.    The Equity Contribution and Subordination Agreement does not contain any provision that authorizes the initiation of sanctions proceedings in connection with a party's alleged commission of Prohibited Practices before the execution of that agreement (or the Loan Agreements).

92.    The Loan Agreements and the Equity Contribution and Subordination Agreement thus gave rise to a reasonable and implied promise that the IDB would not initiate sanctions proceedings against Doe Corporations based on alleged conduct pre-dating the agreements' execution—particularly given that the agreements were executed against the backdrop of the

Charter's and the Sanctions Procedures' limitation of the IDB's sanctions authority to conduct post-dating the execution of financing agreements. Such a fundamental promise, which determines the scope of far-reaching sanctions authority to which Doe Corporations subjected themselves by executing the agreements, is necessary to effectuate the purposes of these agreements.

93.    By initiating sanctions proceedings against Doe Corporations based on actions that exclusively pre-date the start of the parties' contractual relationship, with no basis for doing so, the IDB has breached this implied promise, deprived Doe Corporations of the fruits of these agreements, and thus breached the implied covenant of good faith and fair dealing.

94.    The IDB's breach of the implied covenant of good faith and fair dealing has caused Doe Corporations immediate financial harm. Doe Corporations have expended and will be forced to continue to expend resources to defend themselves in the sanctions proceedings. Those expenses exceed $75,000.

95.    The IDB's breach of the implied covenant of good faith and fair dealing also has caused Doe Corporations harm that cannot be remedied solely through monetary damages. In particular, Doe Corporations have been forced to defend themselves in illegitimate enforcement proceedings and will incur irreparable reputational harm upon disclosure of those sanctions proceedings, the underlying allegations, and the ultimate disposition.

96.    The equitable relief requested by Doe Corporations is warranted when balancing the hardships faced by Doe Corporations and the IDB. The public interest would not be disserved by entry of the preliminary and permanent injunctions requested by Doe Corporations.

### III.    Count Three:  Declaratory Judgment Under 28 U.S.C. § 2201

97.    All preceding paragraphs are repeated, re-alleged, and incorporated as if fully set forth in this paragraph.

98.    Doe Corporations seek a declaratory judgment pursuant to 28 U.S.C. § 2201 that the IDB lacks the authority to initiate sanctions proceedings against Doe Corporations or otherwise impose sanctions on Doe Corporations based on alleged actions that occurred exclusively before the start of the parties' contractual relationship.

99.    An actual case or controversy exists within the jurisdiction of this Court regarding the scope and meaning of Doe Corporations' rights pursuant to the Loan Agreements and the authority of the IDB to subject Doe Corporations to sanctions proceedings and impose sanctions based on actions that occurred exclusively before the start of the parties' contractual relationship.

100.    Doe Corporations accordingly seek a judgment pursuant to 28 U.S.C. § 2201 declaring that the IDB may not pursue sanctions proceedings or impose sanctions against Doe Corporations based on conduct that occurred exclusively before the start of the parties' contractual relationship.

101.    Without the issuance of declaratory relief from this Court, Doe Corporations will remain subject to the IDB's sanctions proceedings and the imposition of potentially draconian sanctions.

102.    Issuing the requested declaratory relief will clarify the parties' existing rights and afford relief to Doe Corporations from the uncertainty and controversy that give rise to this proceeding.

**RELIEF REQUESTED**

WHEREFORE, Doe Corporations respectfully pray that this Court enter judgment against the IDB for the following:

1.     A preliminary injunction barring the IDB from continuing the IDB's pending sanctions proceedings, pursuing charges, or imposing sanctions against Doe Corporations based on alleged conduct that pre-dates the execution of the Loan Agreements pending the final resolution of the claims asserted in this action;

2.     A preliminary injunction barring the IDB from disclosing the existence of the investigation against Doe Corporations that gave rise to the pending sanctions proceedings, the allegations against Doe Corporations in the Statement of Charges or Notices, and any other allegations of Prohibited Practices against any party arising out of the same events;

3.     An injunction barring the IDB from continuing the IDB's pending sanctions proceedings, pursuing charges, or imposing sanctions against Doe Corporations based on alleged conduct that pre-dates the execution of the Loan Agreements;

4.     An injunction barring the IDB from disclosing the existence of the investigation against Doe Corporations that gave rise to the pending sanctions proceedings, the allegations against Doe Corporations in the Statement of Charges or Notices, and any other allegations of Prohibited Practices against any party arising out of the same events;

5.     A declaration that the IDB may not pursue or continue the pending sanctions proceedings against Doe Corporations;

6.     A declaration that the IDB may not commence or continue sanctions proceedings against, pursue charges against, or otherwise sanction, Doe Corporations based on conduct that pre-dates the execution of the Loan Agreements;

7.      Damages in excess of $75,000 in an amount to be calculated;

8.      Costs and fees incurred in this action to the extent permitted by law;

9.      Pre- and post-judgment interest to the extent permitted by law; and

10.     Such other relief as the Court may deem just and proper.


Dated: May 8, 2025                         Respectfully submitted,


                                           /s/ *Margaret E. Krawiec*
                                           Margaret E. Krawiec (D.C. Bar No. 490066)
                                           Michael A. McIntosh (D.C. Bar No. 1012439)
                                           SKADDEN, ARPS, SLATE,
                                               MEAGHER & FLOM LLP
                                           1440 New York Ave. NW
                                           Washington, DC 20005
                                           Phone:  (202) 371-7000
                                           Fax:  (202) 393-5760
                                           margaret.krawiec@skadden.com
                                           michael.mcintosh@skadden.com

                                           Ryan D. Junck (*pro hac vice* forthcoming)
                                           SKADDEN, ARPS, SLATE,
                                               MEAGHER & FLOM (UK) LLP
                                           22 Bishopsgate
                                           London EC2N 4BQ, United Kingdom
                                           Phone: +44 20 7519 7000
                                           ryan.junck@skadden.com

                                           *Counsel for Plaintiffs Doe Corporation 1, Doe*
                                           *Corporation 2, Doe Corporation 3, and Doe*
                                           *Corporation 4*