# Exhibit I

# AGREEMENT ESTABLISHING THE INTER-AMERICAN DEVELOPMENT BANK

# AGREEMENT
# ESTABLISHING
# THE INTER-AMERICAN
# DEVELOPMENT BANK

The *Agreement Establishing the Inter-American Development Bank* became effective December 30, 1959, and has been amended on several occasions. The latest amendments were those which took effect on July 31, 1995 relating to the Eighth General Increase in the Resources of the Bank.

By resolutions of various dates, the Board of Governors has increased the authorized capital of the Bank, as well as the authorized resources of the Fund for Special Operations. Information on the current status of the authorized capital of the Bank and the resources of the Fund is presented in the Annual Reports published by the Bank.

*January 1996 reprint.*

# TABLE OF CONTENTS*

ARTICLE I PURPOSE AND FUNCTIONS ........................................................................ 5
Section 1. *Purpose* ...................................................................................................... 5
Section 2. *Functions*................................................................................................... 5
ARTICLE II MEMBERSHIP IN AND CAPITAL OF THE BANK .................................... 6
Section 1. *Membership*............................................................................................... 6
Section 2. *Authorized Ordinary Capital* .................................................................. 6
Section 3. *Subscription of Shares* ............................................................................. 7
Section 4. *Payment of Subscriptions* ........................................................................ 7
Section 5. *Ordinary Capital Resources* ................................................................... 8
ARTICLE III OPERATIONS............................................................................................... 9
Section 1. *Use of Resources* ...................................................................................... 9
Section 2. *Categories of Operations* ......................................................................... 9
Section 3. Basic Principle of Separation .................................................................... 9
Section 4. *Methods of Making or Guaranteeing Loans* ......................................... 10
Section 6. *Direct Loan Financing* ........................................................................... 11
Section 7. *Rules and Conditions for Making or Guaranteeing Loans* ................. 11
Section 8. *Optional Conditions for Making or Guaranteeing Loans*................... 12
Section 9. *Use of Loans Made or Guaranteed by the Bank* .................................. 12
Section 10. *Payment Provisions for Direct Loans* .................................................. 12
Section 11. *Guarantees* ............................................................................................. 13
Section 12. *Special Commission* .............................................................................. 13
Section 13. *Special Reserve* ...................................................................................... 13
ARTICLE IV FUND FOR SPECIAL OPERATIONS........................................................ 13
Section 1. *Establishment, Purpose, and Functions* ............................................... 13
Section 2. *Applicable Provisions* ............................................................................ 13
Section 3. *Resources* ................................................................................................ 14
Section 4. *Operations*............................................................................................... 15
Section 5. *Limitation on Liability* ........................................................................... 15
Section 6. *Limitation on Disposition of Quotas* .................................................... 16
Section 7. *Discharge of Fund Liabilities on Borrowings* ...................................... 16
Section 8. *Administration*......................................................................................... 16
Section 9. *Voting* ...................................................................................................... 16
Section 10. *Distribution of Net Profits* ................................................................... 17
Section 11. *Withdrawal of Contributions* ............................................................... 17
Section 12. *Suspension and Termination* ................................................................ 17
ARTICLE V CURRENCIES ............................................................................................... 17
Section 1. *Use of Currencies* ................................................................................... 17
Section 2. *Valuation of Currencies* ......................................................................... 18
Section 3. *Maintenance of Value of the Currency Holdings of the Bank* ............. 18
Section 4. *Methods of Conserving Currencies* ....................................................... 19
ARTICLE VI TECHNICAL ASSISTANCE ...................................................................... 19
Section 1. *Provision of Technical Advice and Assistance* ..................................... 19
Section 2. *Cooperative Agreements on Technical Assistance* ............................... 20
Section 3. *Expenses*.................................................................................................. 20
ARTICLE VII MISCELLANEOUS POWERS AND DISTRIBUTION OF PROFITS ..... 20
Section 1. *Miscellaneous Powers of the Bank*........................................................ 20
Section 2. *Warning to be Placed on Securities* ...................................................... 21

---

* *Secretary's note:* This Table of Contents is not part of the Agreement but is included for convenience.

Section 3. *Methods of Meeting Liabilities of the Bank in Case of Defaults* ..........................21
Section 4. *Distribution or Transfer of Net Profits and Surplus* ...........................................21
ARTICLE VIII ORGANIZATION AND MANAGEMENT ......................................................22
  Section 1. *Structure of the Bank* ...............................................................................22
  Section 2. *Board of Governors* ..................................................................................22
  Section 3. *Board of Executive Directors* ...................................................................24
  Section 4. *Voting* ......................................................................................................25
  Section 5. *President, Executive Vice President, and Staff* ........................................26
  Section 6. *Publication of Reports and Provision of Information* ..............................27
ARTICLE IX WITHDRAWAL AND SUSPENSION OF MEMBERS......................................27
  Section 1. *Right to Withdraw* ...................................................................................27
  Section 2. *Suspension of Membership* ......................................................................28
  Section 3. *Settlement of Accounts* ............................................................................28
ARTICLE X SUSPENSION AND TERMINATION OF OPERATIONS ................................29
  Section 1. *Suspension of Operations* ........................................................................29
  Section 2. *Termination of Operations* .......................................................................29
  Section 3. *Liability of Members and Payment of Claims* ..........................................29
  Section 4. *Distribution of Assets* ..............................................................................30
ARTICLE XI STATUS, IMMUNITIES AND PRIVILEGES .................................................30
  Section 1. *Scope of Article* .......................................................................................30
  Section 2. *Legal Status* ............................................................................................30
  Section 3. *Judicial Proceedings* ...............................................................................31
  Section 4. *Immunity of Assets* ..................................................................................31
  Section 5. *Inviolability of Archives* ..........................................................................31
  Section 6. *Freedom of Assets from Restrictions* .......................................................31
  Section 7. *Privilege for Communications* .................................................................31
  Section 8. *Personal Immunities and Privileges* ........................................................31
  Section 9. *Immunities from Taxation* ........................................................................32
  Section 10. *Implementation* ......................................................................................32
ARTICLE XII AMENDMENTS ...........................................................................................33
ARTICLE XIII INTERPRETATION AND ARBITRATION ..................................................33
  Section 1. *Interpretation* ..........................................................................................33
  Section 2. *Arbitration* ..............................................................................................34
ARTICLE XIV GENERAL PROVISIONS ............................................................................34
  Section 1. *Principal Office* .......................................................................................34
  Section 2. *Relations with Other Organizations* ........................................................34
  Section 3. *Channel of Communication* .....................................................................34
  Section 4. *Depositories* ............................................................................................34
ARTICLE XV FINAL PROVISIONS ...................................................................................34
  Section 1. *Signature and Acceptance* .......................................................................34
  Section 2. *Entry into Force* ......................................................................................35
  Section 3. *Commencements of Operations* ...............................................................35
ANNEX A SUBSCRIPTIONS TO AUTHORIZED CAPITAL STOCK OF THE BANK..........36
ADDENDUM A SUBSCRIPTIONS TO AUTHORIZED CAPITAL STOCK OF THE BANK
AS OF DECEMBER 31, 1987* .............................................................................................37
ANNEX B CONTRIBUTION QUOTAS FOR THE FUND FOR SPECIAL OPERATIONS  ...38
ADDENDUM B CONTRIBUTION QUOTAS FOR THE FUND FOR SPECIAL OPERATIONS
AS OF DECEMBER 31, 1987* .............................................................................................39

# AGREEMENT ESTABLISHING
# THE INTER-AMERICAN DEVELOPMENT BANK

The countries on whose behalf this Agreement is signed agree to create the Inter-American Development Bank, which shall operate in accordance with the following provisions:

# ARTICLE I
# PURPOSE AND FUNCTIONS

## Section 1.  *Purpose*

The purpose of the Bank shall be to contribute to the acceleration of the process of economic and social development of the regional developing member countries, individually and collectively.

## Section 2.  *Functions*

(a)      To implement its purpose, the Bank shall have the following functions:

  (i)  to promote the investment of public and private capital for development purposes;

  (ii)  to utilize its own capital, funds raised by it in financial markets, and other available resources, for financing the development of the member countries, giving priority to those loans and guarantees that will contribute most effectively to their economic growth;

  (iii)  to encourage private investment in projects, enterprises, and activities contributing to economic development and to supplement private investment when private capital is not available on reasonable terms and conditions;

  (iv)  to cooperate with the member countries to orient their development policies toward better utilization of their resources, in a manner consistent with the objectives of making their economies more complementary and of fostering the orderly growth of their foreign trade; and

  (v)  to provide technical assistance for the preparation, financing, and implementation of development plans and projects, including the study of priorities and the formulation of specific project proposals.

(b)      In carrying out its functions, the Bank shall cooperate as far as possible with national and international institutions and with private sources supplying investment capital.

# ARTICLE II
# MEMBERSHIP IN AND CAPITAL OF THE BANK

## Section 1. *Membership*

(a)    The original members of the Bank shall be those members of the Organization of American States which, by the date specified in Article XV, Section 1(a), shall accept membership in the Bank.

(b)    Membership shall be open to other members of the Organization of American States and to Canada, Bahamas and Guyana, at such times and in accordance with such terms as the Bank may determine.

Nonregional countries which are members of the International Monetary Fund, and Switzerland, may also be admitted to the Bank, at such times, and under such general rules as the Board of Governors shall have established. Such general rules may be amended only by decision of the Board of Governors by a two-thirds majority of the total number of governors, including two thirds of the governors of nonregional members, representing not less than three fourths of the total voting power of the member countries.

## Section 1A. *Categories of Resources*

The resources of the Bank shall consist of the ordinary capital resources, provided for in this article, and the resources of the Fund for Special Operations established by Article IV (hereinafter called the Fund).

## Section 2. *Authorized Ordinary Capital*

(a)    The authorized ordinary capital stock of the Bank initially shall be in the amount of eight hundred fifty million dollars ($850,000,000) in terms of United States dollars of the weight and fineness in effect on January 1, 1959 and shall be divided into 85,000 shares having a par value of $10,000 each, which shall be available for subscription by members in accordance with Section 3 of this article.

(b)    The authorized ordinary capital stock shall be divided into paid-in shares and callable shares. The equivalent of four hundred million dollars ($400,000,000) shall be paid-in, and four hundred fifty million dollars ($450,000,000) shall be callable for the purposes specified in Section 4(a)(ii) of this article.

(c)    The ordinary capital stock indicated in (a) of this section shall be increased by five hundred million dollars ($500,000,000) in terms of United States dollars of the weight and fineness existing on January 1, 1959, provided that:

(i) the date for payment of all subscriptions established in accordance with Section 4 of this article shall have passed; and

(ii)    a regular or special meeting of the Board of Governors, held as soon as possible after the date referred to in subparagraph (i) of this paragraph, shall have approved the above-mentioned increase of five hundred million dollars ($500,000,000) by a three-fourths majority of the total voting power of the member countries.

(d)    The increase in capital stock provided for in the preceding paragraph shall be in the form of callable capital.

(e)    Notwithstanding the provisions of paragraphs (c) and (d) of this section and subject to the provisions of Article VIII, Section 4(b), the authorized ordinary capital stock may be increased when the Board of Governors deems it advisable and in a manner agreed upon by a three-fourths majority of the total voting power of the member countries, including a three-fourths majority of the total number of governors, which includes a two-thirds majority of the governors of regional members.

## Section 3.  *Subscription of Shares*

(a)    Each member shall subscribe to shares of the ordinary capital stock of the Bank. The number of shares to be subscribed by the original members shall be those set forth in Annex A of this Agreement, which specifies the obligation of each member as to both paid-in and callable capital. The number of shares to be subscribed by other members shall be determined by the Bank.

(b)    In case of an increase in ordinary capital pursuant to Section 2, paragraph (c) or (e) of this article, each member shall have a right to subscribe, under such conditions as the Bank shall decide, to a proportion of the increase of stock equivalent to the proportion which its stock theretofore subscribed bears to the total capital stock of the Bank.  No member, however, shall be obligated to subscribe to any part of such increased capital.

(c)    Shares of ordinary capital stock initially subscribed by original members shall be issued at par. Other shares shall be issued at par unless the Bank decides in special circumstances to issue them on other terms.

(d)    The liability of the member countries on ordinary capital shares shall be limited to the unpaid portion of their issue price.

(e)    Shares of ordinary capital stock shall not be pledged or encumbered in any manner, and they shall be transferable only to the Bank.

## Section 4.  *Payment of Subscriptions*

(a)    Payment of the subscriptions to the ordinary capital stock of the Bank as set forth in Annex A shall be made as follows:

(i)    Payment of the amount subscribed by each country to the paid-in capital stock of the Bank shall be made in three installments, the first of which shall

be 20 per cent, and the second and third each 40 per cent, of such amount. The first installment shall be paid by each country at any time on or after the date on which this Agreement is signed, and the instrument of acceptance or ratification deposited, on its behalf in accordance with Article XV, Section 1, but not later than September 30, 1960.  The remaining two installments shall be paid on such dates as are determined by the Bank, but not sooner than September 30, 1961, and September 30, 1962, respectively.

Of each installment, 50 per cent shall be paid in gold and/or dollars and 50 per cent in the currency of the member.

(ii)   The callable portion of the subscription for ordinary capital shares of the Bank shall be subject to call only when required to meet the obligations of the Bank created under Article III, Section 4(ii) and (iii) on borrowings of funds for inclusion in the Bank's ordinary capital resources or guarantees chargeable to such resources. In the event of such a call, payment may be made at the option of the member either in gold, in United States dollars, in fully convertible currency of the member country, or in the currency required to discharge the obligations of the Bank for the purpose for which the call is made.

Calls on unpaid subscriptions shall be uniform in percentage on all shares.

(b)     Each payment of a member in its own currency under paragraph (a) (i) of this section shall be in such amount as, in the opinion of the Bank, is equivalent to the full value in terms of United States dollars of the weight and fineness in effect on January 1, 1959, of the portion of the subscription being paid.  The initial payment shall be in such amount as the member considers appropriate hereunder but shall be subject to such adjustment, to be effected within 60 days of the date on which the payment was due, as the Bank shall determine to be necessary to constitute the full dollar value equivalent as provided in this paragraph.

(c)     Unless otherwise determined by the Board of Governors by a three-fourths majority of the total voting power of the member countries, the liability of members for payment of the second and third installments of the paid-in portion of their subscriptions to the capital stock shall be conditional upon payment of not less than 90 per cent of the total obligations of the members due for:

(i)   the first and second installments, respectively, of the paid-in portion of the subscriptions; and

(ii)   the initial payment and all prior calls on the subscription quotas to the Fund.

## Section 5.  *Ordinary Capital Resources*

As used in this Agreement, the term "ordinary capital resources" of the Bank shall be deemed to include the following:

(i)   authorized ordinary capital, including both paid-in and callable shares, subscribed pursuant to Sections 2 and 3 of this article;

(ii)  all funds raised by borrowings under the authority of Article VII, Section 1(i) to which the commitment set forth in Section 4(a)(ii) of this article is applicable;

(iii) all funds received in repayment of loans made with the resources indicated in (i) and (ii) of this section;

(iv)  all income derived from loans made from the aforementioned funds or from guarantees to which the commitment set forth in Section 4(a)(ii) of this article is applicable; and

(v)   all other income derived from any of the resources mentioned above.

## ARTICLE III
## OPERATIONS

### Section 1.  *Use of Resources*

The resources and facilities of the Bank shall be used exclusively to implement the purpose and functions enumerated in Article I of this Agreement, as well as to finance the development of any of the members of the Caribbean Development Bank by providing loans and technical assistance to that institution.

### Section 2.  *Categories of Operations*

(a)   The operations of the Bank shall be divided into ordinary operations and special operations.

(b)   The ordinary operations shall be those financed from the Bank's ordinary capital resources, as defined in Article II, Section 5, and shall relate exclusively to loans made, participated in, or guaranteed by the Bank which are repayable only in the respective currency or currencies in which the loans were made.  Such operations shall be subject to the terms and conditions that the Bank deems advisable, consistent with the provisions of this Agreement.

(c)   The special operations shall be those financed from the resources of the Fund in accordance with the provisions of Article IV.

### Section 3.  Basic Principle of Separation

(a)   The ordinary capital resources, as defined in Article II, Section 5, and the resources of the Fund, as defined in Article IV, Section 3(h), shall at all times and in all respects be held, used, obligated, invested, or otherwise disposed of entirely separate from each other.

(b)      The ordinary capital resources shall under no circumstances be charged with, or used to discharge, obligations, liabilities or losses arising out of operations for which the resources of the Fund were originally used or committed.

(c)      The financial statements of the Bank shall show separately the ordinary operations and the special operations, and the Bank shall establish such other administrative rules as may be necessary to ensure the effective separation of the two types of operations.

(d)      Expenses pertaining directly to ordinary operations shall be charged to the ordinary capital resources. Expenses pertaining directly to special operations shall be charged to the resources of the Fund.  Other expenses shall be charged as the Bank determines.

## Section 4.  *Methods of Making or Guaranteeing Loans*

Subject to the conditions stipulated in this article, the Bank may make or guarantee loans to any member, or any agency or political subdivision thereof, to any enterprise in the territory of a member, and to the Caribbean Development Bank, in any of the following ways:

(i)   by making or participating in direct loans with funds corresponding to the unimpaired paid-in ordinary capital and, except as provided in Section 13 of this article, to its reserves and undistributed surplus; or with the unimpaired resources of the Fund;

(ii)  by making or participating in direct loans with funds raised by the Bank in capital markets, or borrowed or acquired in any other manner, for inclusion in the ordinary capital resources of the Bank or the resources of the Fund; and

(iii) by guaranteeing, with the ordinary capital resources or the resources of the Fund, in whole or in part loans made, except in special cases, by private investors.

Section 5.  *Limitations on Operations*

(a)      The total amount outstanding of loans and guarantees made by the Bank in its ordinary operations shall not at any time exceed the total amount of the unimpaired subscribed ordinary capital of the Bank, plus the unimpaired reserves and surplus included in the ordinary capital resources of the Bank, as defined in Article II, Section 5, exclusive of income assigned to the special reserve established pursuant to Section 13 of this article and other income of the ordinary capital resources assigned by decision of the Board of Governors to reserves not available for loans or guarantees.

(b)      In the case of loans made out of funds borrowed by the Bank to which the obligations provided for in Article II, Section 4(a)(ii), are applicable, the total amount of principal outstanding and payable to the Bank in a specific currency shall at no time exceed the total amount of principal of the outstanding borrowings by the Bank for inclusion in its ordinary capital resources that are payable in the same currency.

**Section 6.  *Direct Loan Financing***

In making direct loans or participating in them, the Bank may provide financing in any of the following ways:

(a)      By furnishing the borrower currencies of members, other than the currency of the member in whose territory the project is to be carried out, that are necessary to meet the foreign exchange costs of the project.

(b)      By providing financing to meet expenses related to the purposes of the loan in the territories of the country in which the project is to be carried out. Only in special cases, particularly when the project indirectly gives rise to an increase in the demand for foreign exchange in that country, shall the financing granted by the Bank to meet local expenses be provided in gold or in currencies other than that of such country; in such cases, the amount of the financing granted by the Bank for this purpose shall not exceed a reasonable portion of the local expenses incurred by the borrower.

**Section 7.  *Rules and Conditions for Making or Guaranteeing Loans***

(a)      The Bank may make or guarantee loans subject to the following rules and conditions:

(i)   the applicant for the loan shall have submitted a detailed proposal and the staff of the Bank shall have presented a written report recommending the proposal after a study of its merits.  In special circumstances, the Board of Executive Directors, by a majority of the total voting power of the member countries, may require that a proposal be submitted to the Board for decision in the absence of such a report;

(ii)  in considering a request for a loan or a guarantee, the Bank shall take into account the ability of the borrower to obtain the loan from private sources of financing on terms which, in the opinion of the Bank, are reasonable for the borrower, taking into account all pertinent factors;

(iii) in making or guaranteeing a loan, the Bank shall pay due regard to prospects that the borrower and its guarantor, if any, will be in a position to meet their obligations under the loan contract;

(iv)  in the opinion of the Bank, the rate of interest, other charges and the schedule for repayment of principal are appropriate for the project in question;

(v)   in guaranteeing a loan made by other investors, the Bank shall receive suitable compensation for its risk; and

(vi)  loans made or guaranteed by the Bank shall be principally for financing specific projects, including those forming part of a national or regional development program. However, the Bank may make or guarantee over-all

loans to development institutions or similar agencies of the members in order that the latter may facilitate the financing of specific development projects whose individual financing requirements are not, in the opinion of the Bank, large enough to warrant the direct supervision of the Bank.

(b)      The Bank shall not finance any undertaking in the territory of a member if that member objects to such financing.

## Section 8. *Optional Conditions for Making or Guaranteeing Loans*

(a)      In the case of loans or guarantees of loans to nongovernmental entities, the Bank may, when it deems it advisable, require that the member in whose territory the project is to be carried out, or a public institution or a similar agency of the member acceptable to the Bank, guarantee the repayment of the principal and the payment of interest and other charges on the loan.

(b)      The Bank may attach such other conditions to the making of loans or guarantees as it deems appropriate, taking into account both the interests of the members directly involved in the particular loan or guarantee proposal and the interests of the members as a whole.

## Section 9. *Use of Loans Made or Guaranteed by the Bank*

(a)      Except as provided in Article V, Section 1, the Bank shall impose no condition that the proceeds of a loan shall be spent in the territory of any particular country nor that such proceeds shall not be spent in the territories of any particular member or members; provided, however, that with respect to any increase of the resources of the Bank the question of restriction of procurement by the Bank or any member with regard to those members which do not participate in an increase under the terms and conditions specified by the Board of Governors may be determined by the Board of Governors.

(b)      The Bank shall take the necessary measures to ensure that the proceeds of any loan made, guaranteed, or participated in by the Bank are used only for the purposes for which the loan was granted, with due attention to considerations of economy and efficiency.

## Section 10. *Payment Provisions for Direct Loans*

Direct loan contracts made by the Bank in conformity with Section 4 of this article shall establish:

(a)      All the terms and conditions of each loan, including among others, provision for payment of principal, interest and other charges, maturities, and dates of payment; and

(b)      The currency or currencies in which payment shall be made to the Bank.

**Section 11.** *Guarantees*

(a)    In guaranteeing a loan the Bank shall charge a guarantee fee, at a rate determined by the Bank, payable periodically on the amount of the loan outstanding.

(b)    Guarantee contracts concluded by the Bank shall provide that the Bank may terminate its liability with respect to interest if, upon default by the borrower and by the guarantor, if any, the Bank offers to purchase, at par and interest accrued to a date designated in the offer, the bonds or other obligations guaranteed.

(c)    In issuing guarantees, the Bank shall have power to determine any other terms and conditions.

**Section 12.** *Special Commission*

On all loans, participations, or guarantees made out of or by commitment of the ordinary capital resources of the Bank, the latter shall charge a special commission.  The special commission, payable periodically, shall be computed on the amount outstanding on each loan, participation, or guarantee and shall be at the rate of one per cent per annum, unless the Bank, by a three-fourths majority of the total voting power of the member countries, decides to reduce the rate of commission.

**Section 13.** *Special Reserve*

The amount of commissions received by the Bank under Section 12 of this article shall be set aside as a special reserve, which shall be kept for meeting liabilities of the Bank in accordance with Article VII, Section 3(b)(i). The special reserve shall be held in such liquid form, permitted under this Agreement, as the Board of Executive Directors may decide.

# ARTICLE IV
# FUND FOR SPECIAL OPERATIONS

**Section 1.  *Establishment, Purpose, and Functions***

A Fund for Special Operations is established for the making of loans on terms and conditions appropriate for dealing with special circumstances arising in specific countries or with respect to specific projects.

The Fund, whose administration shall be entrusted to the Bank, shall have the purpose and functions set forth in Article I of this Agreement.

**Section 2.  *Applicable Provisions***

The Fund shall be governed by the provisions of the present article and all other provisions of this Agreement, excepting those inconsistent with the provisions of the present article and those expressly applying only to other operations of the Bank.

**Section 3.**  *Resources*

(a)    The original members of the Bank shall contribute to the resources of the Fund in accordance with the provisions of this section.

(b)    Members of the Organization of American States that join the Bank after the date specified in Article XV, Section 1(a), Canada, Bahamas and Guyana, and countries that are admitted in accordance with Article II, Section 1(b) shall contribute to the Fund with such quotas, and under such terms, as may be determined by the Bank.

(c)    The Fund shall be established with initial resources in the amount of one hundred fifty million dollars ($150,000,000) in terms of United States dollars of the weight and fineness in effect on January 1, 1959, which shall be contributed by the original members of the Bank in accordance with the quotas specified in Annex B.

(d)    Payment of the quotas shall be made as follows:

(i)    Fifty per cent of its quota shall be paid by each member at any time on or after the date on which this Agreement is signed, and the instrument of acceptance or ratification deposited, on its behalf in accordance with Article XV, Section 1, but not later than September 30, 1960.

(ii)    The remaining 50 per cent shall be paid at any time subsequent to one year after the Bank has begun operations, in such amounts and at such times as are determined by the Bank; provided, however, that the total amount of all quotas shall be made due and payable not later than the date fixed for payment of the third installment of the subscriptions to the paid-in capital stock of the Bank.

(iii)    The payments required under this section shall be distributed among the members in proportion to their quotas and shall be made one half in gold and/or United States dollars, and one half in the currency of the contributing member.

(e)    Each payment of a member in its own currency under the preceding paragraph shall be in such amount as, in the opinion of the Bank, is equivalent to the full value, in terms of United States dollars of the weight and fineness in effect on January 1, 1959, of the portion of the quota being paid.  The initial payment shall be in such amount as the member considers appropriate hereunder but shall be subject to such adjustment, to be effected within 60 days of the date on which payment was due, as the Bank shall determine to be necessary to constitute the full dollar value equivalent as provided in this paragraph.

(f)    Unless otherwise determined by the Board of Governors by a three-fourths majority of the total voting power of the member countries, the liability of members for payment of any call on the unpaid portion of their subscription quotas to the Fund shall be conditional upon payment of not less than 90 per cent of the total obligations of the members for:

    (i)   the initial payment and all prior calls on such quota subscriptions to the Fund; and

    (ii)  any installments due on the paid-in portion of the subscriptions to the capital stock of the Bank.

(g)    The resources of the Fund shall be increased through additional contributions by the members when the Board of Governors considers it advisable by a three-fourths majority of the total voting power of the member countries. The provisions of Article II, Section 3(b), shall apply to such increases, in terms of the proportion between the quota in effect for each member and the total amount of the resources of the Fund contributed by members. No member, however, shall be obligated to contribute any part of such increase.

(h)    As used in this Agreement, the term "resources of the Fund" shall be deemed to include the following:

    (i)   contributions by members pursuant to paragraphs (c) and (g) of this section;

    (ii)  all funds raised by borrowing to which the commitment stipulated in Article II, Section 4(a)(ii) is not applicable, i.e., those that are specifically chargeable to the resources of the Fund;

    (iii) all funds received in repayment of loans made from the resources mentioned above;

    (iv) all income derived from operations using or committing any of the resources mentioned above; and

    (v)  any other resources at the disposal of the Fund.

## Section 4. *Operations*

(a)    The operations of the Fund shall be those financed from its own resources, as defined in Section 3(h) of the present article.

(b)    Loans made with resources of the Fund may be partially or wholly repayable in the currency of the member in whose territory the project being financed will be carried out. The part of the loan not repayable in the currency of the member shall be paid in the currency or currencies in which the loan was made.

## Section 5. *Limitation on Liability*

In the operations of the Fund, the financial liability of the Bank shall be limited to the resources and reserves of the Fund, and the liability of members shall be limited to the unpaid portion of their respective quotas that has become due and payable.

**Section 6.  *Limitation on Disposition of Quotas***

The rights of members of the Bank resulting from their contributions to the Fund may not be transferred or encumbered, and members shall have no right of reimbursement of such contributions except in cases of loss of the status of membership or of termination of the operations of the Fund.

**Section 7.  *Discharge of Fund Liabilities on Borrowings***

Payments in satisfaction of any liability on borrowings of funds for inclusion in the resources of the Fund shall be charged:

    (i)  first, against any reserve established for this purpose; and

    (ii)  then, against any other funds available in the resources of the Fund.

**Section 8.  *Administration***

(a)    Subject to the provisions of this Agreement, the authorities of the Bank shall have full powers to administer the Fund.

(b)    There shall be a Vice President of the Bank in charge of the Fund.  The Vice President shall participate in the meetings of the Board of Executive Directors of the Bank, without vote, whenever matters relating to the Fund are discussed.

(c)    In the operations of the Fund the Bank shall utilize to the fullest extent possible the same personnel, experts, installations, offices, equipment, and services as it uses for its other operations.

(d)    The Bank shall publish a separate annual report showing the results of the Fund's financial operations, including profits or losses.  At the annual meeting of the Board of Governors there shall be at least one session devoted to consideration of this report.  In addition, the Bank shall transmit to the members a quarterly summary of the Fund's operations.

**Section 9.  *Voting***

(a)    In making decisions concerning operations of the Fund, each member country of the Bank shall have the voting power in the Board of Governors accorded to it pursuant to Article VIII, Section 4(a) and (c), and each Director shall have the voting power in the Board of Executive Directors accorded to him pursuant to Article VIII, Section 4(a) and (d).

(b)    All decisions of the Bank concerning the operations of the Fund shall be adopted by a three-fourths majority of the total voting power of the member countries, unless otherwise provided in this article.

**Section 10.** *Distribution of Net Profits*

The Board of Governors of the Bank shall determine what portion of the net profits of the Fund shall be distributed among the members after making provision for reserves. Such net profits shall be shared in proportion to the quotas of the members.

**Section 11.** *Withdrawal of Contributions*

(a)    No country may withdraw its contribution and terminate its relations with the Fund while it is still a member of the Bank.

(b)    The provisions of Article IX, Section 3, with respect to the settlement of accounts with countries that terminate their membership in the Bank also shall apply to the Fund.

**Section 12.** *Suspension and Termination*

The provisions of Article X also shall apply to the Fund with substitution of terms relating to the Fund and its resources and respective creditors for those relating to the Bank and its capital resources and respective creditors.

## ARTICLE V
## CURRENCIES

**Section 1.** *Use of Currencies*

(a)    The currency of any member held by the Bank in its ordinary capital resources or in the resources of the Fund, however acquired, may be used by the Bank and by any recipient from the Bank, without restriction by the member, to make payments for goods and services produced in the territory of such member.

(b)    Members may not maintain or impose restrictions of any kind upon the use by the Bank or by any recipient from the Bank, for payments in any country, of the following:

(i)    gold and dollars received by the Bank in payment of the 50 per cent portion of each member's subscription to shares of the Bank's ordinary capital and of the 50 per cent portion of each member's quota for contribution to the Fund, pursuant to the provisions of Article II and Article IV, respectively;

(ii)    currencies of members purchased with the resources referred to in (i) of this paragraph;

(iii)    currencies obtained by borrowings, pursuant to the provisions of Article VII, Section 1(i), for inclusion in the capital resources of the Bank;

(iv)    gold and dollars received by the Bank in payment on account of principal, interest, and other charges, of loans made from the gold and dollar funds

referred to in (i) of this paragraph; currencies received in payment of principal interest, and other charges, of loans made from currencies referred to in (ii) and (iii) of this paragraph; and currencies received in payment of commissions and fees on all guarantees made by the Bank; and

(v)    currencies, other than the member's own currency, received from the Bank pursuant to Article VII, Section 4(d), and Article IV, Section 10, in distribution of net profits.

(c)    A member's currency held by the Bank, whether in its ordinary capital resources or in the resources of the Fund, not covered by paragraph (b) of this section, also may be used by the Bank or any recipient from the Bank for payments in any country without restriction of any kind, unless the member notifies the Bank of its desire that such currency or a portion thereof be restricted to the uses specified in paragraph (a) of this section.

(d)    Members may not place any restrictions on the holding and use by the Bank, for making amortization payments or anticipating payment of, or repurchasing part or all of, the Bank's own obligations, of currencies received by the Bank in repayment of direct loans made from borrowed funds Included in the ordinary capital resources of the Bank.

(e)    Gold or currency held by the Bank in its ordinary capital resources or in the resources of the Fund shall not be used by the Bank to purchase other currencies unless authorized by a three-fourths majority of the total voting power of the member countries. Any currencies purchased pursuant to the provisions of this paragraph shall not be subject to maintenance of value under Section 3 of this article.

## Section 2.  *Valuation of Currencies*

Whenever it shall become necessary under this Agreement to value any currency in terms of another currency, or in terms of gold, such valuation shall be determined by the Bank after consultation with the International Monetary Fund.

## Section 3.  *Maintenance of Value of the Currency Holdings of the Bank*

(a)    Whenever the par value in the International Monetary Fund of a member's currency is reduced or the foreign exchange value of a member's currency has, in the opinion of the Bank, depreciated to a significant extent, the member shall pay to the Bank within a reasonable time an additional amount of its own currency sufficient to maintain the value of all the currency of the member held by the Bank in its ordinary capital resources or in the resources of the Fund, excepting currency derived from borrowings by the Bank.  The standard of value for this purpose shall be the United States dollar of the weight and fineness in effect on January 1, 1959.

(b)    Whenever the par value in the International Monetary Fund of a member's currency is increased or the foreign exchange value of such member's currency has, in the opinion of the Bank, appreciated to a significant extent, the Bank shall return to such member

within a reasonable time an amount of that member's currency equal to the increase in the value of the amount of such currency which is held by the Bank in its ordinary capital resources or in the resources of the Fund, excepting currency derived from borrowings by the Bank. The standard of value for this purpose shall be the same as that established in the preceding paragraph.

(c)    The provisions of this section may be waived by the Bank when a uniform proportionate change in the par value of the currencies of all the Bank's members is made by the International Monetary Fund.

(d)    Notwithstanding any other provisions of this section, the terms and conditions of any increase in the resources of the Fund pursuant to Article IV, Section 3(g), may include maintenance of value provisions other than those provided for in this section which would apply to the resources of the Fund contributed by such increase.

**Section 4.  *Methods of Conserving Currencies***

The Bank shall accept from any member promissory notes or similar securities issued by the government of the member, or by the depository designated by such member, in lieu of any part of the currency of the member representing the 50 per cent portion of its subscription to the Bank's authorized ordinary capital and the 50 per cent portion of its subscription to the resources of the Fund, which, pursuant to the provisions of Article II and Article IV, respectively, are payable by each member in its national currency, provided such currency is not required by the Bank for the conduct of its operations. Such notes or securities shall be non-negotiable, non-interest-bearing, and payable to the Bank at their par value on demand. On the same conditions, the Bank shall also accept such notes or securities in lieu of any part of the subscription of a member with respect to which part the terms of the subscription do not require payment in cash.

## ARTICLE VI
## TECHNICAL ASSISTANCE

**Section 1.  *Provision of Technical Advice and Assistance***

The Bank may, at the request of any member or members, or of private firms that may obtain loans from it, provide technical advice and assistance in its field of activity, particularly on:

(i)   the preparation, financing, and execution of development plans and projects, including the consideration of priorities, and the formulation of loan proposals on specific national or regional development projects; and

(ii)  the development and advanced training, through seminars and other forms of instruction, of personnel specializing in the formulation and implementation of development plans and projects.

## Section 2. *Cooperative Agreements on Technical Assistance*

In order to accomplish the purposes of this article, the Bank may enter into agreements on technical assistance with other national or international institutions, either public or private.

## Section 3. *Expenses*

(a)    The Bank may arrange with member countries or firms receiving technical assistance, for reimbursement of the expenses of furnishing such assistance on terms which the Bank deems appropriate.

(b)    The expenses of providing technical assistance not paid by the recipients shall be met from the net income of the ordinary capital resources or of the Fund.  However, during the first three years of the Bank's operations, up to three per cent, in total, of the initial resources of the Fund may be used to meet such expenses.

# ARTICLE VII
# MISCELLANEOUS POWERS AND DISTRIBUTION OF PROFITS

## Section 1. *Miscellaneous Powers of the Bank*

In addition to the powers specified elsewhere in this Agreement, the Bank shall have the power to:

(i)   borrow funds and in that connection to furnish such collateral or other security therefor as the Bank shall determine, provided that, before making a sale of its obligations in the markets of a country, the Bank shall have obtained the approval of that country and of the member in whose currency the obligations are denominated. In addition, in the case of borrowings of funds to be included in the Bank's ordinary capital resources, the Bank shall obtain agreement of such countries that the proceeds may be exchanged for the currency of any other country without restriction;

(ii)  buy and sell securities it has issued or guaranteed or in which it has invested, provided that the Bank shall obtain the approval of the country in whose territories the securities are to be bought or sold;

(iii) with the approval of a three-fourths majority of the total voting power of the member countries, invest funds not needed in its operations in such obligations as it may determine;

(iv)  guarantee securities in its portfolio for the purpose of facilitating their sale; and

(v)   exercise such other powers as shall be necessary or desirable in furtherance of its purpose and functions, consistent with the provisions of this Agreement.

**Section 2.**  *Warning to be Placed on Securities*

Every security issued or guaranteed by the Bank shall bear on its face a conspicuous statement to the effect that it is not an obligation of any government, unless it is in fact the obligation of a particular government, in which case it shall so state.

**Section 3.**  *Methods of Meeting Liabilities of the Bank in Case of Defaults*

(a)    The Bank, in the event of actual or threatened default on loans made or guaranteed by the Bank using its ordinary capital resources, shall take such action as it deems appropriate with respect to modifying the terms of the loan, other than the currency of repayment.

(b)    The payments in discharge of the Bank's liabilities on borrowings or guarantees under Article III, Section 4(ii) and (iii) chargeable against the ordinary capital resources of the Bank shall be charged:

> (i)    first, against the special reserve provided for in Article III, Section 13; and

> (ii)    then, to the extent necessary and at the discretion of the Bank, against the other reserves, surplus, and funds corresponding to the capital paid in for ordinary capital shares.

(c)    Whenever necessary to meet contractual payments of interest, other charges, or amortization on the Bank's borrowings payable out of its ordinary capital resources, or to meet the Bank's liabilities with respect to similar payments on loans guaranteed by it chargeable to its ordinary capital resources, the Bank may call upon the members to pay an appropriate amount of their callable ordinary capital subscriptions, in accordance with Article II, Section 4(a)(ii). Moreover, if the Bank believes that a default may be of long duration, it may call an additional part of such subscriptions not to exceed in any one year one per cent of the total subscriptions of the members to the ordinary capital resources, for the following purposes:

> (i)    to redeem prior to maturity, or otherwise discharge its liability on, all or part of the outstanding principal of any loan guaranteed by it chargeable to its ordinary capital resources in respect of which the debtor is in default; and

> (ii)    to repurchase, or otherwise discharge its liability on, all or part of its own outstanding obligations payable out of its ordinary capital resources.

**Section 4.**  *Distribution or Transfer of Net Profits and Surplus*

(a)    The Board of Governors may determine periodically what part of the net profits and of the surplus of the ordinary capital resources shall be distributed. Such distributions may be made only when the reserves have reached a level which the Board of Governors considers adequate.

(b)    When approving the statements of profit and loss, pursuant to Article VIII, Section 2(b)(viii), the Board of Governors may by decision of a two-thirds majority of the total

number of governors representing not less than three fourths of the total voting power of the member countries transfer part of the net profits for the respective fiscal year of the ordinary capital resources to the Fund.

Before the Board of Governors determines to make a transfer to the Fund, it shall have received a report from the Board of Executive Directors on the desirability of such a transfer, which shall take into consideration, inter alia, (1) whether the reserves have reached a level that is adequate; (2) whether the transferred funds are needed for the operation of the Fund; and (3) the impact, if any, on the Bank's ability to borrow.

(c)     The distributions referred to in paragraph (a) of this section shall be made from the ordinary capital resources in proportion to the number of ordinary capital shares held by each member and likewise the net profits transferred to the Fund pursuant to paragraph (b) of this section shall be credited to the total contribution quotas of each member in the Fund in the foregoing proportion.

(d)     Payments pursuant to paragraph (a) of this section shall be made in such manner and in such currency or currencies as the Board of Governors shall determine. If such payments are made to a member in currencies other than its own, the transfer of such currencies and their use by the receiving country shall be without restriction by any member.

# ARTICLE VIII
# ORGANIZATION AND MANAGEMENT

## Section 1.  *Structure of the Bank*

The Bank shall have a Board of Governors, a Board of Executive Directors, a President, an Executive Vice President, a Vice President in charge of the Fund, and such other officers and staff as may be considered necessary.

## Section 2.  *Board of Governors*

(a)     All the powers of the Bank shall be vested in the Board of Governors. Each member shall appoint one governor and one alternate, who shall serve for five years, subject to termination of appointment at any time, or to reappointment, at the pleasure of the appointing member.  No alternate may vote except in the absence of his principal. The Board shall select one of the governors as Chairman, who shall hold office until the next regular meeting of the Board.

(b)     The Board of Governors may delegate to the Board of Executive Directors all its powers except power to:

(i)   admit new members and determine the conditions of their admission;

(ii)  increase or decrease the authorized ordinary capital stock of the Bank and the contributions to the Fund;

    (iii)   elect the President of the Bank and determine his remuneration;

    (iv)   suspend a member, pursuant to Article IX, Section 2;

    (v)   determine the remuneration of the executive directors and their alternates;

    (vi)   hear and decide any appeals from interpretations of this Agreement given by the Board of Executive Directors;

    (vii)   authorize the conclusion of general agreements for cooperation with other international organizations;

    (viii)   approve, after reviewing the auditors' report, the general balance sheet and the statement of profit and loss of the institution;

    (ix)   determine the reserves and the distribution of the net profits of the ordinary capital resources and of the Fund;

    (x)   select outside auditors to certify to the general balance sheet and the statement of profit and loss of the institution;

    (xi)   amend this Agreement; and

    (xii)   decide to terminate the operations of the Bank and to distribute its assets.

(c)    The Board of Governors shall retain full power to exercise authority over any matter delegated to the Board of Executive Directors under paragraph (b) above.

(d)    The Board of Governors shall, as a general rule, hold a meeting annually. Other meetings may be held when the Board of Governors so provides or when called by the Board of Executive Directors. Meetings of the Board of Governors also shall be called by the Board of Executive Directors whenever requested by five members of the Bank or by members having one fourth of the total voting power of the member countries.

(e)    A quorum for any meeting of the Board of Governors shall be an absolute majority of the total number of governors, including an absolute majority of the governors of regional members, representing not less than three fourths of the total voting power of the member countries.

(f)    The Board of Governors may establish a procedure whereby the Board of Executive Directors, when it deems such action appropriate, may submit a specific question to a vote of the governors without calling a meeting of the Board of Governors.

(g)    The Board of Governors, and the Board of Executive Directors to the extent authorized, may adopt such rules and regulations as may be necessary or appropriate to conduct the business of the Bank.

(h)     Governors and alternates shall serve as such without compensation from the Bank, but the Bank may pay them reasonable expenses incurred in attending meetings of the Board of Governors.

### Section 3. *Board of Executive Directors*

(a)     The Board of Executive Directors shall be responsible for the conduct of the operations of the Bank, and for this purpose may exercise all the powers delegated to it by the Board of Governors.

(b)     (i)     Executive directors shall be persons of recognized competence and wide experience in economic and financial matters but who shall not be governors.

(ii)     One executive director shall be appointed by the member country having the largest number of shares in the Bank, not less than three executive directors shall be elected by the governors of the nonregional member countries, and not less than ten others shall be elected by the governors of the remaining member countries. The number of executive directors to be elected in these categories, and the procedure for the election of all the elective directors shall be determined by regulations adopted by the Board of Governors by a three-fourths majority of the total voting power of the member countries, including, with respect to provisions relating exclusively to the election of directors by nonregional member countries, a two-thirds majority of the governors of the nonregional members, and, with respect to provisions relating exclusively to the number and election of directors by the remaining member countries, by a two-thirds majority of the governors of regional members. Any change in the aforementioned regulations shall require the same majority of votes for its approval.

(iii)     Executive directors shall be appointed or elected for terms of three years and may be reappointed or re-elected for successive terms.

(c)     Each executive director shall appoint an alternate who shall have full power to act for him when he is not present. Directors and alternates shall be citizens of the member countries. None of the elected directors and their alternates may be of the same citizenship, except in the case of:

(i)     countries that are not borrowers; and

(ii)     borrowing member countries, in cases determined by the governors of the borrowing members pursuant to a three-quarters majority of their total voting power and a two-thirds majority of their total number.

Alternates may participate in meetings but may vote only when they are acting in place of their principals.

(d)    Directors shall continue in office until their successors are appointed or elected. If the office of an elected director becomes vacant more than 180 days before the end of his term, a successor shall be elected for the remainder of the term by the governors who elected the former director.    An absolute majority of the votes cast shall be required for election.    While the office remains vacant, the alternate shall have all the powers of the former director except the power to appoint an alternate.

(e)    The Board of Executive Directors shall function in continuous session at the principal office of the Bank and shall meet as often as the business of the Bank may require.

(f)    A quorum for any meeting of the Board of Executive Directors shall be an absolute majority of the total number of directors, including an absolute majority of directors of regional members, representing not less than two thirds of the total voting power of the member countries.

(g)    A member of the Bank may send a representative to attend any meeting of the Board of Executive Directors when a matter especially affecting that member is under consideration. Such right of representation shall be regulated by the Board of Governors.

(h)    The Board of Executive Directors may appoint such committees as it deems advisable. Membership of such committees need not be limited to governors, directors, or alternates.

(i)    The Board of Executive Directors shall determine the basic organization of the Bank, including the number and general responsibilities of the chief administrative and professional positions of the staff, and shall approve the budget of the Bank.

## Section 4.  *Voting*

(a)    Each member country shall have 135 votes plus one vote for each share of ordinary capital stock of the Bank held by that country, provided, however, that, in connection with any increase in the authorized ordinary capital stock, the Board of Governors may determine that the capital stock authorized by such increase shall not have voting rights and that such increase of stock shall not be subject to the preemptive rights established in Article II, Section 3(b).

(b)    No increase in the subscription of any member to the ordinary capital stock shall become effective, and any right to subscribe thereto is hereby waived, which would have the effect of reducing the voting power (i) of the regional developing members below 50.005 per cent of the total voting power of the member countries; (ii) of the member having the largest number of shares below 30 per cent of such total voting power; or (iii) of Canada below 4 per cent of such total voting power.

(c)    In voting in the Board of Governors, each governor shall be entitled to cast the votes of the member country which he represents.  Except as otherwise specifically provided in

this Agreement, all matters before the Board of Governors shall be decided by a majority of the total voting power of the member countries.

(d)      In voting in the Board of Executive Directors:

(i)   the appointed director shall be entitled to cast the number of votes of the member country which appointed him;

(ii)  each elected director shall be entitled to cast the number of votes that counted toward his election, which votes shall be cast as a unit; and

(iii) except as otherwise specifically provided in this Agreement, all matters before the Board of Executive Directors shall be decided by a majority of the total voting power of the member countries.

## Section 5.  *President, Executive Vice President, and Staff*

(a)      The Board of Governors, by a majority of the total voting power of the member countries, including an absolute majority of the governors of regional members, shall elect a President of the Bank who, while holding office, shall not be a governor or an executive director or alternate for either.

Under the direction of the Board of Executive Directors, the President of the Bank shall conduct the ordinary business of the Bank and shall be chief of its staff. He also shall be the presiding officer at meetings of the Board of Executive Directors, but shall have no vote, except that it shall be his duty to cast a deciding vote when necessary to break a tie.

The President of the Bank shall be the legal representative of the Bank.  The term of office of the President of the Bank shall be five years, and he may be reelected to successive terms. He shall cease to hold office when the Board of Governors so decides by a majority of the total voting power of the member countries, including a majority of the total voting power of the regional member countries.

(b)      The Executive Vice President shall be appointed by the Board of Executive Directors on the recommendation of the President of the Bank.  Under the direction of the Board of Executive Directors and the President of the Bank, the Executive Vice President shall exercise such authority and perform such functions in the administration of the Bank as may be determined by the Board of Executive Directors. In the absence or incapacity of the President of the Bank, the Executive Vice President shall exercise the authority and perform the functions of the President.

The Executive Vice President shall participate in meetings of the Board of Executive Directors but shall have no vote at such meetings, except that he shall cast the deciding vote, as provided in paragraph (a) of this section, when he is acting in place of the President of the Bank.

(c)      In addition to the Vice President referred to in Article IV, Section 8(b), the Board of Executive Directors may, on recommendation of the President of the Bank, appoint other Vice

Presidents who shall exercise such authority and perform such functions as the Board of Executive Directors may determine.

(d)    The President, officers, and staff of the Bank, in the discharge of their offices, owe their duty entirely to the Bank and shall recognize no other authority. Each member of the Bank shall respect the international character of this duty.

(e)    The paramount consideration in the employment of the staff and in the determination of the conditions of service shall be the necessity of securing the highest standards of efficiency, competence, and integrity. Due regard shall also be paid to the importance of recruiting the staff on as wide a geographical basis as possible, taking into account the regional character of the institution.

(f)    The Bank, its officers and employees shall not interfere in the political affairs of any member, nor shall they be influenced in their decisions by the political character of the member or members concerned. Only economic considerations shall be relevant to their decisions, and these considerations shall be weighed impartially in order to achieve the purpose and functions stated in Article I.

## Section 6.  *Publication of Reports and Provision of Information*

(a)    The Bank shall publish an annual report containing an audited statement of the accounts.  It shall also transmit quarterly to the members a summary statement of the financial position and a profit-and-loss statement showing the results of its ordinary operations.

(b)    The Bank may also publish such other reports as it deems desirable to carry out its purpose and functions.

## ARTICLE IX
## WITHDRAWAL AND SUSPENSION OF MEMBERS

## Section 1.  *Right to Withdraw*

Any member may withdraw from the Bank by delivering to the Bank at its principal office written notice of its intention to do so.  Such withdrawal shall become finally effective on the date specified in the notice but in no event less than six months after the notice is delivered to the Bank.  However, at any time before the withdrawal becomes finally effective, the member may notify the Bank in writing of the cancellation of its notice of intention to withdraw.

After withdrawing, a member shall remain liable for all direct and contingent obligations to the Bank to which it was subject at the date of delivery of the withdrawal notice, including those specified in Section 3 of this article. However, if the withdrawal becomes finally effective, the member shall not incur any liability for obligations resulting from operations of the Bank effected after the date on which the withdrawal notice was received by the Bank.

**Section 2.** *Suspension of Membership*

If a member fails to fulfill any of its obligations to the Bank, the Bank may suspend its membership by decision of the Board of Governors by a three-fourths majority of the total voting power of the member countries, including a two-thirds majority of the total number of governors, which, in the case of suspension of a regional member country, shall include a two-thirds majority of the governors of regional members and, in the case of suspension of a nonregional member country, a two-thirds majority of the governors of nonregional members.

The member so suspended shall automatically cease to be a member of the Bank one year from the date of its suspension unless the Board of Governors decides by the same majority to terminate the suspension.

While under suspension, a member shall not be entitled to exercise any rights under this Agreement, except the right of withdrawal, but shall remain subject to all its obligations.

**Section 3.** *Settlement of Accounts*

(a)    After a country ceases to be a member, it no longer shall share in the profits or losses of the Bank, nor shall it incur any liability with respect to loans and guarantees entered into by the Bank thereafter.  However, it shall remain liable for all amounts it owes the Bank and for its contingent liabilities to the Bank so long as any part of the loans or guarantees contracted by the Bank before the date on which the country ceased to be a member remains outstanding.

(b)    When a country ceases to be a member, the Bank shall arrange for the repurchase of such country's capital stock as a part of the settlement of accounts pursuant to the provisions of this section; but the country shall have no other rights under this Agreement except as provided in this section and in Article XIII, Section 2.

(c)    The Bank and the country ceasing to be a member may agree on the repurchase of the capital stock on such terms as are deemed appropriate in the circumstances, without regard to the provisions of the following paragraph. Such agreement may provide, among other things, for a final settlement of all obligations of the country to the Bank.

(d)    If the agreement referred to in the preceding paragraph has not been consummated within six months after the country ceases to be a member or such other time as the Bank and such country may agree upon, the repurchase price of such country's capital stock shall be its book value, according to the books of the Bank, on the date when the country ceased to be a member.  Such repurchase shall be subject to the following conditions:

(i)    As a prerequisite for payment, the country ceasing to be a member shall surrender its stock certificates, and such payment may be made in such installments, at such times and in such available currencies as the Bank determines, taking into account the financial position of the Bank.

(ii)    Any amount which the Bank owes the country for the repurchase of its capital stock shall be withheld to the extent that the country or any of its

subdivisions or agencies remains liable to the Bank as a result of loan or guarantee operations. The amount withheld may, at the option of the Bank, be applied on any such liability as it matures. However, no amount shall be withheld on account of the country's contingent liability for future calls on its subscription pursuant to Article II, Section 4(a)(ii).

(iii)   If the Bank sustains net losses on any loans or participations, or as a result of any guarantees, outstanding on the date the country ceased to be a member, and the amount of such losses exceeds the amount of the reserves provided therefor on such date, such country shall repay on demand the amount by which the repurchase price of its shares would have been reduced, if the losses had been taken into account when the book value of the shares, according to the books of the Bank, was determined. In addition, the former member shall remain liable on any call pursuant to Article II, Section 4(a)(ii), to the extent that it would have been required to respond if the impairment of capital had occurred and the call had been made at the time the repurchase price of its shares had been determined.

(e)   In no event shall any amount due to a country for its shares under this section be paid until six months after the date upon which the country ceases to be a member. If within that period the Bank terminates operations all rights of such country shall be determined by the provisions of Article X, and such country shall be considered still a member of the Bank for the purposes of such article except that it shall have no voting rights.

## ARTICLE X
## SUSPENSION AND TERMINATION OF OPERATIONS

**Section 1.** *Suspension of Operations*

In an emergency the Board of Executive Directors may suspend operations in respect of new loans and guarantees until such time as the Board of Governors may have an opportunity to consider the situation and take pertinent measures.

**Section 2.** *Termination of Operations*

The Bank may terminate its operations by a decision of the Board of Governors by a three-fourths majority of the total voting power of the member countries, including a two-thirds majority of the governors of regional members. After such termination of operations the Bank shall forthwith cease all activities, except those incident to the conservation, preservation, and realization of its assets and settlement of its obligations.

**Section 3.** *Liability of Members and Payment of Claims*

(a)   The liability of all members arising from the subscriptions to the capital stock of the Bank and in respect to the depreciation of their currencies shall continue until all direct and contingent obligations shall have been discharged.

(b)    All creditors holding direct claims shall be paid out of the assets of the Bank and then out of payments to the Bank on unpaid or callable subscriptions. Before making any payments to creditors holding direct claims, the Board of Executive Directors shall make such arrangements as are necessary, in its judgment, to ensure a pro rata distribution among holders of direct and contingent claims.

## Section 4.  *Distribution of Assets*

(a)    No distribution of assets shall be made to members on account of their subscriptions to the capital stock of the Bank until all liabilities to creditors chargeable to such capital stock shall have been discharged or provided for. Moreover, such distribution must be approved by a decision of the Board of Governors by a three-fourths majority of the total voting power of the member countries, including a two-thirds majority of the governors of regional members.

(b)    Any distribution of the assets of the Bank to the members shall be in proportion to capital stock held by each member and shall be effected at such times and under such conditions, as the Bank shall deem fair and equitable. The shares of assets distributed need not be uniform as to type of assets.  No member shall be entitled to receive its share in such a distribution of assets until it has settled all of its obligations to the Bank.

(c)    Any member receiving assets distributed pursuant to this article shall enjoy the same rights with respect to such assets as the Bank enjoyed prior to their distribution.

## ARTICLE XI
## STATUS, IMMUNITIES AND PRIVILEGES

## Section 1.  *Scope of Article*

To enable the Bank to fulfill its purpose and the functions with which it is entrusted, the status, immunities, and privileges set forth in this article shall be accorded to the Bank in the territories of each member.

## Section 2.  *Legal Status*

The Bank shall possess juridical personality and, in particular, full capacity:

(a)    to contract;

(b)    to acquire and dispose of immovable and movable property; and

(c)    to institute legal proceedings.

**Section 3.  *Judicial Proceedings***

Actions may be brought against the Bank only in a court of competent jurisdiction in the territories of a member in which the Bank has an office, has appointed an agent for the purpose of accepting service or notice of process, or has issued or guaranteed securities.

No action shall be brought against the Bank by members or persons acting for or deriving claims from members. However, member countries shall have recourse to such special procedures to settle controversies between the Bank and its members as may be prescribed in this Agreement, in the by-laws and regulations of the Bank or in contracts entered into with the Bank.

Property and assets of the Bank shall, wheresoever located and by whomsoever held, be immune from all forms of seizure, attachment or execution before the delivery of final judgment against the Bank.

**Section 4.  *Immunity of Assets***

Property and assets of the Bank, wheresoever located and by whomsoever held, shall be considered public international property and shall be immune from search, requisition, confiscation, expropriation or any other form of taking or foreclosure by executive or legislative action.

**Section 5.  *Inviolability of Archives***

The archives of the Bank shall be inviolable.

**Section 6.  *Freedom of Assets from Restrictions***

To the extent necessary to carry out the purpose and functions of the Bank and to conduct its operations in accordance with this Agreement, all property and other assets of the Bank shall be free from restrictions, regulations, controls and moratoria of any nature, except as may otherwise be provided in this Agreement.

**Section 7.  *Privilege for Communications***

The official communications of the Bank shall be accorded by each member the same treatment that it accords to the official communications of other members.

**Section 8.  *Personal Immunities and Privileges***

All governors, executive directors, alternates, officers, and employees of the Bank shall have the following privileges and immunities:

(a)    Immunity from legal process with respect to acts performed by them in their official capacity, except when the Bank waives this immunity.

(b)      When not local nationals, the same immunities from immigration restrictions, alien registration requirements and national service obligations and the same facilities as regards exchange provisions as are accorded by members to the representatives, officials, and employees of comparable rank of other members.

(c)      The same privileges in respect of traveling facilities as are accorded by members to representatives, officials, and employees of comparable rank of other members.

## Section 9.  *Immunities from Taxation*

(a)      The Bank, its property, other assets, income, and the operations and transactions it carries out pursuant to this Agreement, shall be immune from all taxation and from all customs duties.  The Bank shall also be immune from any obligation relating to the payment, withholding or collection of any tax, or duty.

(b)      No tax shall be levied on or in respect of salaries and emoluments paid by the Bank to executive directors, alternates, officials or employees of the Bank who are not local citizens or other local nationals.

(c)      No tax of any kind shall be levied on any obligation or security issued by the Bank, including any dividend or interest thereon, by whomsoever held:

> (i)   which discriminates against such obligation or security solely because it is issued by the Bank; or

> (ii)  if the sole jurisdictional basis for such taxation is the place or currency in which it is issued, made payable or paid, or the location of any office or place of business maintained by the Bank.

(d)      No tax of any kind shall be levied on any obligation or security guaranteed by the Bank, including any dividend or interest thereon, by whomsoever held:

> (i)   which discriminates against such obligation or security solely because it is guaranteed by the Bank; or

> (ii)  if the sole jurisdictional basis for such taxation is the location of any office or place of business maintained by the Bank.

## Section 10. *Implementation*

Each member, in accordance with its juridical system, shall take such action as is necessary to make effective in its own territories the principles set forth in this article, and shall inform the Bank of the action which it has taken on the matter.

# ARTICLE XII
## AMENDMENTS

(a)      This Agreement may be amended only by decision of the Board of Governors by a majority of the total number of governors, including two thirds of the governors of regional members, representing not less than three fourths of the total voting power of the member countries, provided, however, that the voting majorities provided in Article II, Section 1(b), may be amended only by the voting majorities stated therein.

(b)      Notwithstanding the provisions of (a) above, the unanimous agreement of the Board of Governors shall be required for the approval of any amendment modifying:

    (i)    the right to withdraw from the Bank as provided in Article IX, Section 1;

    (ii)   the right to purchase capital stock of the Bank and to contribute to the Fund as provided in Article II, Section 3(b) and in Article IV, Section 3(g), respectively; and

    (iii)  the limitation on liability as provided in Article II, Section 3(d), and Article IV, Section 5.

(c)      Any proposal to amend this Agreement, whether emanating from a member or the Board of Executive Directors, shall be communicated to the Chairman of the Board of Governors, who shall bring the proposal before the Board of Governors. When an amendment has been adopted, the Bank shall so certify in an official communication addressed to all members. Amendments shall enter into force for all members three months after the date of the official communication unless the Board of Governors shall specify a different period.

# ARTICLE XIII
## INTERPRETATION AND ARBITRATION

**Section 1.** *Interpretation*

(a)      Any question of interpretation of the provisions of this Agreement arising between any member and the Bank or between any members of the Bank shall be submitted to the Board of Executive Directors for decision.

Members especially affected by the question under consideration shall be entitled to direct representation before the Board of Executive Directors as provided in Article VIII, Section 3(g).

(b)      In any case where the Board of Executive Directors has given a decision under (a) above, any member may require that the question be submitted to the Board of Governors, whose decision shall be final. Pending the decision of the Board of Governors, the Bank may, so far as it deems it necessary, act on the basis of the decision of the Board of Executive Directors.

**Section 2.**  *Arbitration*

If a disagreement should arise between the Bank and a country which has ceased to be a member, or between the Bank and any member after adoption of a decision to terminate the operation of the Bank, such disagreement shall be submitted to arbitration by a tribunal of three arbitrators. One of the arbitrators shall be appointed by the Bank, another by the country concerned, and the third, unless the parties otherwise agree, by the Secretary General of the Organization of American States.  If all efforts to reach a unanimous agreement fail, decisions shall be made by a majority vote of the three arbitrators.

The third arbitrator shall be empowered to settle all questions of procedure in any case where the parties are in disagreement with respect thereto.

## ARTICLE XIV
## GENERAL PROVISIONS

**Section 1.**  *Principal Office*

The principal office of the Bank shall be located in Washington, District of Columbia, United States of America.

**Section 2.**  *Relations with Other Organizations*

The Bank may enter into arrangements with other organizations with respect to the exchange of information or for other purposes consistent with this Agreement.

**Section 3.**  *Channel of Communication*

Each member shall designate an official entity for purposes of communication with the Bank on matters connected with this Agreement.

**Section 4.**  *Depositories*

Each member shall designate its central bank as a depository in which the Bank may keep its holdings of such member's currency and other assets of the Bank.  If a member has no central bank, it shall, in agreement with the Bank, designate another institution for such purpose.

## ARTICLE XV
## FINAL PROVISIONS

**Section 1.**  *Signature and Acceptance*

(a)    This Agreement shall be deposited with the General Secretariat of the Organization of American States, where it shall remain open until December 31, 1959, for signature by the representatives of the countries listed in Annex A. Each signatory country shall deposit with the General Secretariat of the Organization of American States an instrument setting

forth that it has accepted or ratified this Agreement in accordance with its own laws and has taken the steps necessary to enable it to fulfill all of its obligations under this Agreement.

(b)     The General Secretariat of the Organization of American States shall send certified copies of this Agreement to the members of the Organization and duly notify them of each signature and deposit of the instrument of acceptance or ratification made pursuant to the foregoing paragraph, as well as the date thereof.

(c)     At the time the instrument of acceptance or ratification is deposited on its behalf, each country shall deliver to the General Secretariat of the Organization of American States, for the purpose of meeting administrative expenses of the Bank, gold or United States dollars equivalent to one tenth of one per cent of the purchase price of the shares of the Bank subscribed by it and of its quota in the Fund. This payment shall be credited to the member on account of its subscription and quota prescribed pursuant to Articles II, Section 4(a)(i), and IV, Section 3(d)(i). At any time on or after the date on which its instrument of acceptance or ratification is deposited, any member may make additional payments to be credited to the member on account of its subscription and quota prescribed pursuant to Articles II and IV. The General Secretariat of the Organization of American States shall hold all funds paid under this paragraph in a special deposit account or accounts and shall make such funds available to the Bank not later than the time of the first meeting of the Board of Governors held pursuant to Section 3 of this article. If this Agreement has not come into force by December 31, 1959, the General Secretariat of the Organization of American States shall return such funds to the countries that delivered them.

(d)     On or after the date on which the Bank commences operations, the General Secretariat of the Organization of American States may receive the signature and the instrument of acceptance or ratification of this Agreement from any country whose membership has been approved in accordance with Article II, Section 1(b).

## Section 2. *Entry into Force*

(a)     This Agreement shall enter into force when it has been signed and instruments of acceptance or ratification have been deposited, in accordance with Section 1(a) of this article, by representatives of countries whose subscriptions comprise not less than 85 per cent of the total subscriptions set forth in Annex A.

(b)     Countries whose instruments of acceptance or ratification were deposited prior to the date on which the agreement entered into force shall become members on that date. Other countries shall become members on the dates on which their instruments of acceptance or ratification are deposited.

## Section 3. *Commencements of Operations*

(a)     The Secretary General of the Organization of American States shall call the first meeting of the Board of Governors as soon as this Agreement enters into force under Section 2 of this article.

(b)      At the first meeting of the Board of Governors arrangements shall be made for the selection of the executive directors and their alternates in accordance with the provisions of Article VIII, Section 3, and for the determination of the date on which the Bank shall commence operations.  Notwithstanding the provisions of Article VIII, Section 3, the governors, if they deem it desirable, may provide that the first term to be served by such directors may be less than three years.

DONE at the city of Washington, District of Columbia, United States of America, in a single original, dated April 8, 1959, whose English, French, Portuguese, and Spanish texts are equally authentic.

## ANNEX A
## SUBSCRIPTIONS TO AUTHORIZED CAPITAL STOCK OF THE BANK
### (In shares of US$10,000 each)

| Country | Paid-in Capital Shares | Callable Shares | Total Subscription |
|---|---|---|---|
| Argentina | 5,157 | 5,157 | 10,314 |
| Bolivia | 414 | 414 | 828 |
| Brazil | 5,157 | 5,157 | 10,314 |
| Chile | 1,416 | 1,416 | 2,832 |
| Colombia | 1,415 | 1,415 | 2,830 |
| Costa Rica | 207 | 207 | 414 |
| Cuba | 1,842 | 1,842 | 3,684 |
| Dominican Republic | 276 | 276 | 552 |
| Ecuador | 276 | 276 | 552 |
| El Salvador | 207 | 207 | 414 |
| Guatemala | 276 | 276 | 552 |
| Haiti | 207 | 207 | 414 |
| Honduras | 207 | 207 | 414 |
| Mexico | 3,315 | 3,315 | 6,630 |
| Nicaragua | 207 | 207 | 414 |
| Panama | 207 | 207 | 414 |
| Paraguay | 207 | 207 | 414 |
| Peru | 691 | 691 | 1,382 |
| United States of America | 15,000 | 20,000 | 35,000 |
| Uruguay | 553 | 553 | 1,106 |
| Venezuela | 2,763 | 2,763 | 5,526 |
| Total | 40,000 | 45,000 | 85,000 |

### ADDENDUM A
**SUBSCRIPTIONS TO AUTHORIZED CAPITAL STOCK OF THE BANK AS OF DECEMBER 31, 1987* (In shares)**

| Country | Subscribed | | | To be Subscribed or Accepted | | | Total |
|---|---|---|---|---|---|---|---|
| | Paid-in | Callable | Sub-total | Paid-in | Callable | Sub-total | |
| Argentina | 25,344 | 303,017 | 328,361 | 140 | 2,977 | 3,117 | 331,478 |
| Austria | 172 | 2,070 | 2,242 | 1 | 20 | 21 | 2,263 |
| Bahamas | 829 | 5,515 | 6,344 | 3 | 58 | 61 | 6,405 |
| Barbados | 390 | 3,537 | 3,927 | 1 | 36 | 37 | 3,964 |
| Belgium | 421 | 4,892 | 5,313 | 2 | 49 | 51 | 5,364 |
| Bolivia | 2,035 | 24,325 | 26,360 | 11 | 239 | 250 | 26,610 |
| Brazil | 25,344 | 303,017 | 328,361 | 140 | 2,977 | 3,117 | 331,478 |
| Canada | 9,929 | 114,096 | 124,025 | 53 | 1,124 | 1,177 | 125,202 |
| Chile | 6,954 | 83,208 | 90,162 | 38 | 818 | 856 | 91,018 |
| Colombia | 6,952 | 83,144 | 90,096 | 38 | 817 | 855 | 90,951 |
| Costa Rica | 1,016 | 12,159 | 13,175 | 6 | 119 | 125 | 13,300 |
| Denmark | 185 | 2,203 | 2,388 | 1 | 22 | 23 | 2,411 |
| Dominican Republic | 1,356 | 16,235 | 17,591 | 8 | 159 | 167 | 17,758 |
| Ecuador | 1,356 | 16,235 | 17,591 | 8 | 159 | 167 | 17,758 |
| El Salvador | 1,016 | 12,159 | 13,175 | 6 | 119 | 125 | 13,300 |
| Finland | 172 | 2,070 | 2,242 | 1 | 20 | 21 | 2,263 |
| France | 2,114 | 25,186 | 27,300 | 12 | 247 | 259 | 27,559 |
| Germany, Fed. Rep. Of | 2,163 | 25,797 | 27,960 | 12 | 254 | 266 | 28,226 |
| Guatemala | 1,356 | 16,235 | 17,591 | 8 | 159 | 167 | 17,758 |
| Guyana | 548 | 4,338 | 4,886 | 2 | 44 | 46 | 4,932 |
| Haiti | 1,016 | 12,159 | 13,175 | 6 | 119 | 125 | 13,300 |
| Honduras | 1,016 | 12,159 | 13,175 | 6 | 119 | 125 | 13,300 |
| Israel | 171 | 2,038 | 2,209 | 1 | 20 | 21 | 2,230 |
| Italy | 2,114 | 25,186 | 27,300 | 12 | 247 | 259 | 27,559 |
| Jamaica | 1,356 | 16,235 | 17,591 | 8 | 159 | 167 | 17,758 |
| Japan | 2,355 | 28,099 | 30,454 | 13 | 276 | 289 | 30,743 |
| Mexico | 16,294 | 194,781 | 211,075 | 90 | 1,914 | 2,004 | 213,079 |
| Netherlands | 318 | 3,832 | 4,150 | 2 | 37 | 39 | 4,189 |
| Nicaragua | 1,016 | 12,159 | 13,175 | 6 | 119 | 125 | 13,300 |
| Norway | 124 | 1,483 | 1,607 | 62 | 742 | 804 | 2,411 |
| Panama | 1,016 | 12,159 | 13,175 | 6 | 119 | 125 | 13,300 |
| Paraguay | 1,016 | 12,159 | 13,175 | 6 | 119 | 125 | 13,300 |
| Peru | 3,399 | 40,601 | 44,000 | 19 | 399 | 418 | 44,418 |
| Portugal | 53 | 666 | 719 | 1 | 6 | 7 | 726 |
| Spain | 2,114 | 25,186 | 27,300 | 12 | 247 | 259 | 27,559 |
| Suriname | 421 | 2,258 | 2,679 | 1 | 24 | 25 | 2,704 |
| Sweden | 368 | 4,282 | 4,650 | 2 | 42 | 44 | 4,694 |
| Switzerland | 469 | 5,627 | 6,096 | 3 | 55 | 58 | 6,154 |
| Trinidad & Tobago | 1,016 | 12,159 | 13,175 | 6 | 119 | 125 | 13,300 |
| United Kingdom | 2,114 | 25,186 | 27,300 | 12 | 247 | 259 | 27,559 |
| United States | 71,031 | 905,603 | 976,634 | 5,241 | 9,898 | 15,139 | 991,773 |
| Uruguay | 2,721 | 32,485 | 35,206 | 15 | 319 | 334 | 35,540 |
| Venezuela | 14,193 | 161,729 | 175,922 | 75 | 1,595 | 1,670 | 177,592 |
| Yugoslavia | 172 | 2,070 | 2,242 | 1 | 20 | 21 | 2,263 |
| Unassigned | | | | 7,069 | 37,111 | 44,180 | 44,180 |
| Total | 215,535 | 2,609,739 | 2,825,274 | 13,166 | 64,489 | 77,655 | 2,902,929 |

NOTE:   Under Article II, Section 2 of the Agreement Establishing the Inter-American Development Bank, each share of the capital stock of the Bank has a par value of $10,000 in terms of United States dollars of the weight and fineness in effect on January 1, 1959, which is equivalent to $12,063 in terms of current United States dollars.

*Secretary's note:  This Addendum is not part of the Agreement but is included for convenience.

## ANNEX B
### CONTRIBUTION QUOTAS FOR THE FUND FOR SPECIAL OPERATIONS
### (In thousands of US$)

| Country | Quota |
|---------|-------|
| Argentina | 10,314 |
| Bolivia | 828 |
| Brazil | 10,314 |
| Chile | 2,832 |
| Colombia | 2,830 |
| Costa Rica | 414 |
| Cuba | 3,684 |
| Dominican Republic | 552 |
| Ecuador | 552 |
| El Salvador | 414 |
| Guatemala | 552 |
| Haiti | 414 |
| Honduras | 414 |
| Mexico | 6,630 |
| Nicaragua | 414 |
| Panama | 414 |
| Paraguay | 414 |
| Peru | 1,382 |
| United States of America | 100,000 |
| Uruguay | 1,106 |
| Venezuela | 5,526 |
| **Total** | 150,000 |

**ADDENDUM B**
**CONTRIBUTION QUOTAS FOR THE FUND FOR SPECIAL OPERATIONS**
**AS OF DECEMBER 31, 1987\* (In thousands of current US$)**

| Country | Contribution Quotas1 |
|---|---|
| Argentina | 471,754 |
| Austria | 12,950 |
| Bahamas | 9,708 |
| Barbados | 1,569 |
| Belgium | 31,830 |
| Bolivia | 44,856 |
| Brazil | 502,890 |
| Canada | 241,899 |
| Chile | 144,386 |
| Colombia | 141,952 |
| Costa Rica | 21,531 |
| Denmark | 13,818 |
| Dominican Republic | 30,466 |
| Ecuador | 27,861 |
| El Salvador | 19,584 |
| Finland | 12,938 |
| France | 157,710 |
| Germany, Fed. Rep. Of | 161,593 |
| Guatemala | 29,635 |
| Guyana | 7,680 |
| Haiti | 20,126 |
| Honduras | 23,791 |
| Israel | 12,763 |
| Italy | 157,710 |
| Jamaica | 26,478 |
| Japan | 175,948 |
| Mexico | 302,290 |
| Netherlands | 23,959 |
| Nicaragua | 22,239 |
| Norway | 13,818 |
| Panama | 23,669 |
| Paraguay | 26,331 |
| Peru | 73,260 |
| Portugal | 5,636 |
| Spain | 157,710 |
| Suriname | 5,816 |
| Sweden | 27,868 |
| Switzerland | 35,181 |
| Trinidad and Tobago | 19,230 |
| United Kingdom | 157,710 |
| United States | 4,633,553 |
| Uruguay | 51,556 |
| Venezuela | 290,169 |
| Yugoslavia | 12,950 |
| Unassigned | 12,602 |
| **Total** | 8,398,973 |

1Total contribution quotas of the member countries to the Fund for Special Operations, as set forth in the Annual Report 1987.

\*Secretary's note:  This Addendum is not part of the Agreement but is included for convenience.