## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DOE CORPORATION 1, DOE CORPORATION 2, DOE CORPORATION 3, and DOE CORPORATION 4, <br><br> Plaintiffs, <br><br> v. <br><br> INTER-AMERICAN DEVELOPMENT BANK, <br><br> Defendant. | Civil Action No. 1:25-cv-1404 |

---

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

---

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iii

PRELIMINARY STATEMENT ............................................................................... 1

FACTUAL BACKGROUND ................................................................................... 5

    A.    The IDB's Origin and Objectives ........................................................... 5

    B.    Doe Corporations' Commercial Project and Financing Agreements with the IDB .............................................................................................. 6

    C.    The IDB's Investigation and Commencement of Sanctions Proceedings ............ 7

    D.    The Scope of the IDB's Enforcement Authority ................................. 10

        1.    The Charter ............................................................................... 10

        2.    Sanctions Procedures ............................................................... 11

        3.    Financing Agreements ............................................................. 12

LEGAL STANDARD ............................................................................................ 14

ARGUMENT .......................................................................................................... 14

I.    Doe Corporations Are Likely to Establish That the IDB Lacks Immunity from Suit in this Action ........................................................................................... 14

    A.    The IDB Waived Any Immunity Through the Parties' Agreements. ................ 15

    B.    The IDB Waived Any Immunity Through Its Charter. ....................... 18

    C.    The D.C. Circuit's Decision in *Rosenkrantz* Does Not Support a Contrary Result. ....................................................................................... 21

II.    Doe Corporations Are Likely to Succeed on the Merits of Their Claims. ..................... 23

    A.    Doe Corporations Are Likely to Succeed on Their Claim for Breach of Contract ................................................................................................. 23

    B.    Doe Corporations Are Likely to Succeed on Their Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing ............................ 27

    C.    Doe Corporations Are Likely to Establish Their Entitlement to a Declaratory Judgment. ...................................................................... 29

III.   Doe Corporations Are Likely to Suffer Irreparable Harm Absent a Preliminary
       Injunction.......................................................................................................... 31

       A.   Doe Corporations Will Suffer Irreversible Reputational Harm. ......................... 31

       B.   Doe Corporations Will Forever Lose Critical Confidentiality Protections. .......... 38

       C.   The Imposition of Sanctions Will Amplify the Irreversible Harm to Doe
            Corporations. .............................................................................................. 39

       D.   Doe Corporations Will Be Subjected to Illegitimate Enforcement
            Proceedings. ................................................................................................ 40

IV.    The Balance of Equities Favors Doe Corporations' Requested Injunction. .................... 42

V.     The Public Interest Favors Doe Corporations' Requested Injunction. ........................... 43

CONCLUSION ............................................................................................................ 44

## TABLE OF AUTHORITIES

### CASES

*511 West 232nd Owners Corp. v. Jennifer Realty Co.,
    773 N.E.2d 496 (N.Y. 2002)...........................................................................27, 28, 29

Alpine Securities Corp. v. FINRA,
    121 F.4th 1314 (D.C. Cir. 2024) ....................................................................... 41

Ashraf-Hassan v. Embassy of France in United States,
    40 F. Supp. 3d 94 (D.D.C. 2014), aff'd, 610 F. App'x 3 (D.C. Cir. 2015)......... 15, 16, 17

Avon Co. v. Fareva Morton Grove, Inc.,
    No. 22 Civ. 4724 (AKH), 2022 WL 2208156 (S.D.N.Y. June 21, 2022)...................... 43

*Axon Enterprise, Inc. v. FTC,
    598 U.S. 175 (2023) ........................................................................................ 41

Bancorp Services, LLC v. American General Life Insurance Co.,
    No. 14-CV-9687 (VEC), 2016 WL 4916969 (S.D.N.Y. Feb. 11, 2016) ...................... 27

Banks v. Booth,
    459 F. Supp. 3d 143 (D.D.C. 2020)................................................................... 43

Booth v. Bowser,
    597 F. Supp. 3d 1 (D.D.C. 2022)................................................................. 23, 31

BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.,
    229 F.3d 254 (3d Cir. 2000)............................................................................. 32

Dalton v. Educational Testing Service,
    663 N.E.2d 289 (N.Y. 1995)............................................................................ 29

Doe v. Taliban,
    101 F.4th 1 (D.C. Cir. 2024)............................................................................ 14

Eckert International, Inc. v. Government of Sovereign Democratic Republic of Fiji,
    32 F.3d 77 (4th Cir. 1994) ............................................................................... 16

Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of New York,
    375 F.3d 168 (2d Cir. 2004)............................................................................. 24

Fontaine v. Permanent Mission of Chile to United Nations,
    No. 17 Civ. 10086 (AT), 2020 WL 5424156 (S.D.N.Y. Aug. 18, 2020)...................... 16

Franko v. Lewnowski,
    No. 21-CV-6115 (VSB), 2023 WL 2989050 (S.D.N.Y. Apr. 18, 2023) ...................... 27

*Hospitality Staffing Solutions, LLC v. Reyes*,
    736 F. Supp. 2d 192 (D.D.C. 2010)............................................................ 39

*Ivanenko v. Yanukovich*,
    995 F.3d 232 (D.C. Cir. 2021) .................................................... 15, 16, 17

*\*Jam v. International Finance Corp.*,
    586 U.S. 199 (2019)................................................................................ 14

*\*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ............................................... 31, 42, 43

*M.G.U. v. Nielsen*,
    325 F. Supp. 3d 111 (D.D.C. 2018)................................................. 23, 43

*Mendaro v. World Bank*,
    717 F.2d 610 (D.C. Cir. 1983) ..................................................... 18, 19

*\*Merryman v. J.P. Morgan Chase Bank, N.A.*,
    No. 15-CV-9188 (VEC), 2016 WL 5477776 (S.D.N.Y. Sept. 29, 2016) ................ 24, 26

*Michaan v. Gazebo Horticultural, Inc.*,
    117 A.D.3d 692 (2d Dep't 2014)............................................................. 27

*Morgan Stanley DW Inc. v. Rothe*,
    150 F. Supp. 2d 67 (D.D.C. 2001)............................................................. 43

*National Ass'n for Advancement of Colored People v. United States Postal Service*,
    496 F. Supp. 3d 1 (D.D.C. 2020).......................................................... 14, 42

*\*National Railroad Passenger Corp. v. Consolidated Rail Corp.*,
    670 F. Supp. 424 (D.D.C. 1987)........................................................... 30, 31

*\*Orlando v. Nxt-ID Inc.*,
    No. 20-cv-1604 (MKV), 2022 WL 976875 (S.D.N.Y. Mar. 31, 2022)................... 25, 26

*\*Osseiran v. International Finance Corp.*,
    552 F.3d 836 (D.C. Cir. 2009) ................................................ 19, 20, 21

*Patriot, Inc. v. United States Department of Housing & Urban Development*,
    963 F. Supp. 1 (D.D.C. 1997) ............................................... 31, 34, 38

*Pfeiffer v. Ajamie PLLC*,
    469 F. Supp. 3d 752 (S.D. Tex. 2019).................................................. 32, 39

*Quadrant Structured Products Co. v. Vertin*,
    16 N.E.3d 1165 (N.Y. 2014).................................................................... 25

*Realtime Data, LLC v. Melone*,
    104 A.D.3d 748 (2d Dep't 2013)..................................................................... 26

*Robert Half International Inc. v. Billingham*,
    315 F. Supp. 3d 419 (D.D.C. 2018)................................................................. 38

*Rosenkrantz v. Inter-American Development Bank*,
    35 F.4th 854 (D.C. Cir. 2022) ..................................... 18, 19, 20, 21, 22, 23

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
    217 F.3d 8 (1st Cir. 2000)................................................................................ 31

*Singh v. Berger*,
    56 F.4th 88 (D.C. Cir. 2022) .......................................................................... 14

*TIG Insurance Co. v. Republic of Argentina*,
    110 F.4th 221 (D.C. Cir. 2024) ................................................................ 15, 16

*United Government Security Officers of America, Local No. 52 v. Chertoff*,
    587 F. Supp. 2d 209 (D.D.C. 2008)......................................................... 29, 30

*United States v. Facebook, Inc.*,
    No. 23-5280, 2024 WL 1128083 (D.C. Cir. Mar. 12, 2024) ........................ 41

*Vallecillo v. Embassy of Republic of South Africa*,
    No. 20-cv-432-ACR-ZMF, 2024 WL 754736 (D.D.C. Feb. 9, 2024)..................... 15, 16

*Vanderbilt University v. National Labor Relations Board*,
    759 F. Supp. 3d 812 (M.D. Tenn. 2024) ................................................. 35, 36

*VHS Acquisition Subsidiary No. 7 v. NLRB*,
    No. 1:24-cv-02577 (TNM), 2024 WL 4817175 (D.D.C. Nov. 17, 2024)..................... 41

*Vila v. Inter-American Investment Corp.*,
    570 F.3d 274 (D.C. Cir. 2009) .................................................. 18, 19, 20

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008)............................................................................................ 14

*Wu v. JP Morgan Chase Bank, N.A.*,
    No. 23 Civ. 763 (JPC), 2024 WL 732116 (S.D.N.Y. Feb. 22, 2024)..................... 28, 29

## STATUTES

22 U.S.C. § 283g..................................................................................................... 6

22 U.S.C. §§ 288-288*l*............................................................................................ 14

28 U.S.C. § 1605(a)(1)............................................................................................ 15

28 U.S.C. § 2201(a)...................................................................................................... 29, 30

Plaintiffs Doe Corporation 1, Doe Corporation 2, Doe Corporation 3, and Doe Corporation 4 (collectively, "Doe Corporations"), by and through undersigned counsel, submit this Memorandum of Points and Authorities in support of their Motion for a Preliminary Injunction (the "Motion").

## PRELIMINARY STATEMENT

This Motion asks the Court to immediately halt the Inter-American Development Bank's (the "IDB's") illegitimate power grab, which, if left unchecked, will cause permanent and irreparable harm to Doe Corporations. The IDB seeks to dramatically expand its power to punish and sanction in a way that is completely at odds with its governing charter and contractual agreements with Doe Corporations. Using internal enforcement proceedings in which it is almost always successful, known as "sanctions proceedings," the IDB is trying to penalize and sanction Doe Corporations based exclusively on alleged conduct that pre-dates the parties' contractual relationship by over a year. Notably, the IDB's affiliate previously assessed the matters at issue in the sanctions proceeding without a finding of wrongdoing after Doe Corporations themselves proactively flagged the underlying allegations to the affiliate.

The IDB's charter and its corresponding Sanctions Procedures permit the IDB to investigate and sanction specific, enumerated categories of misconduct related to the use of IDB funds, but nothing purports to confer sweeping authority on the IDB to reach back in time and commence sanctions proceedings based on events that occurred long before any contracts were executed or any funds were disbursed. The IDB could have addressed any perceived limitations on its authority through contract, but it did not do so here. The result is that Doe Corporations now face an ultra vires action that, given the nature of the IDB's internal sanctions proceedings, is near certain to result in the imposition of draconian sanctions and indelible reputational harm unless the Court puts an immediate stop to the IDB's illegitimate and unlawful actions.

As detailed below, each of the controlling four factors counsels in favor of granting a preliminary injunction barring the IDB from continuing its sanctions proceedings against Doe Corporations, and disclosing any information concerning those proceedings, pending resolution of this lawsuit.

*First*, Doe Corporations are likely to succeed on the merits of their claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory judgment. As a threshold matter, to the extent that the IDB asserts that it is immune from this suit, Doe Corporations are likely to prevail on their argument that the IDB waived any such immunity. The IDB, in multiple contracts with Doe Corporations, agreed that New York law would apply to all claims arising out of the parties' contractual relationship. Courts consistently have held that acquiescence to such a U.S. choice-of-law provision waives immunity. The IDB's consent to litigation before a judge, as opposed to a jury, reiterates and reinforces this contractual waiver. Moreover, the IDB has waived immunity to this action through its charter, which expressly contemplates that actions may be brought against the IDB. Courts analyzing waiver under these circumstances look to whether waiver would advance a goal of the organization and weigh that benefit against the costs of waiver. Here, resolving the question whether the IDB possesses generally applicable authority to commence sanctions proceedings based on allegations of misconduct pre-dating any contract or disbursement of funds will substantially assist the IDB's mission by giving commercial counterparties the certainty needed to carry out developmental projects with IDB funding. Adjudicating Doe Corporations' claims will not correspondingly burden the IDB because this action presents a categorical question that, once resolved, will conclusively settle any similar disputes and is unlikely to spawn additional litigation. For all these reasons, there is a substantial likelihood that any immunity claim by the IDB will fail.

2

Doe Corporations also are likely to succeed on the merits of their claims. The IDB's initiation of sanctions proceedings against Doe Corporations based on the alleged commission of so-called Prohibited Practices over a year before execution of the parties' agreements, or the disbursement of funds pursuant to those agreements, breaches at least two provisions of the parties' contracts. First, the contracts set forth a detailed set of proscribed acts to govern Doe Corporations' conduct. None of those enumerated acts involves the commission of Prohibited Practices—or, indeed, any other conduct—that pre-date the execution of the agreements that underpin the parties' relationship. Second, the contracts identify specific remedies that the IDB can seek as a result of particular conduct. None of the enumerated remedies permits the IDB to initiate sanctions proceedings based on Prohibited Practices that occurred before execution of the agreements. Alternatively (or in addition), the IDB's commencement of sanctions proceedings violates the implied covenant of good faith and fair dealing between the IDB and Doe Corporations. Doe Corporations reasonably expected that their agreements with the IDB precluded the IDB from seeking to impose sanctions based on alleged Prohibited Practices that occurred prior to the execution of the agreements. The IDB's usurpation of the authority to impose far-reaching sanctions on Doe Corporations for conduct that took place long before entry into those agreements disrupts Doe Corporations' reasonable expectation and deprives them of a fundamental benefit of their bargain with the IDB.

*Second*, Doe Corporations are likely to suffer irreparable harm in the absence of preliminary injunctive relief. Doe Corporations are now—and will continue to be, absent this Court's intervention—forced to participate in unauthorized sanctions proceedings, with an essentially preordained outcome and no opportunity for external review. Doe Corporations also will suffer irreversible reputational harm in the absence of relief. Win or lose, the IDB will

publicly disclose the existence of the investigation and sanctions proceedings. Doe Corporations' current and potential customers, regulators, financial institutions, governments across the globe, other international organizations, and the public at large will discover that the IDB endorsed allegations of criminal misconduct against them, indelibly tarnishing Doe Corporations' hard-earned reputation and causing irreparable loss of business—irrespective of the merit of such allegations, which are baseless. And, indeed, these harms *already* have begun to materialize. The IDB's premature disclosure of "integrity concerns" about the Doe Corporations prompted a government agency to rescind an invitation for a Doe Corporation affiliate to participate in an important business convention. This Court's intervention is needed now, before Doe Corporations are forced to further yield to the IDB's unlawful assumption of police power and while it is still possible to prevent any further disclosure of the IDB's allegations to key stakeholders during the pendency of the sanctions proceedings and through the public release of findings afterward.

*Third*, the balance of equities favors a preliminary injunction. As noted above, Doe Corporations face severe and irreversible harm in the absence of immediate relief. The IDB, on the other hand, will only be required to pause a single set of sanctions proceedings. It will remain free to continue all other investigations and sanctions proceedings pending the resolution of this lawsuit. And should this Court ultimately decline to afford Doe Corporations permanent relief, the IDB will be able to resume the pending sanctions proceedings.

*Finally*, the public interest favors a preliminary injunction. Maintaining the status quo will vindicate basic notions of fairness by giving Doe Corporations a full opportunity to develop and present their claims that the IDB's exercise of sweeping enforcement authority against them is unlawful. The public has a profound interest in ensuring that international organizations—which depend on U.S. funding—exercise their authority in a fair and predictable manner. Precluding the

4

IDB from continuing its sanctions proceedings also would promote the public's interest in facilitating development in Latin America and the Caribbean. Fear that the IDB could impose draconian sanctions based on alleged conduct that long pre-dates any contractual relationship with the IDB has the potential to chill critical investment in those regions.

For all these reasons, and as further explained below, the Court should grant the Motion and enjoin the IDB from continuing the sanctions proceedings against Doe Corporations, and from disclosing any information related to those proceedings and the underlying allegations, pending resolution of this action.

## FACTUAL BACKGROUND

### A.    The IDB's Origin and Objectives

The IDB is an international financial institution that was established pursuant to the Agreement Establishing the Inter-American Development Bank, *opened for signature* Apr. 8, 1959, 10 U.S.T. 3068 (the "Charter"). Compl. ¶ 12; *id.*, Ex. I, Charter. According to the Charter, the IDB's purpose is to "contribute to the acceleration of the process of economic and social development of the regional development member countries, individually and collectively." Compl., Ex. I, Charter, Art. I, § 1. The IDB's missions, among others, include "promot[ing] the investment of public and private capital for development purposes," "utiliz[ing] its own capital . . . for financing the development of the member countries," "encourag[ing] private investment in projects, enterprises, and activities contributing to economic development," and "supplement[ing] private investment when private capital is not available on reasonable terms and conditions." *Id.*

Art. I, §§ 2(a)(i)–(iii).  The IDB advertises itself as "[t]he main source of development financing for Latin America and the Caribbean."[1]

Notably, the Charter includes an express waiver of the IDB's immunity to suit in U.S. courts, among other venues: "Actions may be brought against the Bank only in a court of competent jurisdiction in the territories of a member in which the Bank has an office, has appointed an agent for the purpose of accepting service or notice of process, or has issued or guaranteed securities."  Compl., Ex. I, Charter, Art. XI, § 3; *see also* 22 U.S.C. § 283g (incorporating this provision into federal law).

**B.    Doe Corporations' Commercial Project and Financing Agreements with the IDB**

Doe Corporation 3, a subsidiary of Doe Corporation 1, executed an agreement to complete a commercial project (the "Commercial Project Agreement").  Compl. ¶ 17.  Doe Corporations subsequently sought financing to partially fund the commercial project (the "Commercial Project"). In 2018—more than a year after the execution of the Commercial Project Agreement—Doe Corporation 1, Doe Corporation 2, and Doe Corporation 3 entered into agreements to obtain financing from the IDB (and other counterparties) to fund the Commercial Project.  *Id.* ¶ 18.

First, Doe Corporation 3 entered into the Common Terms Agreement with the IDB (expressly through its agent, the Inter-American Investment Corporation ("IDB Invest")), IDB Invest (in its own and other capacities), and two additional lenders (collectively, the "Senior Lenders").  *Id.* ¶ 19; *see also* Ex. A to Compl. and Mot. to Proceed Under Pseudonym ("Combined Ex. A"), Common Terms Agreement (the "CTA").[2]  Second, Doe Corporation 3 entered into the

---

[1]    *Who We Are*, IDB, *available at* https://www.iadb.org/en/who-we-are/about-idb (last visited May 7, 2025).

[2]    *See* Compl. ¶ 19 n.1; Pltfs.' Mot. to Proceed Under Pseudonym, at 13 n.2.

IDB Group Senior Loan Agreement (the "Senior Loan Agreement" and, collectively with the Common Terms Agreement, the "Loan Agreements") with the IDB (again expressly through its agent, IDB Invest) and IDB Invest.  *Id.* ¶ 20; *see also* Combined Ex. B, Senior Loan Agreement.

These documents establish the IDB's status as a Senior Lender and reflect the agreement between the Senior Lenders to lend, and Doe Corporation 3 to borrow, "subject to the terms and conditions set forth" within those documents.  *Id.* ¶ 21.  Doe Corporation 1, Doe Corporation 2, and Doe Corporation 3 entered into a series of contemporaneous additional agreements with the IDB, IDB Invest, and other entities that effectively incorporated the Loan Agreements' terms.  *Id.* ¶ 22 n.2.; *see also* Combined Ex. C, Equity Contribution and Subordination Agreement ("ECSA"). Prior to executing these agreements, neither the IDB nor IDB Invest had any involvement in the Commercial Project.  *Id.* ¶ 21.

Doe Corporation 3 received installments of the IDB loan in 2019 and 2020.  *Id.* ¶ 23.  Doe Corporation 3 has timely made all payments on the loans to date, and Doe Corporations have otherwise fulfilled all of the contractual obligations owed to the IDB and the other counterparties. *Id.*

## C.    The IDB's Investigation and Commencement of Sanctions Proceedings

In 2020, the IDB's Office of Institutional Integrity (the "OII") initiated an investigation into events concerning the award of the Commercial Project Agreement.  Compl. ¶ 24.  The OII's investigation centered exclusively on alleged conduct that pre-dates—by more than a year—the beginning of the contractual relationship between Doe Corporations and the IDB, as well as the disbursement of any funds.  *Id.*

Notably, before the OII initiated its investigation into Doe Corporations—and before Doe Corporation 3 received the first loan installment—Doe Corporations proactively informed IDB Invest about allegations that had surfaced regarding the award of the Commercial Project

Agreement. *Id.* ¶ 25. IDB Invest responded by conducting a due diligence inquiry regarding the allegations that included consultation with outside legal counsel. *Id.* ¶ 26. Doe Corporations fully cooperated with the diligence process, addressing all requests from IDB Invest and outside counsel and providing responsive information to demonstrate that the allegations were unfounded. *Id.* The information provided was subject to disclosure to the OII. *Id.* The inquiry did not delay or otherwise impede the disbursement of loan funds from IDB and IDB Invest; Doe Corporation 3 received the first installment of the loan funds shortly after it had disclosed the allegations to IDB Invest, and continued to receive additional installments both during and after the diligence process. *Id.* ¶ 27. After a period of time, IDB Invest ceased inquiring about the allegations and continued its support of the Commercial Project. *Id.* ¶ 26.

Nevertheless, more than a year after IDB Invest began its due diligence inquiry, the OII notified Doe Corporations that it was initiating an investigation into the same allegations that Doe Corporations had flagged and IDB Invest apparently had cleared. *Id.* ¶ 28. The OII issued a series of requests for documents and information. *Id.* Doe Corporations cooperated with the OII's investigation in an effort to resolve the matter without the need to resort to adversarial proceedings within the IDB or in a U.S. court. *Id.* During the investigative process, however, Doe Corporations made clear that the allegations of wrongdoing are groundless and that the IDB lacks any authority to subject Doe Corporations to sanctions proceedings in connection with allegations of Prohibited Practices that entirely pre-date any contractual relationship between the parties. *Id.* Doe Corporations provided OII with a voluminous record during this time, including a report in which government auditors concluded, following an extensive audit, that the Commercial Project Agreement had been properly awarded. *Id.*

Ultimately, the parties' efforts to come to a resolution were unsuccessful. On September 24, 2024, the OII issued written notice that it was terminating the negotiated resolution process. *Id.* ¶ 29. On April 28, 2025, the IDB's Office of the Sanctions Officer issued a separate Notice of Administrative Action to Doe Corporation 1, Doe Corporation 2, Doe Corporation 3, and Doe Corporation 4 (the "Notices"), pursuant to the IDB's Sanctions Procedures. *Id.* ¶ 30; *see also* Combined Exs. D–G, Notices. Alongside the Notices, the IDB provided Doe Corporations with the OII's Statement of Charges and Evidence (the "Statement of Charges"), which the OII had presented to the Sanctions Officer prior to issuance of the Notices. *Id.*; *see also* Combined Ex. H, Statement of Charges; Compl., Ex. J, 2015 Sanctions Procedures § 3.3.

The OII's Statement of Charges asserts that a preponderance of the evidence shows that Doe Corporation 1 and Doe Corporation 2 engaged in so-called "Prohibited Practices," a category of conduct defined in the Sanctions Procedures. *Id.* ¶ 31; *see also* pp. 11–12 *infra*. The Statement of Charges further claims that sanctions may be imposed on Doe Corporation 3 and Doe Corporation 4 as a result of the alleged conduct. *Id.* All of the conduct that forms the basis of the charges against Doe Corporations pre-dates the execution of the parties' financing agreements by a year or more. *Id.* ¶ 32. None of the alleged misconduct relates to the use of any funds that the IDB (or any other Senior Lender) provided to Doe Corporations. *Id.*

The Notices reflect the Sanctions Officer's determination that, based on a review of the OII's charges, a preponderance of the evidence shows that Doe Corporation 1 and Doe Corporation 2 engaged in Prohibited Practices, and that Doe Corporation 3 and Doe Corporation 4 may be sanctioned for that supposed conduct to the same degree as Doe Corporation 1 and Doe Corporation 2. Each Notice clarifies that the action "is related to charges of prohibited practices linked to" the Common Terms Agreement, the Senior Loan Agreement, and the Equity

Contribution and Subordination Agreement. Combined Ex. D, Notice to Doe Corporation 1, at 1; *see also* Compl. ¶ 30. Like the incorporated Statement of Charges, the Notices make clear that all alleged misconduct took place prior to the parties' execution of the transactional agreements. *Id.* ¶ 32.

Service of the Notices triggered the commencement of formal sanctions proceedings against Doe Corporations. *Id.* ¶ 33. The Notices impose on Doe Corporations an immediate obligation to respond, and they make clear that failure to do so will be considered an admission of the allegations and a waiver of any future right to appeal the Sanctions Officer's final determination to the IDB's Sanctions Committee. *Id.*; *see also* Combined Ex. D, Notice to Doe Corporation 1, at 1. Doe Corporations are now subject to an enforcement action with imminent obligations, notwithstanding the illegitimacy and unlawfulness of the proceedings. Given the IDB's exceptionally high success rate historically—a direct product of its overwhelming structural advantages in the enforcement proceedings—the end result is virtually certain to include draconian sanctions and indelible reputational harm, underscoring the fundamental unfairness of the process.

**D.     The Scope of the IDB's Enforcement Authority**

The IDB can derive its authority to initiate enforcement proceedings against Doe Corporations from three sources: (i) the Charter; (ii) the Sanctions Procedures, which implement powers delegated by the Charter; and (iii) the financing agreements with Doe Corporations. None of those purports to confer authority on the IDB to commence sanctions proceedings based on conduct pre-dating the initiation of any contractual relationship with Doe Corporations.

**1.     The Charter**

The Charter's sole grant of enforcement authority is found in its provision that the IDB "shall take the necessary measures to ensure that the proceeds of any loan made, guaranteed, or participated in by the Bank are used only for the purposes for which the loan was granted, with

due attention to considerations of economy and efficiency." Compl., Ex. I, Charter, Art. XII, § 9(b). The Charter's plain terms thus limit the IDB's enforcement authority to events that occur following the execution of financing agreements with a loan recipient and the disbursement of funds. After all, the IDB must enter into an agreement with the loan recipient outlining the "purposes for which the loan was granted" before it can invoke its power to ensure that the loaned funds are used in a manner consistent with those purposes. And the IDB must actually transfer funds to a recipient before it can exercise its authority to trace the "proceeds" of the "loan." Consequently, the Charter does not purport to confer any authority on the IDB to broadly police conduct pre-dating the execution of financing agreements and the actual disbursement of funds.

### 2. Sanctions Procedures

The IDB, along with the other members of the "IDB Group" (IDB Invest and the Multilateral Investment Fund, also known as "IDB Lab"), has adopted Sanctions Procedures to outline the scope of the IDB's authority to investigate, bring sanctions proceedings against, and ultimately sanction entities involved in IDB-financed projects. Compl., Ex. J, 2015 Sanctions Procedures.[3] The Sanctions Procedures "are to be followed in connection with allegations of fraud and corruption" in IDB Group projects. *Id.* § 1.1. Parties are subject to the Sanctions Procedures, and corresponding sanctions proceedings, only upon allegations fitting within specific categories of proscribed conduct designated as "Prohibited Practices." *Id.* §§ 2.2, 3.4. 8.1; *see also* Compl. ¶ 40. The Sanctions Procedures outline the procedural steps accompanying allegations of Prohibited Practices, which culminate in a ruling by a Sanctions Officer and, if appealed internally, the Sanctions Committee. Compl., Ex. J, 2015 Sanctions Procedures §§ 2–7. The Sanctions

---

[3]    The 2015 Sanctions Procedures govern the claims in this action because they were in effect at the time that the parties executed the Loan Agreements. Compl. ¶ 39 n.4. But even if the current Sanctions Procedures applied, Doe Corporations' claims would be unaffected.

Procedures also specify the range of sanctions, many of which are especially punitive and harsh, that can accompany determinations of wrongdoing.  *Id.* § 8.2.  They also make clear that "[t]he imposition of any Sanction shall be public."  *Id.*; *see also id.* § 14.1.

Consistent with the Charter, the Sanctions Procedures contemplate that the IDB's enforcement authority is limited to conduct that follows the execution of the relevant financing agreements.  The Sanctions Procedures apply in the first instance only after the relevant loan agreement is executed.  *Id.* § 1.2.  The Sanctions Procedures also define the conduct that comes within their ambit in exclusively forward-looking terms, prohibiting parties from "*engaging* in [Prohibited Practices]."  *Id.* § 2.2 (emphasis added).  And the definitions of Prohibited Practices themselves—which serve as the predicate for the initiation of sanctions proceedings and imposition of sanctions—are purely prospective.  *See id.* § 2.2(a)–(e); Compl. ¶¶ 40–42.

### 3.    Financing Agreements

Apart from the Charter and the derivative Sanctions Procedures, the IDB can assume additional authority through contractual arrangement.  In this case, however, none of the parties' agreements augment the IDB's authority to initiate sanctions proceedings and impose sanctions. Compl. ¶¶ 43–47.

As is relevant here, the Loan Agreements enumerate "Events of Default" and "Policy Events of Default" for which the IDB may seek redress.  Combined Ex. A, CTA § 6.1, Annex I-28.  The Common Terms Agreement includes a comprehensive list of fifteen Events of Default and exhaustively describes Policy Events of Default.  *Id.*  These categories encompass potential "events of default" based on the conduct of other Loan Parties as defined by the relevant contractual agreements (such as the parties to the Equity Contribution and Subordination Agreement).  The Senior Loan Agreement incorporates those lists, adding one Policy Event of Default.  Combined Ex. B, Senior Loan Agreement § 3.4.1.  These provisions of the Loan

Agreements identify the entire universe of acts by Doe Corporations for which the IDB may seek relief. Compl. ¶ 44. None of those Events of Default or Policy Events of Default involves the commission of Prohibited Practices prior to the execution of those agreements. *Id.* ¶¶ 44–45.

The Loan Agreements separately enumerate the remedies available to the IDB based on the commission of an Event of Default or Policy Event of Default. *Id.* ¶ 46. The Loan Agreements include an exhaustive list of five potential remedies in such circumstances. Combined Ex. A, CTA § 6.2.3; *accord* Combined Ex. B, Senior Loan Agreement § 3.4.1(a). None of these terms expressly mentions sanctions proceedings (nor does, for that matter, the Equity Contribution and Subordination Agreement). At most, the Loan Agreements indirectly refer to those proceedings through the catch-all remedies clause, which permits the IDB "to exercise any other remedies that may be available to it under any Financing Document or *Applicable Law*." Combined Ex. A, CTA § 6.2.3 (emphasis added); *accord* Combined Ex. B, Senior Loan Agreement § 3.4.1(a). But even if this provision circuitously incorporates the Sanctions Procedures through the term "Applicable Law," nowhere do the Loan Agreements purport to expand the scope of those Procedures to cover Prohibited Practices committed prior to the execution of the Agreements. Compl. ¶ 46.

Finally, the Senior Loan Agreement states that Doe Corporations "shall not engage in (or authorize or permit any Affiliate or any other Person acting on its behalf to engage in) any Prohibited Practice with respect to the Project." Combined Ex. B, Senior Loan Agreement § 3.3.3. This language is solely prospective, barring Doe Corporations from committing Prohibited Practices ***after*** execution of the Senior Loan Agreement. Compl. ¶ 45. So, too, is the additional "Policy Event of Default" defined in that agreement, which applies where a party "engages in a Prohibited Practice in connection with the Project." Combined Ex. B, Senior Loan Agreement § 3.4.1(b). The Senior Loan Agreement likewise defines Prohibited Practices in an exclusively

13

forward-looking manner. *Id.*; *accord* Combined Ex. C, ECSA, at 8 (incorporating definition from Senior Loan Agreement). It also "incorporate[s]" the remedies provisions from the Common Terms Agreement, which, as noted, do not authorize the commencement of sanctions proceedings based on allegations of Prohibited Practices committed prior to the execution of the Agreement. Combined Ex. B, Senior Loan Agreement § 3.4.1(a); Compl. ¶¶ 46–47.

## LEGAL STANDARD

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Nat'l Ass'n for Advancement of Colored People v. United States Postal Serv.*, 496 F. Supp. 3d 1, 8 (D.D.C. 2020) ("*NAACP*") (citation omitted). To obtain a preliminary injunction, the moving party must establish that (i) "it has a likelihood of success on the merits," (ii) "it will likely suffer irreparable harm before the district court can resolve the merits of the case," (iii) "the balance of equities favors preliminary relief," and (iv) "an injunction is in the public interest." *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "In this Circuit, the four factors have typically been evaluated on a 'sliding scale,' such that if 'the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor.'" *NAACP*, 496 F. Supp. 3d at 8 (citation omitted).

## ARGUMENT

## I.　Doe Corporations Are Likely to Establish That the IDB Lacks Immunity from Suit in this Action.

Doe Corporations anticipate that the IDB will assert that it is immune from suit under the International Organizations Immunities Act (the "IOIA"), *see* 22 U.S.C. §§ 288-288*l*. Under the IOIA, international organizations "enjoy the same immunities subject to the same exceptions that foreign governments have under the [Foreign Sovereign Immunities Act]." *Doe v. Taliban*, 101

F.4th 1, 6 (D.C. Cir. 2024); *see also Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 215 (2019) (explaining that the Foreign Sovereign Immunities Act, including its enumerated exceptions to sovereign immunity, "governs the immunity of international organizations" under the IOIA). Accordingly, international organizations are not immune from suit "in any case . . . in which the [international organization] has waived its immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1).

As explained below, Doe Corporations are likely to prevail on their argument that the IDB implicitly waived any immunity through the execution of the relevant Agreements with Doe Corporations and, independently, explicitly waived any immunity via the Charter.

### A.      The IDB Waived Any Immunity Through the Parties' Agreements.

As an initial matter, the IDB implicitly waived its immunity from Doe Corporations' claims through its execution of the Common Terms Agreement, the Senior Loan Agreement, and the Equity Contribution and Subordination Agreement, all of which include a choice-of-law provision designating New York law as applicable. The D.C. Circuit has recognized that a sovereign "implicitly dispenses with its immunity" by "executing a contract containing a choice-of-law clause designating the laws of the United States as applicable." *Ivanenko v. Yanukovich*, 995 F.3d 232, 239 (D.C. Cir. 2021); *see also Ashraf-Hassan v. Embassy of Fr. in United States*, 40 F. Supp. 3d 94, 100 (D.D.C. 2014) (noting that such clauses "appear to 'contemplate a role for United States courts' in resolving disputes" (citation omitted)), *aff'd*, 610 F. App'x 3 (D.C. Cir. 2015). A contractual choice-of-law clause reflects an "indicat[ion] [of] a willingness to submit to litigation in this country," and thus the subsequent implied waiver analysis requires no "evidence of subjective intent." *TIG Ins. Co. v. Republic of Arg.*, 110 F.4th 221, 236 (D.C. Cir. 2024).

Applying this straightforward principle, courts within this Circuit have consistently rejected a sovereign's claim of immunity when the underlying contract contemplates the application of U.S. law. *See, e.g.*, *Vallecillo v. Embassy of Republic of S. Afr.*, No. 20-cv-432-

15

ACR-ZMF, 2024 WL 754736, at *4 (D.D.C. Feb. 9, 2024) ("By agreeing that D.C. law controlled the interpretation of the employment contract, the Embassy assumed an obligation to abide by U.S. law . . . . [and thus] waived its sovereign immunity."); *Ashraf-Hassan*, 40 F. Supp. 3d at 101 (finding waiver where "the employment contract that the Embassy concluded with Plaintiff was expressly subject to U.S. law to the exclusion of any other potential source"); *accord Eckert Int'l, Inc. v. Gov't of Sovereign Democratic Republic of Fiji*, 32 F.3d 77, 81 (4th Cir. 1994) (affirming sovereign's waiver of immunity on the basis of a contractual provision designating U.S. law as applicable); *Fontaine v. Permanent Mission of Chile to United Nations*, No. 17 Civ. 10086 (AT), 2020 WL 5424156, at *4 (S.D.N.Y. Aug. 18, 2020) (applying the "longstanding rule that a waiver of sovereign immunity can be implied from a contract's choice of law provision" and holding that sovereign waived immunity through U.S. choice-of-law provision in relevant contract).

The Court should reach the same result here. The Common Terms Agreement, the Senior Loan Agreement, and the Equity Contribution and Subordination Agreement include the precise kind of choice-of-law provision that triggers a waiver of immunity:

> This Agreement and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement and the transactions contemplated hereby, shall be governed by, and construed in accordance with, the law of the State of New York of the U.S.A.

Combined Ex. A, CTA § 7.10.1; Combined Ex. B, Senior Loan Agreement § 4.2.1; Combined Ex. C, ECSA § 6.10(a). The IDB thus "'implicitly dispense[d] with its immunity' by 'executing a contract containing a choice-of-law clause designating the laws of the United States as applicable.'" *Vallecillo*, 2024 WL 754736, at *3 (citation omitted); *see also Ashraf-Hassan*, 40 F. Supp. 3d at 100-01; *Ivanenko*, 995 F.3d at 239. The specificity of the choice-of-law provision in these Agreements underscores the IDB's "intent[ion] to waive its sovereign immunity," *id.* at 240 (citation omitted), and reflects its "willingness to submit to litigation" in the United States. *TIG*

*Ins.*, 110 F.4th at 236.  Rather than vaguely referring to U.S. law writ large, these agreements expressly state that New York law will apply and carefully delimit the class of claims to which it will apply.  Thus, the IDB plainly "'contemplate[d] a role for United States courts' in resolving disputes."  *Ashraf-Hassan*, 40 F. Supp. 3d at 100 (citation omitted).  U.S. courts have jurisdiction to resolve "any claims, controversy, dispute or cause of action . . . based upon, arising out of or relating to [the Common Terms Agreement, the Senior Loan Agreement, or the Equity Contribtuion and Subordination Agreement] and the transactions contemplated [there]by." Combined Ex. A, CTA § 7.10.1; Combined Ex. B, Senior Loan Agreement § 4.2.1; Combined Ex. C, ECSA § 6.10(a).

An additional provision of the three agreements reinforces that the IDB "*intended* to waive its . . . immunity," *Ivanenko*, 995 F.3d at 240 (citation omitted).  Each agreement states that the "Senior Lenders shall be entitled under Applicable Law, including the [IOIA], to immunity from *trial by jury* in any proceeding arising out of or relating to this Agreement."  Combined Ex. A, CTA § 7.10.11 (emphasis added); Combined Ex. B, Senior Loan Agreement § 4.2.2 (emphasis added); Combined Ex. C, ECSA § 6.10(j) (emphasis added).  By carefully specifying that it is immune *only* from jury trials, the IDB correspondingly waived immunity as to claims "arising out of or relating to" these Agreements for which Doe Corporations seek any other form of judicial relief.

The claims in this action fall comfortably within the scope of the IDB's waiver of immunity.  Doe Corporations bring claims for breach of the Loan Agreements and for breach of the implied covenant of good faith and fair dealing as to the Loan Agreements and Equity Contribution and Subordination Agreement.  These claims are "based upon, aris[e] out of, or relat[e] to" these agreements as well as "the transactions contemplated [there]by."  Combined

Ex. A, CTA § 7.10.1; Combined Ex. B, Senior Loan Agreement § 4.2.1; Combined Ex. C, ECSA § 6.10(a). So, too, does Doe Corporations' request for a declaratory judgment, which will clarify the parties' contractual relationship and the IDB's enforcement authority related to the parties' transactions. And Doe Corporations do not seek a trial by jury as to any of the claims asserted in the Complaint. Accordingly, this Court has subject-matter jurisdiction to adjudicate all of the claims in this action.

### B.    The IDB Waived Any Immunity Through Its Charter.

The IDB's waiver-by-contract is sufficient, without more, to confer subject-matter jurisdiction on this Court. But even if it were not, the IDB independently waived immunity from this action through its Charter. The Charter includes an express waiver of immunity:

> Actions may be brought against the Bank only in a court of competent jurisdiction in the territories of a member in which the Bank has an office, has appointed an agent for the purpose of accepting service or notice of process, or has issued or guaranteed securities.

Compl., Ex. I, Charter, Art. XI, § 3. Courts have interpreted this language (as well as virtually identical language in the charters of other international organizations) to waive an international organization's immunity where such waiver would provide a "corresponding benefit which would further the organization's goals." *Mendaro v. World Bank*, 717 F.2d 610, 617 (D.C. Cir. 1983); *see also id.* at 620–21 (interpreting language in the World Bank's Charter). This inquiry requires "[w]eighing the costs and benefits" of deeming the organization's immunity waived in a certain lawsuit. *Rosenkrantz v. Inter-Am. Dev. Bank*, 35 F.4th 854, 867 (D.C. Cir. 2022); *see also Vila v. Inter-Am. Inv. Corp.*, 570 F.3d 274, 279 (D.C. Cir. 2009) (asking whether benefits from judicial review "would be substantially outweighed by the burdens caused by judicial scrutiny" of the relevant issues (citation omitted)). "[I]mmunity does not turn on the validity of the underlying suit," but rather "whether a waiver of immunity to allow this *type* of suit, by this *type* of plaintiff,

would benefit the organization over the long term." *Osseiran v. Int'l Fin. Corp.*, 552 F.3d 836, 840 (D.C. Cir. 2009).

"In the context of a multilateral bank like the IDB, the Court has generally looked to whether waiver of immunity serves to 'enhance the marketability' of an international organization's financial products 'and the credibility of its activities in the lending markets.'" *Rosenkrantz*, 35 F.4th at 866 (citation omitted). In applying this standard, courts have drawn a distinction between suits that implicate an organization's "*internal* operations, such as its relationship with its own employees," and those that pertain to an organization's "*external* relations with its debtors and creditors." *Mendaro*, 717 F.2d at 618. Courts have upheld waiver in the latter category. *See, e.g.*, *Osseiran*, 552 F.3d at 840 (finding waiver in action brought by the purchaser of an international organization's investment products because "waiver . . . might help attract prospective investors by reinforcing expectations of fair play," and emphasizing that "immunity from suits based on 'commercial transactions with the outside world' can hinder an organization's ability to operate in the marketplace" (citation omitted)); *Vila*, 570 F.3d at 280 (permitting unjust enrichment claim brought by a consultant to the Inter-American Investment Corporation to move forward where claim "arises out of commercial activity with the outside world that is directly related to [organization's] fulfillment of its chartered objectives").

Against this backdrop, the Court should conclude that the IDB has expressly waived immunity from Doe Corporations' claims. As a threshold matter, Doe Corporations—commercial counterparties of the IDB in connection with a loan financed in significant part by the IDB—sit squarely within the category of "potential plaintiffs to whom the [IDB] would have to subject itself to suit in order to achieve its chartered objectives." *Mendaro*, 717 F.2d at 615; *see also id.* (identifying "debtors, creditors, [and] bondholders" as falling within that category); *see also*

Compl. Ex. J, 2015 Sanctions Procedures § 1.2 (specifically articulating application to "borrowers, sponsors, and guaranteed parties"). This action arises directly out of that contractual relationship. Doe Corporations argue that the IDB's claim of sweeping enforcement authority concerning alleged conduct that pre-dates the commencement of the parties' contractual relationship violates the parties' contracts and finds no support in the IDB's governing sources.

At the same time, resolving the claims in this action stands to "'enhance the marketability' of [the IDB's] financial products 'and the credibility of its activities in the lending markets.'" *Rosenkrantz*, 35 F.4th at 866 (citation omitted). The Complaint presents a question fundamental to the IDB's ability to spur both public and private investment and thereby achieve its mission: Does the IDB have the inherent authority to seek punitive sanctions against contractual counterparties based on alleged conduct that entirely pre-dates the parties' contractual relationship? Absent this Court's delineation of the IDB's authority to pursue sanctions proceedings in this context, commercial entities "[might] hesitate to do business with [the IDB]" for fear of subjecting themselves to boundless liability for past conduct that could carry potentially disastrous consequences. *Osseiran*, 552 F.3d at 840. The resulting chill in private investment in Latin America and the Caribbean would strike at the heart of the IDB's overarching purpose to "contribute to the acceleration of the process of economic and social development of regional development member countries" by, among other activities, "promot[ing] the investment of public and private capital for development purposes" and "encourag[ing]" and "supplement[ing]" private investment for similar aims. Compl., Ex. I, Charter, Art. I, §§ 1–2. "[W]aiver of immunity" for this action thus "help[s] attract prospective investors by reinforcing expectations of fair play" and thereby "promote[s] [the IDB's] chartered objective[s]." *Osseiran*, 552 F.3d at 840; *see also Vila*, 570 F.3d at 280 (rejecting immunity where claims implicated "the type of commercial lending that

the [organization's] Charter describes as part of the functions that 'the [organization] shall undertake' '[i]n order to accomplish its purpose'" (third alteration in original) (citation omitted)).

"As against this potential benefit," the IDB can point to "no unique countervailing costs" that justify upholding its immunity. *Osseiran*, 552 F.3d at 840. Doe Corporations' claims depend on a single categorical question about the scope of the IDB's authority. The claims do not affect the IDB's ability to perform its core functions. Nor do they challenge the procedures by which the IDB investigates and punishes misconduct. The burdens, if any, imposed through litigation of Doe Corporations' claims are minimal and vastly outweighed by the corresponding benefits to the IDB.

### C.    The D.C. Circuit's Decision in *Rosenkrantz* Does Not Support a Contrary Result.

The D.C. Circuit's decision in *Rosenkrantz* does not support a finding that the IDB is immune from the claims asserted in this action. In *Rosenkrantz*, the plaintiffs—who, notably, had not entered into any contracts with the IDB—alleged that the IDB had violated its Sanctions Procedures when investigating and ultimately sanctioning the plaintiffs for having engaged in Prohibited Practices in connection with IDB-financed contracts. 35 F.4th at 857, 59. The plaintiffs' claims revolved around a number of case-specific allegations, including that the OII had wrongfully instructed a related entity not to cooperate with the plaintiffs, that the IDB had unfairly pre-determined the plaintiffs' guilt, and that the IDB had erred by charging one of the plaintiffs as a party subject to sanctions. *See id.* at 860.

As is relevant here, the plaintiffs pinned their waiver-of-immunity argument on the Charter. They contended that "allowing their suit to proceed would benefit the IDB's organizational interests by easing commercial parties' worry that the IDB 'is beyond judicial process for bad faith handling' of its Sanctions Procedures." *Id.* at 866–67 (citation omitted). While acknowledging that the plaintiffs' argument on this score was, "at the very least, colorable" and potentially "well-

founded," the D.C. Circuit nevertheless upheld the IDB's immunity from suit. *Id.* at 867. The court found that adjudication of the plaintiffs' claims would impose future burdens on the IDB that "substantially outweigh[]" "the Plaintiffs' proffered benefit." *Id.* The court explained that it was "reasonably foresee[able that] future subjects of sanctions proceedings [might] 'halt[] or delay[] those proceedings by filing suits in the courts of the IDB's member countries,' thereby frustrating the IDB's ability to 'expeditiously root[] out corruption in its projects' and 'safeguard[] its funds' with any sort of economy and efficiency." *Id.* (fifth and sixth alterations in original) (citation omitted). "This would be especially true if such suits are, over time, brought in the courts of different IDB member states, potentially leading to inconsistent judgments and directives." *Id.*

Doe Corporations' action is fundamentally different from *Rosenkrantz* for two reasons. ***First***, and most importantly, the IDB waived immunity from this suit through provisions in its contracts with Doe Corporations, *see* Section I.B *supra*. The D.C. Circuit did not address implicit or contractual waiver in *Rosenkrantz*. The plaintiffs there were not parties to any IDB contracts. Accordingly, even if this Court concludes that *Rosenkrantz* forecloses Doe Corporations' argument that the IDB has waived immunity from this action pursuant to its Charter, the Court nevertheless should find that the IDB waived its immunity via the parties' agreements.

***Second***, Doe Corporations' waiver argument based on the Charter is readily distinguishable from *Rosenkrantz*. As explained above, resolving Doe Corporations' claims will produce significant and important benefits to the IDB—ones greater in magnitude than those in *Rosenkrantz* that the D.C. Circuit deemed, "at the very least, colorable" and potentially "well-founded." 35 F.4th at 867. Moreover, unlike *Rosenkrantz*, these benefits are not "substantially outweighed by the burdens caused by judicial scrutiny." *Id.* This is because Doe Corporations' claims are categorical. They implicate the fundamental threshold question whether the IDB has

the inherent authority to initiate sanctions proceedings and impose sanctions based solely on conduct pre-dating the execution of the relevant loan agreements. The issue is not case-specific and avoids the kinds of individualized inquiries on which the *Rosenkrantz* plaintiffs' claims turned. A ruling on the merits of Doe Corporations' claims will apply to all sanctions proceedings as a general matter. It will not produce a flood of lawsuits against the IDB based on the peculiarities of individual sanctions proceedings, as the D.C. Circuit in *Rosenkrantz* feared. *Id.*

## II.    Doe Corporations Are Likely to Succeed on the Merits of Their Claims.

Just as Doe Corporations are likely to establish that the IDB waived its immunity from this action, they are likely to succeed on the merits of their claims. To be clear, Doe Corporations "need not establish an absolute certainty of success"; rather, it is "ordinarily . . . enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Booth v. Bowser*, 597 F. Supp. 3d 1, 16 (D.D.C. 2022) (citations omitted). Nor are Doe Corporations "required to prove their case in full at the preliminary injunction stage, but only such portions that enable them to obtain the injunctive relief that they seek." *M.G.U. v. Nielsen*, 325 F. Supp. 3d 111, 118 (D.D.C. 2018). Under this standard, Doe Corporations have established a likelihood of success on their claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and a declaratory judgment.

### A.    Doe Corporations Are Likely to Succeed on Their Claim for Breach of Contract.

First, Doe Corporations are likely to succeed on their breach-of-contract claim. To plead such a claim under New York law,[4] a "complaint need only allege (1) the existence of an

---

[4]    New York law applies to Doe Corporations' claims, which arise out of the parties' financing agreements. *See supra* p. 16.

23

agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (citation omitted). "At the motion to dismiss stage, any contractual ambiguities must be resolved in plaintiff's favor." *Merryman v. J.P. Morgan Chase Bank, N.A.*, No. 15-CV-9188 (VEC), 2016 WL 5477776, at *8 (S.D.N.Y. Sept. 29, 2016), *reconsideration denied*, 2017 WL 456470 (S.D.N.Y. Feb. 2, 2017).

Doe Corporations are likely to show that the Complaint satisfies all of these elements. It is undisputed that the relevant agreements are valid contracts. *See* Compl. ¶¶ 72–73. Doe Corporations also have adequately performed under these agreements by timely making all payments on the loan to date and otherwise fulfilling all of the contractual obligations owed to IDB and the other Senior Lenders. *Id* ¶ 74.

Doe Corporations also are likely to show that the IDB breached the Loan Agreements through the commencement of sanctions proceedings against them. As explained above, the IDB has breached at least two provisions in the Common Terms Agreement and the Senior Loan Agreement.[5]

First, the IDB's initiation of sanctions proceedings based on alleged Prohibited Practices involving conduct that exclusively pre-dates the execution of the Loan Agreements breaches the

---

[5]    As alleged, the corpus of agreements between Doe Corporations and the IDB are a unified whole for purposes relevant to Doe Corporations' claims and support this claim on behalf of all four Plaintiffs. *See* Compl. ¶ 22 n.2; *see also* Combined Ex. A, CTA § 7.12 (incorporating other agreements into an integration clause); Combined Ex. C, ECSA § 1.1–1.2 (incorporating definitions and interpretation principles from CTA); 6 (including Doe Corporations 1, 2, and 3 within the definition of "Loan Party"). The Notices recognize as much, as they initiate formal proceedings against each of the Doe Corporations on the basis of allegations "linked" specifically to the Common Terms Agreement, the Senior Loan Agreement, and the Equity Contribution and Subordination Agreement; *see also* Combined Ex. H, Statement of Charges ¶ 23.

"Events of Default" and "Policy Events of Default" provisions in the Common Terms Agreement and the Senior Loan Agreement. Both of those agreements identify a lengthy and comprehensive list of Events of Default and Policy Events of Default that serve as the complete universe of conduct for which the IDB can seek relief. That list does not suggest that the IDB can seek redress based on the alleged commission of Prohibited Practices prior to the execution of the Loan Agreements.

Second, the IDB's initiation of sanctions proceedings breaches the remedies provisions in the Common Terms Agreement and the Senior Loan Agreement. Those agreements set forth an exhaustive list of potential remedies that the IDB may seek in the event that Doe Corporations commit an Event of Default or Policy Event of Default. The initiation of sanctions proceedings, and imposition of sanctions, is not identified. At most, the Sanctions Procedures themselves are incorporated into the list of remedies through their reference to "Applicable Law." But, as established above, the Sanctions Procedures provide the IDB with authority only to initiate sanctions proceedings in connection with the commission of Prohibited Practices *after* execution of the relevant financing agreements.

The IDB's initiation of sanctions proceedings against Doe Corporations constitutes a breach of the Loan Agreements under settled principles of New York law. Courts applying New York law have applied "[t]he principle of *expressio unius est exclusio alterius*" to questions of contract interpretation. *Orlando v. Nxt-ID Inc.*, No. 20-cv-1604 (MKV), 2022 WL 976875, at *5 (S.D.N.Y. Mar. 31, 2022). That canon of construction "instructs that the express mention of a particular circumstance may support the inference that another circumstance, 'left unmentioned,' is 'meant to be excluded.'" *Id.* (citation omitted); *see also Quadrant Structured Prods. Co. v.*

*Vertin*, 16 N.E.3d 1165, 1172 (N.Y. 2014) (explaining that "if parties to a contract omit" terms from the contract, "the inescapable conclusion is that the parties intended the omission").

Courts have routinely invoked this principle when evaluating whether a contract has been breached. *See, e.g.*, *Orlando*, 2022 WL 976875, at *5 (concluding that defendant's sale of a company to a third party terminated its obligation to make earnout payments to plaintiff where the operative contract "expressly mention[ed] that Plaintiffs' right to receive an Earnout Payment from [defendant] could 'not be modified or decreased if, in the future, there is an *internal* ownership, organizational or operational change within'" defendant, but the contract "d[id] not say anything about a sale to an external third party" (citation omitted)); *Realtime Data, LLC v. Melone*, 104 A.D.3d 748, 751 (2d Dep't 2013) (holding that contractual language limiting bonus compensation to "a share of distributions based upon either the sale of [plaintiff's] assets, or some of [plaintiff's] assets . . . . implie[d] that bonus compensation does not apply to distributions based upon something other than the sale of assets"); *see also Merryman*, 2016 WL 5477776, at *8 (concluding that plaintiffs stated a claim for breach of contract where defendant bank imposed a fee that was "not an enumerated expense or charge permitted as a deduction from the converted sum").

These principles justify a similar outcome here. The IDB's sanctions proceedings allege conduct (Prohibited Practices pre-dating the execution of the Loan Agreements) and seek remedies (sanctions) not permitted under the parties' contracts. The lengthy list of proscribed acts and corresponding remedies, none of which mentions the possibility of sanctions proceedings based on conduct pre-dating the execution of the Loan Agreements, "implies" that the pending sanctions proceedings violate the parties' contractual terms. *Realtime Data*, 104 A.D.3d at 751. That the relevant provisions "do[] not say anything about" the initiation of sanctions proceedings based on pre-agreement conduct is dispositive. *Orlando*, 2022 WL 976875, at *5.

Finally, Doe Corporations have adequately alleged damages caused by the IDB's breach. Doe Corporations already have incurred expenses, including, but not limited to, attorneys' fees, in reviewing and responding to Notices.  Compl. ¶¶ 34, 81.  And these expenses will accumulate absent immediate relief, since Doe Corporations will be forced to submit a formal written response to the Notices in short order and to participate in the illegitimate sanctions proceedings to avoid the effective abdication of their ability to mount a defense.  *Id.* ¶ 33.  Not only that, Doe Corporations are likely to suffer irreparable harm that cannot be remedied through monetary damages if the sanctions proceedings continue.  *See id.* ¶¶ 62–70, 82–83; *see also* Decl. ISO Pltfs.' Mot. to Proceed Under Pseudonym and Pltfs.' Mot. for a Preliminary Injunction ("Decl.")[6] & *infra* Section III.  These allegations are more than sufficient to establish damages at this stage.  *See, e.g.*, *Bancorp Servs., LLC v. Am. Gen. Life Ins. Co.*, No. 14-CV-9687 (VEC), 2016 WL 4916969, at \*6 (S.D.N.Y. Feb. 11, 2016) (noting that a plaintiff "need only plead allegations from which damages attributable to defendant's [breach] might be reasonably inferred" (citations omitted)).

### B.  Doe Corporations Are Likely to Succeed on Their Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing.

In the alternative (or in addition), Doe Corporations are likely to succeed on their claim that the IDB's commencement of unauthorized sanctions proceedings breaches the implied covenant of good faith and fair dealing.  *See, e.g.*, *Franko v. Lewnowski*, No. 21-CV-6115 (VSB), 2023 WL 2989050, at \*5 (S.D.N.Y. Apr. 18, 2023) (holding that implied covenant claim was properly pled in the alternative to a breach of contract claim).  Under New York law, a covenant of good faith and fair dealing is "implicit in every contract."  *Michaan v. Gazebo Horticultural, Inc.*, 117 A.D.3d 692, 693 (2d Dep't 2014); *see also 511 W. 232nd Owners Corp. v. Jennifer Realty*

---

[6]  The cited declaration has been filed under seal with Doe Corporations' Motion to Proceed Under Pseudonym.

*Co.*, 773 N.E.2d 496, 500 (N.Y. 2002) ("In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance."). The covenant "embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Id.* (citation omitted). It encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included" in the contract. *Id.* at 501 (citation omitted); *see also id.* (holding that "plaintiffs pleaded a valid cause of action" where they sufficiently claimed that cooperative sponsor "failed to exercise good faith and deal fairly in fulfilling the terms and promises contemplated by the offering plan"); *Wu v. JP Morgan Chase Bank, N.A.*, No. 23 Civ. 763 (JPC), 2024 WL 732116, at *3 (S.D.N.Y. Feb. 22, 2024) ("[T]he implied covenant extends to obligations that, while not expressly provided for in the contract, are consistent with the contract's central purpose.").

Against this backdrop, the IDB's commencement of sanctions proceedings against Doe Corporations breaches the implied covenant of good faith and fair dealing. Doe Corporation 3 did not obtain financing from the IDB, and Doe Corporation 1 and Doe Corporation 2 did not enter into the relevant accompanying agreements, until well after execution of the Commercial Project Agreement. Compl. ¶¶ 18–22. At that point, Doe Corporations were "justified in understanding" that the IDB could not reach back in time to investigate and sanction alleged conduct that began and ended long before the parties' contractual relationship commenced and prior to any IDB involvement in the underlying project. *511 W. 232nd Owners*, 773 N.E.2d at 501. After all, nothing in the relevant agreements (including the Common Terms Agreement, the Senior Loan Agreement, and the Equity Contribution and Subordination Agreement) or even the Charter or Sanctions Procedures suggested that the IDB had the authority to initiate sanctions proceedings

based on such stale alleged conduct that is disconnected from the terms of Doe Corporations' agreements with the IDB. *See* Compl. ¶¶ 88–92.

In entering into the agreements, Doe Corporations thus contracted for and reasonably expected that the IDB could not use those agreements as a springboard to grant itself sweeping authority to pursue sanctions for alleged Prohibited Practices pre-dating the execution of those agreements and wholly divorced from the IDB's involvement with the Commercial Project. This fundamental limitation on the IDB's enforcement authority constituted an equally fundamental promise that the Doe Corporations "reasonab[ly]" understood to be included in these agreements. *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995) (citation omitted). By disrupting this reasonable expectation, the IDB has impermissibly deprived Doe Corporations of their ability to receive the "fruits" of their contracts with the IDB. *See, e.g.*, *511 W. 232nd Owners*, 773 N.E.2d at 499–501 (permitting claim to move forward where cooperative stakeholders alleged that cooperative's sponsor breached offering plan by failing to actually pursue a sale for shares in the cooperative, in contravention of the reasonably implied purpose and terms of that offering plan); *Wu*, 2024 WL 732116, at *2–3 (denying defendant bank's motion to dismiss based on allegations that it "negligently allowed [plaintiff's] account to be stolen from" and deeming it "plausible that a reasonable accountholder in [plaintiff's] position would expect her banking institution to safeguard her funds, regardless of the presence of express contractual terms to that effect").

### C.    Doe Corporations Are Likely to Establish Their Entitlement to a Declaratory Judgment.

Finally, Doe Corporations are likely to prevail on their request that this Court issue a declaratory judgment. Under the Declaratory Judgment Act, federal courts may "declare the rights and other legal relations of any interested party seeking such declaration" in any "case of actual controversy within its jurisdiction." 28 U.S.C. § 2201(a); *see also United Gov't Sec. Officers of*

29

*Am., Loc. No. 52 v. Chertoff*, 587 F. Supp. 2d 209, 222 (D.D.C. 2008) ("[A] plaintiff must demonstrate that 'there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" (citation omitted)).   In assessing whether relief is warranted, courts consider whether the declaratory judgment will "serve a useful purpose in clarifying the legal relations in issue" and "whether the judgment will 'terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Nat'l R.R. Passenger Corp. v. Consol. Rail Corp.*, 670 F. Supp. 424, 431 (D.D.C. 1987) (citation omitted).

Doe Corporations' request for declaratory relief satisfies this standard.  For starters, Doe Corporations have alleged a justiciable "case of actual controversy within [this Court's] jurisdiction." 28 U.S.C. § 2201(a).   The IDB's issuance of the Notices triggered sanctions proceedings against Doe Corporations and thereby represents an exercise of the authority that Doe Corporations allege is illegitimate and unsupported.  Not only that, Doe Corporations are now on the clock and must imminently respond to the Notices and further participate in the sanctions proceedings absent immediate injunctive relief.  This dispute thus presents claims of "sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *United Gov't Sec. Officers*, 587 F. Supp. 2d at 222 (citation omitted); *see also, e.g.*, *Nat'l R.R. Passenger*, 670 F. Supp. at 428 (holding that an actual case or controversy existed regarding Amtrak's obligation to indemnify a third party where lawsuits against the third party had already been filed and were not "hypothetical").

Moreover, the Court's exercise of its discretion to issue declaratory relief is proper in this case.  Doe Corporations face an unauthorized enforcement action brought in breach of the relevant agreements; the requested declaratory judgment will either confirm their position or vindicate the

IDB's authority to bring that action. "In either case, [Doe Corporations] will be assured of [their] legal position and will be relieved from the uncertainty under which [they] presently labor[]." *Nat'l R.R. Passenger*, 670 F. Supp. at 432. And the Court's clarification of the parties' rights in this action will have even broader utility by providing certainty concerning the scope of the IDB's enforcement authority—both to the IDB itself and to all of its existing and potential commercial partners.

### III.    Doe Corporations Are Likely to Suffer Irreparable Harm Absent a Preliminary Injunction.

Doe Corporations also are likely to suffer irreparable harm absent the requested preliminary injunction. Such harm must be "actual and not theoretical" and present a "clear and present need for equitable relief to prevent." *Booth*, 597 F. Supp. 3d at 28 (citation omitted). That said, "a preliminary injunction requires only a likelihood of irreparable injury" such that "Damocles's sword does not have to actually fall on all appellants before the court will issue an injunction." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016) (citation omitted). Here, Doe Corporations face irreparable harm in the absence of immediate relief for at least four reasons.

### A.    Doe Corporations Will Suffer Irreversible Reputational Harm.

First, Doe Corporations will experience irreversible reputational harm if the IDB's unlawful sanctions proceedings continue. Courts have held that reputational harm—including harm to a plaintiff's business reputation—can justify issuance of a preliminary injunction. *See, e.g.*, *Patriot, Inc. v. United States Dep't of Hous. & Urb. Dev.*, 963 F. Supp. 1, 5 (D.D.C. 1997) (granting preliminary injunction and finding irreparable harm "in damage to [plaintiffs'] business reputation" through agency's "characterization of them . . . as 'enticing' senior citizens into meetings, and 'pressuring' them to obtain reverse mortgages 'under the guise of sound estate

planning'"); *Pfeiffer v. Ajamie PLLC*, 469 F. Supp. 3d 752, 764 (S.D. Tex. 2019) ("The loss of reputation, goodwill, and clients that [plaintiffs] may face further establishes irreparable harm."); *BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 263 (3d Cir. 2000) (upholding finding of irreparable harm where plaintiff presented evidence of harm to its "reputation, credibility and ability to license its technology" and explaining that "injuries to reputation are difficult to calculate, and thus money damages are an inadequate remedy"); *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000) ("[I]njunctions against contract breach are common where there is some reasonable doubt about whether damages can be sufficient." (citation omitted)).

Such is the case here. The IDB's allegations against Doe Corporations will become public absent immediate relief. Indeed, the IDB *already* has begun disseminating the existence of integrity concerns related to the sanctions proceedings to key stakeholders and has caused Doe Corporations reputational damage. Earlier this year, a government agency in a country in which Doe Corporations conduct significant business invited a subsidiary of Doe Corporation 1 to participate in a prominent regional event that the agency hosts in partnership with the IDB. *See* Decl. ¶ 9. The agency abruptly barred the subsidiary from participating in the event on account of "integrity concerns" with Doe Corporations raised by the IDB. *Id.* The IDB's disclosure of such concerns has seriously undermined Doe Corporations' standing in a key market and at a critical time when an affiliate is negotiating additional investments within that market. *See id.* That the IDB disparaged Doe Corporations in this way despite its own policies safeguarding the confidentiality of sanctions proceedings is especially alarming considering that neither the Sanctions Officer nor the Sanctions Committee has had the opportunity to adjudicate the veracity

of the allegations made against Doe Corporations and since Doe Corporations have shown the allegations to be baseless.

And the IDB's spurious claims of wrongdoing will reach a much wider audience no matter the result of the sanctions proceedings. Even if Doe Corporations defy historical patterns and prevail in the sanctions proceedings, the IDB still will publish a synopsis of the proceeding alongside an associated hyperlink to the relevant project, highlighting the allegations of wrongdoing and leaving little doubt as to the identities of Doe Corporations.[7] Thus, win or lose, the public will know that the OII investigated and concluded that Doe Corporations engaged in misconduct, which will cause a far-reaching and highly damaging effect on their reputation that cannot be redressed through mere monetary relief. *See generally* Decl. ¶¶ 4–5.[8] And assuming (as is almost certain) that the one-sided sanctions proceedings culminate in the imposition of sanctions against Doe Corporations, that determination will be made public on the IDB's website via the "Sanctions List," which will serve as a scarlet letter identifying Doe Corporations, the relevant countries, the nature of the Prohibited Practices, and the IDB's sanctions.[9] That webpage makes clear to all who visit that "[t]he firms and individuals listed below have been sanctioned for

---

[7]    *See* "Sanctions Officer Synopses," *available at* https://www.iadb.org/en/who-we-are/transparency/sanctions-system/sanctions-officer/sanctions-officer-synopsis?countries=All&nationality=All&type_of_sanction=50677 (last visited May 7, 2025).

[8]    *See also* "INSIGHT: World Bank-Financed Projects – Tips for Successful Participation," Bloomberg, *available at* https://news.bloomberglaw.com/banking-law/insight-world-bank-financed-projects-tips-for-successful-participation (last visited May 7, 2025) (explaining that sanctions from multilateral development banks can have "serious consequences," including a "reputational effect" because the list of sanctioned entities and individuals is "publicly available and searchable, thereby generating negative hits through the most basic of background checks").

[9]    *See* "Sanctioned Firms and Individuals," IDB, *available at* https://www.iadb.org/en/who-we-are/transparency/sanctions-system/sanctioned-firms-and-individuals (last visited May 7, 2025).

having engaged in fraudulent, corrupt, collusive, coercive or obstructive practices" in violation of the Sanctions Procedures.[10]  Such a damaging "characterization" of Doe Corporations, carrying the IDB's imprimatur, would cause irreversible "damage to their business reputation." *Patriot, Inc.*, 963 F. Supp. at 5.

Sanctions or no sanctions, Doe Corporations' core commercial constituents—including government officials, other international financial institutions, current and potential customers, and the public at large—will re-examine their ties to Doe Corporations upon disclosure of the IDB's investigation and findings, even though the IDB's allegations of wrongdoing are wholly unfounded. *See* Decl. ¶¶ 7–8, 10. Those counterparties will view the IDB's decision to commence sanctions proceedings as tantamount to a final determination of wrongdoing, spurring questions about Doe Corporations' fitness for and ability to conduct business going forward. *See id.* ¶ 8. The result is that Doe Corporations' existing business will suffer and future opportunities will diminish. *See id.*

Absent the requested injunction—as demonstrated by the IDB's wrongful disclosure of the allegations of wrongdoing earlier this year—governments and institutional lenders will be less likely to contract with Doe Corporations, thereby hamstringing their ability to participate in government-sanctioned projects and to obtain external financing. *See id.* ¶ 12. Negative reactions to the IDB's enforcement activity will severely stunt Doe Corporations' growth and development, thereby causing irreparable harm. Doe Corporations' candidacy for certain projects will be meaningfully compromised, both now and later— for example, entities accused of or adjudicated to have engaged in corrupt conduct are often barred from participating in commercial tenders. *See*

---

[10]  *Id.*

*id.* ¶¶ 7, 12. And the likelihood that peer international organizations will impose reciprocal sanctions on Doe Corporations only compounds the magnitude of this reputational harm.[11]

Finally, at the same time that disclosure of Doe Corporations' identities in the context of the IDB's enforcement activity will undermine future opportunities, it will threaten to disrupt current and long-standing projects. Public release of the IDB's investigation and sanctions proceedings, for instance, will create substantial risks to the Commercial Project. *See* Decl. ¶ 11. Doe Corporations have devoted extensive resources, including time and money, to operationalizing that project. *See id.* They are depending on future revenue generated from that project to offset those losses and contribute materially to their financial well-being. *See id.* In the event that the existence of the investigation and sanctions proceedings is disclosed, the government of the country in which the project is located likely will seize the project from Doe Corporations—leaving Doe Corporations with significant financial losses. *See id.*

That the outcome of the sanctions proceedings against Doe Corporations—and the irreparable consequences—is sufficiently imminent and preordained is not seriously in dispute. Any challenge to the scope of the IDB's enforcement authority within the IDB's own sanctions proceedings assuredly will meet an unreceptive audience. *See generally Vanderbilt Univ. v. Nat'l Lab. Rels. Bd.*, 759 F. Supp. 3d 812, 853–54 (M.D. Tenn. 2024) (granting injunction in challenge to agency enforcement action and citing in support the unlikelihood that the agency would find

---

[11] *See* Cendan, D. et al., The Guide to Multilateral Development Bank Investigations, *Part IV: Debarment, Strategic Considerations for Sanctions Processes at Leading Multilateral Development Banks* (Feb. 26, 2025) (noting that cross-debarment can be particularly harmful "in an era when many private sector bids seek information regarding prior findings of wrongdoing," and thus "disclosure of an MDB sanction could potentially impact future commercial bidding opportunities"), *available at* https://globalinvestigationsreview.com/guide/the-guide-multilateral-development-bank-investigations/first-edition/article/strategic-considerations-sanctions-processes-leading-multilateral-development-banks (last visited May 7, 2025).

that its own regulations violated law in support). And, indeed, the IDB has already flagged its "integrity concerns" to a government agency based on the still-to-be-proven allegations in the sanctions proceedings, removing any doubt that it will be a biased adjudicator of the evidence.

Even beyond this improper disclosure, the IDB has abandoned any pretense that its internal sanctions proceedings are neutral and fair. It has embraced the massive thumb on the scale in favor of its positions. The OII boasted in its annual report detailing enforcement activity in 2022 that it had obtained a "*100 percent favorable decision rate* for cases investigated and prepared by OII in which a final decision was issued by the [Sanctions Officer] or the [Sanctions Committee]."[12] And 2022 was no anomaly. The IDB similarly trumpeted its "very high 94% favorable decision rate" in 2021 and its "97% favorable decision rate" in 2020.[13] Although the OII's most recent report does not match this trend, the OII acknowledges that 2023 was an extreme outlier with a "record number of rejected sanctions" based on a combination of extraordinary circumstances.[14] Overall, the picture is clear: the OII's issuance of the Notices has set in motion a process virtually certain to result in an adverse ruling against Doe Corporations, and all of the cascading irreversible harm.

---

[12] *See* OII's 2022 Annual Report at 45–46, *available at* https://publications.iadb.org/en/publications/english/viewer/Office-of-Institutional-Integrity-and-Sanctions-System-Annual-Report-2022.pdf (last visited May 7, 2025).

[13] *See* OII's 2021 Annual Report at 56, *available at* https://publications.iadb.org/en/publications/english/viewer/Office-of-Institutional-Integrity-and-Sanctions-System-Annual-Report-2021.pdf (last visited May 7, 2025); OII's 2020 Annual Report at 37, *available at* https://publications.iadb.org/en/office-institutional-integrity-and-sanctions-system-annual-report-2020 (last visited May 7, 2025).

[14] *See* OII's 2023 Annual Report at 58–59, *available at* https://publications.iadb.org/en/office-institutional-integrity-and-sanctions-system-annual-report-2023 (last visited May 7, 2025). The record number of rejections resulted primarily from a finding in favor of a single respondent that "automatically caused the dismissal of sanctions against" 17 additional companies. *Id.*

These alarming statistics come as no surprise, given the inherent structural features of the enforcement process that tip the scales sharply in favor of the IDB.[15]  For example, the IDB Sanctions Officer who decides whether the IDB has substantiated allegations of Prohibited Practices is appointed by the IDB President.  Compl., Ex. J, 2015 Sanctions Procedures §§ 3.2–3.4.  The Sanctions Officer also has oversight of the negotiated resolution process between OII and investigated parties, with responsibility for approving agreed penalties.  Although a party that receives an adverse judgment from the Sanctions Officer can seek appellate review before the IDB's Sanctions Committee, the Committee's members (just like the Sanctions Officer) are hand-picked by the IDB itself.  *See, e.g.*, *id.* § 5.1; Annex A, Sanctions Committee Charter, Art. III § 1.2 (providing that three members of the Sanctions Committee "shall be appointed by the [Bank] President from among Bank Group Staff").  Notably, moreover, a responding party is not entitled to a hearing before either the Sanctions Officer or the Sanctions Committee.  Compl., Ex. J, 2015 Sanctions Procedures § 11.3.  And throughout the process, the IDB wields control of the admissibility and weight of any evidence introduced.  *Id.* § 11.2.[16]

Even if Doe Corporations elude recent history and become one of the lucky few respondents who prevail in sanctions proceedings, the threat of irreparable harm will not wane.  As described above, determinations of dismissal are publicly released among the published

---

[15]  *See* DeBernardis, M. & Zygielbaum, J., The Guide to Multilateral Development Bank Investigations, *Part III: Litigation, Rules of Evidence in MDB Sanctions Proceedings* (Feb. 26, 2025) (noting that MDB rules and processes "generally tip in favour of the MDB divisions responsible for investigating and prosecuting potential sanctionable practices . . ."), *available at*   https://globalinvestigationsreview.com/guide/the-guide-multilateral-development-bank-investigations/first-edition/article/rules-of-evidence-in-mdb-sanctions-proceedings   (last visited May 7, 2025).

[16]  *See also* Cendan, D. et al., *supra* n.11 (describing similar features of MDB proceedings which can "restrict a respondent's defen[s]e").

synopses on the IDB's website.  Accordingly, all of Doe Corporations' stakeholders would know that the IDB had investigated Doe Corporations for Prohibited Practices and found sufficient evidence to initiate sanctions proceedings.  Monetary relief down the road could not compensate Doe Corporations for the resulting reputational harm.  *See Patriot*, 963 F. Supp. at 5.

### B.    Doe Corporations Will Forever Lose Critical Confidentiality Protections.

Continuation of the sanctions proceedings against Doe Corporations, moreover, will strip confidentiality protections that have bound (or should have bound) the IDB and safeguarded Doe Corporations through the investigation to date.  Although the IDB's previous known disclosure of confidential information to a government agency was improper and unauthorized, the Sanctions Procedures do afford IDB personnel with some ability to disseminate otherwise confidential information concerning respondents in formal sanctions proceedings (like Doe Corporations) and the underlying allegations to outside organizations and governments while those proceedings remain pending prior to a final determination.  *See, e.g.*, Compl., Ex. J, 2015 Sanctions Procedures § 14.2 (authorizing the referral of matters to governmental authorities "[i]f the Sanctions Officer or the Chairperson of the Committee believes that the laws of any country may have been violated by a Respondent"); *id.* § 14.3 (authorizing evidence sharing with an external organization or "agency of a member government" upon internal decision that materials might be relevant to a violation of that entity's policies).

Not only would further disclosure of this information cause irreversible reputational harm to Doe Corporations, it would also lead to irreparable harm for the additional and independent reason that the current confidentiality protections forever would be lost.  *See, e.g.*, *Robert Half Int'l Inc. v. Billingham*, 315 F. Supp. 3d 419, 433–34 (D.D.C. 2018) (noting that "[c]ourts in this District have recognized that the disclosure of confidential information is, by its very nature, irreparable" and concluding that movant's "use and disclosure of confidential information to his

new employer . . . cannot be cured through money damages"); *Hosp. Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 200 (D.D.C. 2010) ("[D]isclosure of confidential information can constitute an irreparable harm because such information, once disclosed, loses its confidential nature."); *Pfeiffer*, 469 F. Supp. 3d at 764 (granting motion for preliminary injunction after finding "irreparable harm sufficient to obtain equity's protection" because "once [confidential information] is made public, its confidential nature is permanently and irrevocably impaired"). Indeed, as described above, that the IDB is already leveraging its allegations of wrongdoing to negatively affect Doe Corporations' commercial status underscores the risks Doe Corporations face should the sanctions proceedings continue unabated.

## C. The Imposition of Sanctions Will Amplify the Irreversible Harm to Doe Corporations.

The draconian sanctions that almost assuredly would accompany a formal determination of wrongdoing reinforce the irreparable harm that Doe Corporations face in the absence of immediate relief. The IDB has seized on its authority under the Sanctions Procedures to impose sanctions on entities up and down the corporate chain of Doe Corporations. *See* Compl., Ex. J, 2015 Sanctions Procedures § 8.3; *see generally* Ex. D–G, Notices. The Sanctions Procedures make clear that "[t]he imposition of any Sanction shall be public." Compl., Ex. J, 2015 Sanctions Procedures § 8.2. And these sanctions include, among other harsh consequences, the significant penalty of debarment—that is, a determination that respondents are "ineligible, either permanently or for a stated period of time, to be awarded and/or participate in additional contracts for [IDB] projects." *Id.* § 8.2.2. Debarment carries especially far-reaching consequences given the likelihood that other multilateral development banks would recognize and reciprocate the IDB's sanctions, leading to cross-debarment across approximately two dozen international financial institutions. Doe Corporations thus would be shut out of this entire market for years or more. The

threat of debarment and cross-debarment is not abstract or conjectural.  Over the last four years, 96 percent of the sanctions imposed by the IDB Sanctions Committee met the criteria of the [Cross-Debarment Agreement] and were notified by the OII for cross-debarment by the participating [multilateral development banks].[17]  The disclosure of the IDB's sanctions and the likely penalty of debarment would also jeopardize Doe Corporations' ability to secure the necessary funding and regulatory approvals that their core business activities require.  *See* Decl. ¶ 12.

The IDB's ultra vires sanctions proceedings against Doe Corporations are likely to result in a years-long blacklist from associating with these multilateral development banks whatsoever, not to mention a scarlet letter that will endure far longer than that.

### D.    Doe Corporations Will Be Subjected to Illegitimate Enforcement Proceedings.

Finally, unless this Court halts the pending sanctions proceedings, Doe Corporations will be forced to acquiesce to the IDB's unlawful and illegitimate usurpation of enforcement authority.  The Notices require Doe Corporations to respond with their defense on the merits within sixty days.  Doe Corporations must comply with that deadline, and continue to participate in the sanctions proceedings, to avoid the automatic entry of an adverse ruling.  *See, e.g.*, Combined Ex. D, Notice to Doe Corporation 1, at 1, 5.

---

[17]  OII's 2023 Annual Report, *supra* n.14, at 63; OII's 2022 Annual Report, *supra* n.12, at 56–57; OII's 2021 Annual Report, *supra* n.12, at 70; OII's 2020 Annual Report, *supra* n. 13, at 44. From debarments that originated with the IDB, since 2012, the African Development Bank ("AfDB") has imposed 154 cross-debarments, the World Bank has imposed 157, the European Bank for Reconstruction and Development ("EBRD") has imposed 169.  *See* "List of Debarred Entities," AfDB, *available at* https://www.afdb.org/en/projects-operations/debarment-and-sanctions-procedures (last visited May 7, 2025); "World Bank Listing of Ineligible Firms and Individuals," World Bank Group, *available at* https://www.worldbank.org/en/projects-operations/procurement/debarred-firms (last visited May 7, 2025); "Ineligible Entities," EBRD, *available at* https://www.ebrd.com/home/who-we-are/strategies-governance-compliance/ebrd-sanctions-system/ineligible-entities.html (last visited May 7, 2025).

The harm that Doe Corporations will suffer by being forced to accede to the IDB's illegitimate arrogation of authority cannot be remedied after the fact through monetary damages. In a similar context, the Supreme Court has characterized the harm associated with being "subject[ed] to an illegitimate proceeding, led by an illegitimate decisionmaker" as a "here-and-now injury" that is "impossible to remedy once the proceeding is over." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191 (2023) (citation omitted). Doe Corporations face precisely the same "here-and-now" injury, which will only compound in the absence of immediate relief. While the D.C. Circuit has clarified that forced participation in an illegitimate proceeding does not "*automatically* mandate[] a finding of irreparable harm," *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1335–36 (D.C. Cir. 2024) (emphasis added), the harm recognized in *Axon* is sufficiently irreparable where, as here, it is accompanied "by more tangible injuries," *VHS Acquisition Subsidiary No. 7 v. NLRB*, Case No. 1:24-cv-02577 (TNM), 2024 WL 4817175, at *6 (D.D.C. Nov. 17, 2024). And Doe Corporations' lack of any opportunity to pursue independent judicial review of the ultimate sanctions ruling lays bare the prejudice that Doe Corporations face while subjected to those proceedings. *See, e.g.*, *United States v. Facebook, Inc.*, No. 23-5280, 2024 WL 1128083, at *1 (D.C. Cir. Mar. 12, 2024) (denying request for injunction pending appeal of ruling dismissing challenge to federal agency action because, among other things, plaintiff did "not dispute that a final order" in the challenged agency proceeding "will be reviewable by a federal court of appeals").

*    *    *

Put simply, issuance of the Notices presents Doe Corporations with a Hobson's Choice in the absence of interim relief awarded by this Court. Doe Corporations can participate in the sanctions proceedings to try to forestall or mitigate the inevitable determination of wrongdoing and imposition of sanctions from an enforcement process that is structurally biased toward the IDB,

41

thereby acquiescing in the IDB's unlawful power grab. Or they can take a principled stand and decline to participate in the illegitimate proceedings, thereby waiving their ability to defend themselves on the merits of those proceedings and increasing the risk of even more draconian sanctions. Either way, Doe Corporations face imminent and irreversible harm from the erosion of their hard-earned reputation and loss of critical confidentiality protections.

## IV.    The Balance of Equities Favors Doe Corporations' Requested Injunction.

Next, the balance of equities counsels strongly in favor of granting interim relief in this case. This factor directs the reviewing court to "balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief." *NAACP*, 496 F. Supp. 3d at 19 (alteration in original) (citation omitted). Here, as Doe Corporations have described in detail, the harm that they face absent preliminary relief is imminent and severe. In sharp contrast, entry of a preliminary injunction would result in minimal, if any, harm to the IDB. The IDB would remain free to continue sanctions proceedings and seek sanctions against other loan recipients or related parties. *See, e.g.*, *League of Women Voters*, 838 F.3d at 12 (noting that the balance of equities "tips in [movant's] favor [where] a preliminary injunction will 'not substantially injure other interested parties'" (citation omitted)); *NAACP*, 496 F. Supp. 3d at 20 (granting preliminary injunction where the requested injunction was appropriately "targeted" and rejecting argument that an injunction would involve judicial oversight of agency's "day-to-day activities" (citation omitted)).

Importantly, Doe Corporations' requested injunction would simply preserve the status quo until the Court has fully considered their claims; if the Court ultimately rejects those claims, the IDB would be free to resume its sanctions proceedings against Doe Corporations. *See id.* at 19–20 (noting that the balance of equities favor injunctions "that serve[] only 'to preserve the relative positions of the parties until a trial on the merits can be held'" (citation omitted)). Given the

straightforward question at issue in this case, little (if any) additional discovery should be required, and this Court could reach the merits of Doe Corporations' claims with little delay. And the likelihood that Doe Corporations will succeed on the merits of their claims further weighs in their favor on this element. *See, e.g.*, *Nielsen*, 325 F. Supp. 3d at 123 (concluding that defendants "cannot suffer harm from an injunction that merely ends an unlawful practice" (citation omitted)).

## V.    The Public Interest Favors Doe Corporations' Requested Injunction.

Finally, Doe Corporations' request for preliminary injunctive relief comports with the public interest. Even if the IDB's organizational activities might benefit the public interest in the abstract, its ***unauthorized*** activities—like the sanctions proceedings against Doe Corporations— do not. *See, e.g.*, *League of Women Voters*, 838 F.3d at 12 ("There is generally no public interest in the perpetuation of unlawful agency action."); *Banks v. Booth*, 459 F. Supp. 3d 143, 160 (D.D.C. 2020) (noting the absence of harm where "a court prevents unlawful practices"). And insofar as Doe Corporations seek to assert their rights under the Loan Agreements, "[g]ranting a preliminary injunction is in the public interest because it serves the strong public policy of enforcing valid contracts." *Avon Co. v. Fareva Morton Grove, Inc.*, No. 22 Civ. 4724 (AKH), 2022 WL 2208156, at *9 (S.D.N.Y. June 21, 2022) (granting preliminary injunction in action alleging breach of contract under New York law); *accord, e.g.*, *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 79 (D.D.C. 2001) (granting temporary restraining order and noting that "the court's desire to see the terms of a reasonable contract enforced" "tipp[ed] the public-interest scales to the plaintiff's side").

On the other side of the ledger, granting Doe Corporations' request vindicates basic principles of fairness by relieving them of the conundrum brought about by the Notices while this Court considers their claims. The public also would benefit from this Court's assessment and clarification of the IDB's authority to impose sanctions based on alleged conduct pre-dating the

commencement of a contractual relationship, which will promote the IDB's objectives and forestall any potential chill in investment and development. *See supra* Section I.B.

## <u>CONCLUSION</u>

For the foregoing reasons, Doe Corporations respectfully request that the Court grant their Motion for a Preliminary Injunction.

Dated:  May 8, 2025

Respectfully submitted,

/s/ *Margaret E. Krawiec*
Margaret E. Krawiec (D.C. Bar No. 490066)
Michael A. McIntosh (D.C. Bar No. 1012439)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
1440 New York Ave. NW
Washington, DC 20005
Phone:  (202) 371-7000
Fax:  (202) 393-5760
margaret.krawiec@skadden.com
michael.mcintosh@skadden.com

Ryan D. Junck (*pro hac vice* forthcoming)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM (UK) LLP
22 Bishopsgate
London EC2N 4BQ, United Kingdom
Phone:  +44 20 7519 7000
ryan.junck@skadden.com

*Counsel for Plaintiffs Doe Corporation 1, Doe Corporation 2, Doe Corporation 3, and Doe Corporation 4*